IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| R.E. Goodson Construction Company, Inc. and R.E. Goodson, L.L.C., | ) ) ) | C/A No. 4:02-4184-RBH |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **ORDER** |
| International Paper Company, International Paper Realty Corp., and the United States of America | ) ) ) | |
| Defendants. | ) ) ) | |

Currently before the Court are the following: (1) motion by plaintiffs R.E. Goodson Construction Company, Inc. and R.E. Goodson L.L.C. (jointly, "Goodson") for summary judgment with respect to their claim under the citizen suit provision of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972[1] ("RCRA") [Document 39]; (2) the United States' motion for summary judgment with respect to Goodsons' RCRA claim [Document 48]; (3) motion by Defendants International Paper Company ("IP") and International Paper Realty Corporation ("IPR") for summary judgment as to all claims [Document 45]; (4) the United States' motion for summary judgment as to claims under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601[2] *et seq.* ("CERCLA") [Document 58]; (5) Goodsons' countermotion for summary judgment under CERCLA [Document 65]; and (6) Goodsons' written [Document 64] and International Paper's oral motion for leave to amend their pleadings to add an implied contribution claim under § 107(a) of

---

[1] Also referred to as RCRA § 7002.

[2] Also referred to as CERCLA § 101.

1

CERCLA.

The Court heard oral arguments on these motions June 23, 2005. At the conclusion of oral arguments the Court took the motions under advisement, asked counsel for IP to brief the lease/contractual relationship issue between it and the US, and asked all parties to submit proposed orders.

## Procedural History

On December 16, 2002, the Goodsons commenced this civil action, asserting claims under §§ 107(a) and 113(f) of CERCLA[3] against all defendants, as well as state law claims of equitable

---

[3]        CERCLA was enacted by Congress in 1980 as a result of the realization that abandoned or inactive hazardous waste sites presented great risk to public health and the environment. With the passage of CERCLA, Congress empowered the EPA to identify, investigate and clean up these contaminated sites through governmental and private party initiatives. The federal government may clean up a contaminated site itself under CERCLA § 104 or order responsible parties to conduct the cleanup under CERCLA § 106. In either case, the federal government may recover its response costs, often referred to as cleanup costs, under CERCLA § 107.
        Early in the 1980s, litigation arose over whether a potentially responsible party ("PRP") that had incurred response costs could recover response costs from other PRPs under CERCLA § 107. Congress amended CERCLA in 1986 to create an express cause of action for contribution codified as CERCLA § 113(f)(1). The CERCLA amendments also created a separate express right of contribution under CERCLA § 113(f)(3)(B) for a person who has resolved its liability to the US or a state for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement. *Cooper Industries, Inc. v. Aviall Services, Inc.*, 125 S. Ct. 577 (2004).
        In *Aviall*, the case involved contaminated aircraft engine maintenance sites. Cooper Industries owned the sites until 1981 when it sold them to Aviall Services. Aviall discovered that both it and Cooper Industries contaminated the site with petroleum and other hazardous substances. Aviall and Cooper both conceded they were PRPs under CERCLA. Aviall notified the appropriate state environmental agency for the state of Texas, Aviall began cleanup of the sites under that agency's supervision, and Aviall incurred millions in cleanup costs. However, neither the EPA nor Texas' state environmental agency ever took any administrative or judicial actions to compel the cleanup. Aviall filed an action against Cooper seeking to recover cleanup costs. Its amended complaint was based on a claim for contribution under CERCLA § 113(f). The district court held that Aviall could not pursue a § 113(f) claim because Aviall had not been sued. The Fifth Circuit Court of Appeals reversed, holding that CERCLA § 113(f) allowed a PRP to seek contribution regardless of whether the PRP has been sued for cleanup cost recovery under § 106 or § 107. The U.S. Supreme Court reversed and agreed with Cooper.
        The Supreme Court concluded that CERCLA § 113(f)(1) did not authorize the lawsuit filed by Aviall Services. The Supreme Court focused on the enabling clause of CERCLA § 113(f)(1), which states that a PRP "*may* seek contribution . . . *during or following* any civil action" under CERCLA § 106 or § 107(a). *Aviall*, 125 S. Ct. at 580 (emphasis in opinion). The natural meaning of the enabling clause is that contribution may only be sought "during or following" a civil action under CERCLA § 106 or § 107(a). After reviewing CERCLA § 113 as a whole, the Supreme Court found that CERCLA § 113 provides two avenues for contribution: CERCLA § 113(f)(1) (during or following specified civil actions) and CERCLA § 113(f)(3)(B) (after an administrative or judicially approved settlement that resolves liability to the US or a state).
        The Supreme Court chose not to clarify whether a PRP may bring a cost recovery claim against another PRP under

(continued...)

2

indemnity, negligence, negligent non-disclosure, and strict liability against IP/IPR stemming from a piece of property located in Horry County, South Carolina.[4]  On May 6, 2003, the Goodsons filed an Amended Complaint adding RCRA[5] claims against all defendants.  IP/IPR answered the complaint and filed a counterclaim against the Goodsons and a cross-claim against the US seeking contribution and indemnity for any alleged liability they may have for cleanup costs.[6]  Additionally, the IP defendants filed cross-claims against the US for their cleanup response costs and for injunctive and declaratory relief related to the location of unexploded ordnance on property IPR owns, which is also near and in the vicinity of Goodsons' property.  Both the Goodsons and the IP defendants have unexploded ordnance located on their respective properties.

### Facts

On May 27, 1941, President Roosevelt declared an "Unlimited National Emergency"[7] resulting from events surrounding World War II.  Within months, the US acquired, through lease, fee simple purchase or condemnation, thousands of acres in Georgetown and Horry Counties for use as an air-to-

---

[3](...continued)
CERCLA § 107.  Since CERCLA was amended in 1986, numerous appellate courts, including the Fourth Circuit, have held that a PRP is limited solely to a claim for contribution under CERCLA § 113.  *See Pneumo Abex Corp. v. High Point, T. & D. R. Co.*, 142 F.3d 749, 776 (4th Cir. 1998) (PRP must seek contribution under CERCLA § 113).

     Aviall Services argued that, as an alternative to a contribution action based upon CERCLA § 113(f)(1), it could recover costs under CERCLA § 107(a)(4)(B) even though it is a PRP.  This section allows any person who has incurred costs for cleaning up a hazardous waste site to recover all or a portion of those costs from any other person liable under CERCLA.  The Supreme Court declined to rule on two issues relating to CERCLA § 107, first, whether a PRP has a claim for cost recovery under CERCLA § 107, and second, whether a PRP has an implied right of contribution under CERCLA § 107.

[4] All parties agree that this property is not on the EPA's National Priority list.

[5] In 1976, Congress enacted RCRA as a cradle-to-grave tracking and management system for hazardous waste.  From the moment a source generates a hazardous waste, to its final disposal at a hazardous waste site, RCRA controls the movement and handling of this waste.  More specifically, RCRA regulates the ongoing generation, transportation, storage, treatment, and disposal of hazardous wastes.

[6] No one has sued the Goodsons for response costs under § 107.

[7] Proclamation  2487.

3

ground bombing and gunnery training area.   This area became known as the Conway Bombing and

Gunnery Range ("CBGR").  The CBGR constituted of approximately 55,854 acres between Conway

and Myrtle Beach in Horry County, South Carolina (the "Site").   From 1941 until 1947, the US

conducted bombing and aerial gunnery activities at that location.  This case involves a portion of the

land leased by the US from IP for use as an aerial and gunnery target range.[8]  The original term of the

lease was from January 1, 1942, to June 30, 1942, at an annual rent of $17,837, with a renewal option

given to the government.  The lease was renewed by the US from year to year in accordance with the

lease terms until 1948.

   The Site contained five separate ranges – known as Ranges II, III, IV, VII, and XX – as well as

a moving target range, two turret ranges, a machine gun range, and a rifle range.  These ranges were

used for a variety of bombing and air-to-ground gunnery purposes throughout World War II.   The

property that is the subject of this litigation is at and around Range III, which was comprised of an

Impact Zone and a Safety Zone.  The Impact Zone, a circular area, is where bombers attempted to drop

bombs and fire munitions.  The Impact Zone is encircled by the Safety Zone.  Troops were required to

stay outside the Safety Zone during bombing and gunnery operations.

   Beginning in 1948, the US began to terminate leases and sell the property it had acquired for

the CBGR.[9]  At this time, the US terminated its lease with IP and IP regained possession of the property

---

[8] The property at issue in this case is 392 acres on two parcels presently owned by the Goodsons and approximately 1,090 acres presently owned by IPR.

[9] In its public advertising of the sale of the bombing range property in 1949, the Department of the Army stated: "This property was formerly used as a bombing and gunnery range by the Army and there is a reasonable potential hazard on that account; however, the Department of the Army has certified that it has made a careful visual inspection of the property and that it has been cleared of all dangerous and explosive materials reasonably possible to detect.  The Department of the Army is of the opinion that the area will not require additional dedudding to render it safe for public use."

4

for its continued use.[10]  On January 11, 1950, the War Department issued a Military Acquisition Project Report summarizing the total amount of property acquired for the CBGR, breaking it down by the number of tracts, fees acquired, number purchased, number condemned.  Documents relating to the resale of the property included one entitled, "Declaration of Surplus Real Property," dated June 22, 1948, indicate, among other things, "Dedudding of the installation is in process.  A Certificate of Clearance will be furnished upon completion."

Significant amounts of timber on IP's property had either been cut or rendered unusable.  In 1953, IP filed a claim against the US in the Court of Claims for damages, namely fire and bullet damage, to timber and "improvements" on the land as a result of the US' use of its property.  An agreement was ultimately reached in which the US paid IP $22,879.50 in full settlement of the claim. In 1989, IP conveyed part of its interest in the Site to IPR.  Allen D. Moore, IPR's director of sales and marketing, testified at his deposition that the company knew that a bomb had been found on a nearby tract in 1996, 1997, or 1998.

In the mid-1990s, IPR began to subdivide the property as part of the twelve thousand (12,000) acre planned residence development known as Carolina Forest development, a residential and commercial community adjacent to the rapidly growing area of Myrtle Beach, in Horry County.  This development was adjacent to a substantial road project undertaken by the South Carolina Department of Transportation ("SC DOT"), known as the Carolina Bays Parkway.  In addition, IPR contracted with the Goodsons to install roads in and through the Carolina Forest subdivision.  IPR has built eleven and a half miles of two-lane highway in Carolina Forest.  The main subdivision roadway, Carolina Forest

---

[10] By October 31, 1948, leases on 34,684.6 acres of IP lands were terminated and approximately 15,635.44 acres were transferred to the War Assets Administration for sale to private landowners through a bid process.  After "dedudding" of the installation, the land that had been acquired in fee simple by the government was sold.

Boulevard, which runs along the boundary of Tract 19A,[11] was installed by the Goodsons.  On December 22, 1999, the Goodsons purchased a 367.56-acre portion of the Site from IPR for $2.037 million (Tracts 19A and 19C).  On March 14, 2000, the Goodsons bought an additional 25 acres from IPR for $274,000 (a portion of Tract 19B).[12]  Recent aerial photographs in the record illustrate the large-scale residential development surrounding and approaching the contaminated Site from the north, south, and east.

The US reports that there are approximately one thousand (1,000) military munitions cleanup projects nationwide that are being managed by the US Army Corps of Engineers (the "Corps") as part of its Formerly Used Defense Site ("FUDS") program.  The Department of Defense ("DOD") and the Corps, in coordination with other federal agencies, have established national policies and internal guidance that govern the cleanup of these sites.  The Center of Expertise for Military Munitions in Huntsville, Alabama, provides programmatic oversight for all of the Corps' FUDS military munitions response projects.

In May of 1991, the Corps commenced a Preliminary Assessment/Site Investigation ("PA/SI") of the former CBGR and determined that ordnance and explosives might still be present.  In January 1994, the Corps determined that the former CBGR was eligible as a Defense Environmental Restoration Program--Formerly Used Defense Site ("DERP-FUDS").  *See* 10 U.S.C. § 2701(c).[13]

---

[11] Tract 19A is part of the property at issue in this case.

[12] Before purchasing the property, the Goodsons did not conduct an environmental assessment, nor did it consider conducting one.  The Goodsons and IPR agree that the Goodsons did not ask about these issues before executing the purchase of the property.  The parties also agree that IPR did not disclose to the Goodsons the existence of the unexploded ordnance or the Corps' removal action.

[13] Under 10 U.S.C. § 2701(c)(1)(B), the Secretary of Defense "shall carry out . . . all response actions with respect to releases. . . . from [e]ach facility or site which was under the jurisdiction of the Secretary and owned by, leased to, or

(continued...)

6

In 1995, the Corps completed an archive search report that reviewed numerous sources of documentation and concluded there was the potential for ordnance at Range III, where Goodsons' property is situated. The report also concluded that ordnance was present at other areas of the Site.

In 1999, the Corps hired Parsons Corporation to perform an Engineering Evaluation/Cost Analysis ("EE/CA") at the Site, which confirmed that the impact zone of Target III of the CBGR was located on the property now owned by the plaintiffs. Through physical inspection, geographical instrumented study, and partial clean up, the contractor confirmed that ordnance material remains on the Site, including unexploded ordnance. This comprehensive study characterized the ordnance, analyzed the risk presented by the unexploded ordnance, evaluated the risk management alternatives, and recommended risk reduction alternative actions. The EE/CA report was submitted to the Corps in September 2003.

During its EE/CA Study for the US, Parsons Corporation, through its sub-contractors, tested in late 1999 and early 2000, 2.96 acres of the approximately 425 acres constituting the Target Zone III Impact Zone (also known as Area B). Parsons Corporation found and handled 343 anomalies, including five (5) unexploded ordnance "(UXO)" items (live bombs).

From 2000 to 2002, the Corps funded and performed a Time-Critical Removal Action on about forty (40) acres of Goodsons' property inside the Range III Target Zone to enable the plaintiffs to provide fill dirt required for the construction of the SC DOT Carolina Bays Parkway, Phase I. This work involved the removal of exploded scrap and unexploded ordnance at depths up to twenty-six (26) feet below the land surface. As a result of this action, 2158 items classified as UXO, including a two

---

[13](...continued)

otherwise possessed by the United States at the time of actions leading to contamination." The Corps' investigation and characterization work at the former CBGR is being done under DERP-FUDS authority on behalf of the DOD.

hundred fifty (250) pound bomb, were discovered and removed.  The Corps also provided one (1) year of assistance and guidance to the Goodsons while the company used a sixty-five (65) acre portion of the property as a borrow pit for the construction of the Carolina Bays Parkway.  The borrow pit has since been converted into a large lake on the property.

The EE/CA recommends that the property presently owned by the Goodsons be "cleared to depth."  This means that the Corps will remove earth that is four (4) to six (6) feet below land surface, unless the intended land use requires removal to a greater depth.  The EE/CA also proposes that, after the removal action is completed, the Corps evaluate the effectiveness of the response action every five (5) years.

Since 1993, the Corps has spent more than $6.7 million to investigate and remove munitions at the Site.[14]  The entire cleanup is estimated to cost approximately $25.5 million, including the cost of post-remedial, long-term monitoring through 2040.  Under the current schedule, the Corps' plans for 2006 include field investigations to evaluate potential contamination of the earth.[15]  Based on current funding projections, the principal Site cleanup action is projected to be completed in 2012.

In addition to the Site, the Corps is either presently cleaning up or scheduled to clean up approximately 2,700 additional FUDS across the country, including approximately 1,000 munitions removal projects.  At this time, the Corps has sufficient funding for only those projects that are classified as "high risk"; projects that are classified "medium risk" or "low risk" receive no funding at this time.  Pursuant to congressional mandate, the Corps prioritizes which projects receive the limited

---

[14] This information was provided to the Court by the US in the Declaration of T. Julian Chu, the Team Leader for Policy and Planning in the DERP for the FUDS unit of the Corps.

[15] The Court notes that at the hearing on these motions counsel for the Goodsons and IP indicated that the US has no current right of entry to the property and has requested none.

funding pursuant to a congressionally mandated protocol. *See* 10 U.S.C. § 2710(b). The Site at issue in this case has been classified "high risk" and thus has the highest priority that the Corps can assign to a munitions removal project.

The Court notes that this is not a typical environmental case. There is no toxic substance seeping into the groundwater, leaching into the soil, or being released into the air. Rather, this case involves a substance--unexploded ordnance-- left there by the US from the World War II era when the US operated a defense facility on this Site. The ordnance has not moved nor has the hazardous condition of the ordnance increased; it has decreased as a result of the removal actions by the US.

The US does not dispute that it, *and no other entity*, put the hazardous substance there. There is no question that the US was and is responsible for removing it. In fact, during the late 1940's and early 1950's, the US made affirmative representations to landowners that were either buying the property from the US or were regaining possession of the property after the US's leases were terminated that the property was "dedudded" and safe for use. *See* 1949 Advertisement, fn. 6, *supra*.

In this instance, the property was returned to IP in 1948 when the US terminated its lease. Subsequently, IP conveyed the property in 1989 to its subsidiary, IPR, who, in turn, sold a portion of the property to the Goodsons in 1999 and 2000. As a result, this is an unusual situation in which the party that is clearly responsible for depositing the substance on the Site is known, is in court, and accepts responsibility for the cleanup.

The US says, in its defense, that it has begun the process of cleanup, but the process may take considerable time, given federal budget restraints, and believes that the cleanup on the IPR and Goodson property may not occur until 2012 or later. The US says that the owners must be patient while the US waits for the resources to clean and clear this property of bombs and other explosive devices.

9

Further, the US has advised landowners not to use or disturb the property given the presence of the ordnance; however, the US says that, of course, the owners are free to clean up the ordnance themselves, but at the hearing on these motions the US surprisingly claimed that the federal policy underlying RCRA and CERCLA discourages voluntary cleanup, and that if these landowners are PRPs and undertake that cleanup on their own, they will be precluded by the statutes and the case law, including the Supreme Court's decision in *Cooper Industries, Inc. v. Aviall Services, Inc.*, 125 S. Ct. 577 (2004), from seeking any cost recovery or contribution from the US if the landowners are deemed PRPs. This position by the US appears contrary to previous government policy: "A CERCLA regime which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind." *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845-846 (4th Cir. 1992).

### **Motion to Amend**

The Goodsons and IP/IPR[16] have moved under Federal Rule of Civil Procedure 15(a) to amend their respective pleadings to add a claim for implied right of contribution under CERCLA § 107(a), as an alternative to the full cost recovery they have already pled under that section,[17] following the recent United States Supreme Court decision of *Cooper Industries, Inc. v. Aviall Services, Inc.*, ___ U.S. ___, 125 S.Ct. 577 (2004). The parties acknowledge that pre-*Aviall* such a legal theory was not recognized in this circuit. *See Pneumo Abex Corp. v. High Point T. & D. R. Co.*, 142 F.3d 169 (4th Cir. 1998) (holding that a PRP's claim for contribution can only be brought under CERCLA § 113). They also

---

[16] IP has not filed a written motion to amend; rather, counsel orally moved during the hearing on June 23, 2005. It is presumed that IP is relying on the same arguments made by the Goodsons in their motion papers.

[17] This alternative theory of recovery is sought for use only if the Goodsons and/or IP/IPR are deemed PRPs under CERCLA § 107(a) and, therefore, are not entitled to full cost recovery.

seek to add a common law claim for implied contribution.  The movants argue that this amendment has

been prompted by the recent *Aviall* decision which, they argue, recognized legal theories not previously

accepted in this Circuit.  The Supreme Court in *Aviall* declined to rule on two issues: (a) whether there

is a cause of action for cost recovery, in whole or in part, by a potentially responsible party ("PRP")

under CERCLA § 107(a); and (b) whether a PRP has an implied right of contribution under CERCLA

§ 107(a) and at common law.

The Court agrees with the US that the Goodsons and the IP defendants seek to add a claim

without a basis in the law.  To the extent that they attempt to assert a common law claim for implied

contribution, this Court notes that the right  of  contribution is generally a statutory remedy, not

available at common law.  They state that *Aviall* decision "opens the door" to an implied contribution

claim under CERCLA § 107(a).  However, the Supreme Court specifically declined to address whether

a PRP plaintiff has an implied right to contribution under Section 107.  *Id*. at 586 ("[W]e decline to

decide whether Aviall has an implied right to contribution under § 107.").  By declining to address this

issue, the Supreme Court certainly did not "open the door" to the legal theory upon which Goodsons'

motion is based.  Accordingly, it is this Court's opinion that Goodsons' motion is premised on an

erroneous reading of the *Aviall* decision.[18]

The only court in the Fourth Circuit that has addressed this issue denied a plaintiff's motion to

amend its complaint to add an implied claim of contribution under § 107.  *Mercury Mall Assocs., Inc.*

*v. Nick's Market, Inc.*, 368 F. Supp. 2d 513 (E.D. Va. 2005).  That court concluded: "Until Congress

---

[18]  Goodson goes so far as to read *Aviall* as standing for the proposition that the decision "identified as a possibility" the reversal of well-established Fourth Circuit precedent that potentially responsible parties may not assert claims under § 107 of CERCLA.  As the *Aviall* decision contains no language to this effect, this Court must apply the controlling Fourth Circuit law.  *See Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409, 415 (4th Cir. 1999); *Minyard Enter., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 385 (4th Cir. 1999); *Pneumo Abex Corp.*, 142 F.3d at 776.

explicitly creates one, or until the United States Court of Appeals or the United States Supreme Court unequivocally holds that § 9607(a) implicitly provides for a contribution suit as a matter of *federal* common law, this Court will not unilaterally divine one." *Id*. at 520. Based on this rationale, the district court denied the plaintiff's motion. In this case, the Goodsons and the IP defendants are attempting to amend their pleadings to add the very same claim – one which has not been recognized by the Fourth Circuit or the Supreme Court.

While this Court may agree with the Goodsons and the IP defendants that *Aviall* leaves a void in the contribution mechanism since the enactment of CERCLA § 113(f) in 1986 as part of the Superfund Amendments and Reauthorization Act ("SARA"), this Court will not legislate from the bench.[19] While this Court believes the *Aviall* decision may discourage the "voluntary" cleanup of contaminated properties by private parties, Congress is given the duty to remedy such a situation and any injustice that may occur as a result of the *Aviall* decision.

In denying this motion to amend, the Court finds that the motion to amend was timely filed, it would not be prejudicial to the opposing party, and there has been no bad faith on the part of the moving parties. However, the amendment would be futile. "The law is well-settled that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party or the amendment would be futile." *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999). If an amended complaint could not withstand a motion to dismiss, then the motion to amend should be denied as "futile." *Perkins v. U.S.*, 55 F.3d 910, 917 (4th Cir. 1995). The decision to deny the motion is based solely on the fact that the Fourth Circuit

---

[19] The Goodsons and the IP defendants want the Court to allow amendment of their pleadings, even if the Court subsequently denies relief, in order to preserve the issue for appeal. However, it is this Court's belief that they have adequately preserved their positions for appeal.

does not recognize the causes of action plaintiffs and the IP defendants attempt to now additionally include and proceed under. Had the causes of action that Goodson and the IP defendants seek to now assert had been recognized under the existing law of this Circuit, this Court would have granted their motions to amend. If any party feels that a supplemental order is still required to preserve this issue for appeal, the parties are directed to so inform the Court.

### Summary Judgment Standard

Under Rule 56, FRCP, the moving party bears the burden of showing that summary judgment is proper. Summary Judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rules 56(c), FRCP; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. *Celotex*, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Barber v. Hosp. Corp. of Am.*, 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at trial on the merits."

*Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## CERCLA

Both the Goodsons and IP/IPR have asserted claims based on CERCLA.  The Goodsons seek

recovery of response costs, often referred to as cleanup costs, pursuant to CERCLA § 107(a) and "100%

contribution" from the US and IP/IPR pursuant to CERCLA § 113(f).  IP/IPR seeks to recover response

costs from the US under CERCLA § 107(a) because the US owned or operated the property at the time

of the disposal of the ordnance.  IP/IPR also alleges that it is entitled to "100% contribution" from the

US pursuant to CERCLA § 113(f).

Congress enacted CERCLA in 1980 in response to the serious environmental and health dangers

posed by property contaminated by hazardous substances.  *United States v. Bestfoods*, 524 U.S. 51, 55

(1998).

> CERCLA substantially changed the legal machinery used to enforce environmental
> cleanup efforts and was enacted to fill gaps left in an earlier statute, the Resource
> Conservation and Recovery Act of 1976 ('RCRA') . . . [which had] left inactive sites
> largely unmonitored by the EPA unless they posed an imminent hazard."  CERCLA
> addressed this problem "by establishing a means of controlling and financing both
> governmental and private responses to hazardous releases at abandoned and inactive
> waste disposal sites.  42 U.S.C. § 9607(a), one of CERCLA's key provisions for
> furthering this objective, allows both government and private plaintiffs to recover from
> responsible parties the costs incurred in cleaning up and responding to hazardous
> substances at those sites.

*Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.*, 748 F. Supp. 373, 381 (E.D. N.C.

1990) (internal quotations and citations omitted).  CERCLA, as amended in 1986 by SARA, Pub. L.

No. 99-99, 100 Stat. 1613, "grants the President broad power to command government agencies and

private parties to clean up hazardous waste sites."  *Key Tronic Corp. v. United States*, 511 U.S. 809,

814 (1994).  It "both provides a mechanism for cleaning up hazardous waste sites, and imposes the

14

costs of the cleanup on those responsible for the contamination." *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7 (1989) (citations omitted); *see also Pneumo Abex Corp.*, 142 F.3d at 774. The two primary goals of CERCLA have been recognized as (1) the promotion of prompt and effective cleanup of hazardous waste sites and (2) the sharing of financial responsibility among the "parties who created the hazards." *South Carolina Department of Health and Environmental Control v. Commerce and Industry Ins. Co.*, 372 F.3d 245, 251 (4th Cir. 2004).

The US has moved for summary judgment with respect to all claims asserted against it under CERCLA. The US first argues that neither plaintiffs nor the IP defendants may bring a cost-recovery claim under § 107(a)(4)(B) because those parties are themselves liable for contamination at the Site (i.e., plaintiffs who are PRPs cannot recover under § 107). Second, the US argues that the § 113 contribution actions are barred by the Supreme Court's decision in *Cooper Industries, Inc. v. Aviall Services, Inc.*, *supra*. under the facts of the instant case.

Plaintiffs filed a corresponding countermotion for summary judgment seeking this Court's ruling, as a matter of law, that it is entitled to seek cost recovery under § 107(a)(4)(B). Specifically, the Goodsons assert that they enjoy the protection of the third party defense provided by CERCLA §107(b)(3) and the innocent purchaser defense under CERCLA §101(35)(A)(i). In their summary judgment motion, the IP defendants assert that they are entitled to the CERCLA third party defense and the Act of War defense.

**Standing to Sue Under § 107**

CERCLA § 107(a)(4) authorizes the US, as well as other entities and persons, to seek recovery of appropriate response costs or cleanup costs through a cost recovery suit against four categories of

covered persons, referred to as "potentially responsible parties" or PRPs.[20]  The four categories of PRPs are: (1) owners and operators of facilities at which hazardous substances are located; (2) persons who owned or operated any facility at the time hazardous substances were disposed of; (3) persons who arranged for disposal or treatment of hazardous substances; and (4) certain transporters of hazardous substances to the site.  42 U.S.C. § 9607(a)(1)-(4).[21]  To state a claim under § 107(a), a plaintiff must allege that: (1) the defendant is a covered person within the meaning of the CERCLA; (2) a release or threatened release of a hazardous substance from the site in question has occurred; (3) the release or threatened release caused the plaintiff to incur costs; (4) plaintiff's costs were "necessary" for the response; and (5) plaintiff's actions were consistent with the National Contingency Plan.  *Channel Master*, 748 F. Supp. at 381.

---

[20] The four categories of covered persons under the statute reach back through the causal chain from those who disposed of a hazardous substance to those who transport and generate it.  "Because the Act imposes strict liability, plaintiffs generally need not prove causation, only that the defendant is a 'covered person.'"  *Pneumo Abex Corp.*, 142 F.3d at 774.

[21] 42 U.S.C. § 9607(a) provides:
   Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-
   (1) the owner and operator of a vessel or a facility,
   (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
   (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
   (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
     (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
     (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
     (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
     (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

A party can escape liability for response costs only if it qualifies for one of the enumerated defenses in § 107(b)[22] or an exclusion from liability, *see* §§ 107(n), (q), (r).  If a party cannot avail itself of one of the enumerated defenses or exclusions to liability, § 107(a)(4)(A) specifically provides that the US, individual States, and Indian tribes are entitled to recover from PRPs "all costs of removal or remedial action incurred" that are "not inconsistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(A).  Additionally, § 107(a)(4)(B) provides that PRPs "shall be liable for [] any other necessary costs of response incurred by any other person consistent with the national contingency plan."  42 U.S.C.  § 9607(a)(4)(B).  The Fourth Circuit has concluded that a PRP, as opposed to a non-responsible party, cannot rely on § 107(a) to seek cost recovery from another responsible party, but rather must seek contribution pursuant to § 113.    *Axel Johnson*, 191 F.3d at 415; *see also Pneumo Abex Corp.*, 142 F.3d 169.

CERCLA is a strict liability statute with few defenses.  It envisions that sometimes the cleanup must be paid for by those least responsible because those who are most responsible lack funds or cannot be found.  *Lincoln Properties Ltd. v. Higgins*, 823 F. Supp. 1528, 1537 (E.D. Cal. 1992).  Under §

---

[22] A person who can successful establish a defense under § 107(b) is **not** a PRP.  *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1120 (3rd Cir. 1997).  Section 107(b) provides:
> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by--
> (1) an act of God;
> (2) an act of war;
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
> (4) any combination of the foregoing paragraphs.

107(b), there are three affirmative defenses available to those otherwise liable under § 107(a): the defense of an Act of God, an Act of War, and a third party defense. PRPs can avail themselves of one of the three extremely limited statutory defense. 42 U.S.C. § 9607(b). These defenses are available when releases of hazardous substances are caused exclusively by (1) acts of war, (2) acts of God, or (3) acts of unrelated third parties with whom a PRP has no direct or indirect contractual relationship, and where the PRP exercises due care with respect to any hazardous substances. The third party defense has a variant known as the "innocent landowner" defense. In essence, to be an "innocent landowner." one must undertake at the time of acquisition "all appropriate inquiry . . . consistent with good commercial or customary practice in an effort to minimize liability" and not know or have reason to know of any hazardous substance released or threatened to be released. The experience of the owner and the purchase price are relevant to the elements of this requirement. *See* 42 U.S.C. § 9601(35)(A) which defines "contractual relationship" for purposes of § 9607(b)(3) which is the third party defense statute.

In this case, the Goodsons have raised the innocent purchaser[23] defense, both the Goodsons and the IP defendants have raised the third party defense, § 107(b)(3), and the IP defendants have asserted the Act of War defense, § 107(b)(2).

Although it was not specifically raised in the parties' motions for summary judgment or at oral arguments, it has come to this Court's attention through the proposed orders presented that § 101(35) was amended in 2002 by the Small Business Relief and Brownfields Revitalization Act. *See* Pub. L. 107-118, 115 Stat. 2356 (2001). This amendment is of particular concern to this case because the amended version of the section, defining "contractual relationship," altered the innocent landowner

---

[23] Also referred to as the "innocent landowner" defense.

defense or the third party defense.  The current definition of contractual relationship provides:

(A) The term "contractual relationship", for the purpose of section 9607(b)(3) of this title, includes, but is not limited to, land contracts, deeds, easements, leases, or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:

  (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know   that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or   at the facility.

  (ii) The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.

           (iii) The defendant acquired the facility by inheritance or bequest.
           In addition to establishing the foregoing, the defendant must establish
           that the defendant has satisfied the requirements of section 9607(b)(3)(a)
           and (b) of this title, provides full cooperation, assistance, and facility
           access to the persons that are authorized to conduct response actions at
           the facility (including the cooperation and access necessary for the
           installation, integrity, operation, and maintenance of any   complete or
           partial response action at the facility), is in compliance with any land use
           restrictions established or relied on in connection with the response
           action at a facility, and does not impede the effectiveness or integrity of
           any institutional control employed at the facility in connection with a
           response action.
(B) Reason to know
  (i) All appropriate inquiries
   To establish that the defendant had no reason to know of the matter described in subparagraph (A)(i),     the defendant must demonstrate to a court that--
           (I) on or before the date on which the defendant acquired the facility, the
           defendant carried out all appropriate inquiries, as provided in clauses (ii) and
           (iv), into the previous ownership and uses of the facility in accordance with
           generally accepted good commercial and customary standards and practices; and
           (II) the defendant took reasonable steps to--
             (aa) stop any continuing release;
             (bb) prevent any threatened future release; and
             (cc) prevent or limit any human, environmental, or natural resource exposure
   to any previously released hazardous substance.
  (ii) Standards and practices
   Not later than 2 years after January 11, 2002, the Administrator shall by regulation establish standards and practices for the purpose of satisfying the requirement to carry

19

out all appropriate inquiries under clause (I).
  (iii) Criteria
  In promulgating regulations that establish the standards and practices referred to in clause (ii), the Administrator shall include each of the following:

    (I) The results of an inquiry by an environmental professional.

    (II) Interviews with past and present owners, operators, and occupants of the facility for the purpose of gathering information regarding the potential for contamination at the facility.

    (III) Reviews of historical sources, such as chain of title documents, aerial photographs, building department records, and land use records, to determine previous uses and occupancies of the real property since the property was first developed.

    (IV) Searches for recorded environmental cleanup liens against the facility that are filed under Federal, State, or local law.

    (V) Reviews of Federal, State, and local government records, waste disposal records, underground storage tank records, and hazardous waste handling, generation, treatment, disposal, and spill records, concerning contamination at or near the facility.

    (VI) Visual inspections of the facility and of adjoining properties.

    (VII) Specialized knowledge or experience on the part of the defendant.

    (VIII) The relationship of the purchase price to the value of the property, if the property was not contaminated.

    (IX) Commonly known or reasonably ascertainable information about the property.

    (X) The degree of obviousness of the presence or likely presence of contamination at the property, and the ability to detect the contamination by appropriate investigation.
  (iv) Interim standards and practices
(I) Property purchased before May 31, 1997
With respect to property purchased before May 31, 1997, in making a determination with respect to a defendant described in clause (i), a court shall take into account--
(aa) any specialized knowledge or experience on the part of the defendant;
(bb) the relationship of the purchase price to the value of the property, if the property was not contaminated;
(cc) commonly known or reasonably ascertainable information about the property;
(dd) the obviousness of the presence or likely presence of contamination at the property; and
(ee) the ability of the defendant to detect the contamination by appropriate inspection.
(II) Property purchased on or after May 31, 1997
With respect to property purchased on or after May 31, 1997, and until the Administrator promulgates the regulations described in clause (ii), the procedures of the American Society for Testing and Materials, including the document known as 'Standard E1527-97', entitled 'Standard Practice for Environmental Site Assessment: Phase 1 Environmental Site Assessment Process', shall satisfy the requirements in clause (I).
(v) Site inspection and title search
In the case of property for residential use or other similar use purchased by a nongovernmental

or noncommercial entity, a facility inspection and title search that reveal no basis for further investigation shall be considered to satisfy the requirements of this subparagraph.

42 U.S.C. § 9601(35).  The pre-Brownfields Amendments definition of "contractual relationship" was:

(A) The term "contractual relationship", for the purpose of section 9607(b)(3) of this title includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendants after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:

   (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

   (ii) The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.

   (iii) The defendant acquired the facility by inheritance or bequest.
In addition to establishing the foregoing, the defendant must establish that he has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title.
(B) To establish that the defendant had no reason to know, as provided in clause (I) of subparagraph (A) of this paragraph, the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

42 U.S.C. § 9601(35).

As summarized by our sister court:

The Act altered the innocent landowner defense in four important ways. First, a landowner now must show that it has provided "full cooperation, assistance, and facility access to the persons that are authorized to conduct response actions at the facility," which includes permitting access to the facility for installing, operating and maintaining remediation systems.  42 U.S.C. § 9601(35)(A).  Second, the Act changed the "all appropriate inquiry" standard from one that must be "consistent with good commercial or customary practice" to one that must be "in accordance with generally accepted good

commercial and customary standards and practices." 42 U.S.C. § 9601(35)(B)(i)(I). Third, the Act established extensive criteria for the EPA to include in regulations for determining whether a landowner sufficiently has made "all appropriate inquiries." *See* 42 U.S.C. § 9601(35)(B)(iii). Fourth, a landowner now must demonstrate that it "took reasonable steps" to stop any continuing release, prevent any threatened future release, and prevent or limit exposure to any previously released hazardous substance. 42 U.S.C. § 9601(35)(B)(i)(II)(aa)-(cc).

*1325 "G" Street Associates, LP v. Rockwood Pigments NA, Inc.*, 2004 WL 2191709, *9 (D. Md. 2004) (unpublished) (refusing to apply the Brownfields Amendments retroactively).

This Court is faced with which version of the definition of "contractual relationship" to apply to the instant case. The Goodsons bought the property at issue in 1999 and 2000, before the Brownfields Amendments. There is a "traditional presumption" against retroactive legislation because of "the unfairness of imposing new burdens on persons after the fact." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 270, 280 (1994).

When a pending case involves a federal statute enacted after the underlying events in the lawsuit, as here, the Court first must "determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf,* 511 U.S. at 280. If the statute contains no such directive on its "temporal reach," *Martin v. Hadix,* 527 U.S. 343, 352 (1999), the Court then must determine "whether the new statute would have retroactive effect." *Landgraf,* 511 U.S. at 280. The test of whether a statute operates retroactively is "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269-70. Where such a retroactive operation would result, the presumption against retroactivity instructs that the new statute "does not govern absent clear congressional intent favoring such a result." *Id.* at 280. *See also Tasios v. Reno,* 204 F.3d 544, 549 (4th Cir. 2000) (absent such intent, "presumption against statutory retroactivity is not rebutted").

Nothing in the Brownfields Amendments "evidences a clear intent by Congress that [they] be

applied retroactively" to the innocent landowner or third party defenses, "and no one suggests otherwise." *Hughes Aircraft Co.,* 520 U.S. at 946. As plaintiffs aptly point out, the significant events in this case occurred when the initial definition of "contractual relationship" was in place and long before the Brownfields Amendments took effect in 2002: plaintiffs purchased the property at issue from IPR in 1999 and 2000.

The Brownfields Amendments impose additional substantive requirements for use of the innocent landowner and third party defenses. They unquestionably attach "new legal consequences" to events that occurred before their enactment by "alter[ing] the legal standards that are applied in reviewing the merits of [plaintiff's] claims." *Khattak v. Ashcroft,* 332 F.3d 250, 253 (4th Cir. 2003) Prior to 2002, a party asserting the innocent landowner defense had to satisfy the initial "all appropriate inquiry" standard, discussed *supra.* If applied here, "the legal effect" of the Brownfields Amendments "would be to deprive [plaintiff] of that defense," which was in effect at the time the Goodsons purchased the property from IPR. *See Hughes Aircraft Co.,* 520 U.S. at 951-52; *see also 1325 "G" Street Associates*, 2004 WL 2191709. Standards which the Court must apply to the analysis of a site owner's conduct for purposes of determining applicability of the CERCLA innocent landowner defense must be those which were in effect at the time of the purchase of the land. *HRW Systems, Inc. v. Washington Gas & Light*, 823 F. Supp. 318 (D. Md. 1993). "Any other finding would hold landowners to the impossibly high standard of complying with current perceptions of appropriateness in an area where perceptions change quickly." *Id.* at 348. Accordingly, the pre-Brownfields definition of "contractual relationship" is the appropriate standard to apply in this case, and the Court will evaluate plaintiffs' claimed defense under that standard since that is the standard that existed at the time of Goodson's purchase.

23

**Third Party Defense**

The plaintiffs, present owners of the property at issue, and the IP defendants, previous owners of the property, are seeking cost recovery under § 107(a)(4)(B) based upon this third party defense.[24] The third party defense provides that an otherwise liable party can escape liability under § 107(a) of CERCLA only if it can establish by a preponderance of the evidence that it satisfies all of the requirements set forth in § 107(b)(3):

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by —
>
> *          *          *
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . ., if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . . .

---

[24] The plaintiffs use both the terms third party defense and innocent purchaser/landowner defense. The Fourth Circuit has used these terms interchangeably to refer to the third party defense. *See Westfarm Assocs. Limited Partnership v. Washington Suburban Sanitary Commission*, 66 F.3d 669, 682 (4th Cir. 1995). The Fourth Circuit has also stated that to satisfy any innocent purchaser/landowner defense, a party must be able to satisfy the statutory elements of the third party defense:

> Only a few circuits have recognized an "innocent party" exception of this kind, and all but one of those have done so in dicta, rejecting the applicability of any exception on the facts before them.
> Whether Congress intended or contemplated this kind of treatment for "innocent" but "potentially responsible" parties is not at all clear. Congress enacted CERCLA "to protect public health and the environment from inactive hazardous waste sites." Because CERCLA is "a comprehensive remedial statutory scheme, ... courts must construe its provisions liberally to avoid frustrating the legislature's purpose." The rule that potentially responsible persons cannot sue under § 107 protects the strict liability scheme created by the statute, and thus any exceptions to that rule should be narrow ones. If an "innocent party" exception is even possible, a question we need not decide here, it would therefore seem prudent to limit its applicability to those who can make out one of the defenses to liability that § 107 itself provides. We note that some of the courts that recognize the possibility of an "innocent party" exception have defined it in precisely this way.

*Axel Johnson*, 191 F.3d at 416.

42 U.S.C. § 9607(b)(3).[25]  The elements of a third party defense are: (1) that another party was the "sole cause" of the release of hazardous substances and any resulting damages; (2) that the other, responsible party did not cause the release in connection with a contractual, employment, or agency relationship with the defendant; and (3) that the defendant exercised due care and guarded against the foreseeable acts or omissions of the responsible party.  *Westfarm Assocs. Limited Partnership v. Washington Suburban Sanitary Commission*, 66 F.3d 669, 682 (4th Cir. 1995).

Another Party was the "Sole Cause" of the Release

There is no dispute in this case that the US was the "sole cause" of the release of the ordnance onto the property.  Instead, the US challenges whether the Goodsons and the IP defendants can satisfy the other two elements of the defense.

Contractual Relationship

The US contends that IP and the US had a "contractual relationship."  Persons in a direct or indirect contractual relationship with a PRP, where the polluting act or omission of the third party occurs in connection with that contractual relationship, are excluded from the third party defense.  *See Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d. 85 (2d Cir. 1992) ("[A] landowner is precluded from raising the third-party defense only if the contract between the landowner and the third party is somehow connected with the handling of hazardous substances.").

IP entered into a lease with the US at the end of 1941 at the outset of World War II.  The US argues that this lease is a "contractual relationship" that disqualifies IP from claiming the third party defense.  On December 31, 1941, IP and the US of America entered into a lease amounting to 35,674

---

[25] Although the statute speaks here of the "defendant," this analysis is applicable to the Goodson plaintiffs in this case, as well as the IP defendants.

acres at an annual rental of $17,837.00 for use by the government as an aerial and gunnery target range.

This amounts to approximately two dollars ($2.00) an acre on an annual basis.  The lease was renewed

by the government from year to year, at their sole discretion, until October 31, 1948, when the lease was

terminated and possession of the premises was surrendered to IP.  The lease contained a provision at

paragraph five (5) that:

> This lease may, at the option of the Government, be renewed from year to year at a
> rental of Seventeen thousand eight hundred thirty seven and no/100 ($17,837.00)
> Dollars per annum and otherwise upon the terms and conditions herein specified,
> provided notice be given in writing to the Lessor at least thirty days before this lease or
> any renewal thereof would otherwise expire:  Provided that no renewal thereof shall
> extend the period of occupancy of the premises beyond the six months beyond the end
> of the present unlimited National Emergency.

IP claims that its lease with the United States was not a voluntary contractual relationship as

contemplated by CERCLA.  It argues that, had it not leased the property to the US, it would have been

condemned for the war efforts.  This Court acknowledges that while CERCLA § 9601(35) defines

contractual relationship to include leases, the leasing of the property owned by IP to the US, in this

particular instance, for its inclusion in the CBGR may not have been a normal, arm's length lease

transaction, because it was the assembly of property by the US for the construction of a military training

facility brought on by the events of World War II.  It is possible that that the US would have acquired

this property one way or the other.  The lease arrangement between the US and IP may have been driven

more by the Fifth Amendment than market forces.  Further, the lease does not concern the bombing

which resulted in the contamination at instance, but rather involves solely the lease of land.

Additionally, other courts have held that a party opposing an assertion of the third party defense "must

show 'something more than a mere contractual relationship.'"  *Lincoln Properties Ltd.*, 823 F. Supp.

26

at 1543 (*quoting Westwood Pharmaceuticals*, 964 F.2d at 89.)[26]  This Court finds that there exists a genuine issue of material fact precluding the issuance of summary judgment on this matter.[27]

"Contractual relationship" is defined by CERCLA, *see* 42 U.S.C. § 9601(35), and specifically includes deeds and leases: "[t]he term 'contractual relationship' . . . includes, but is not limited to, land contracts, deeds, easements, leases or other instruments transferring title or possession."  In this case, it is undisputed that the Goodson plaintiffs had a contract to purchase with IPR followed by deeds, but that the relationship was not connected to any act of contamination or the handling of any hazardous substance.

There is no "contractual relationship" for the purpose of CERCLA if a party can prove by a preponderance of the evidence that: (1) it acquired the property after disposal of the hazardous substances at issue and (2) at the time it acquired the property, it "did not know and had no reason to know" that the hazardous substances were "disposed of on, in, or at" the property.  42 U.S.C. § 9601(35)(A)(i).

The US argues that the Goodsons have an indirect relationship with the US because they "purchased portions of the former bombing range and, therefore is in the chain of title."  Goodson argues that except for their being in the chain of title, there is no evidence that they had any sort of

---

[26] This Court points out that even if the IP defendants and/or the Goodsons can establish that they had no contractual relationship in connection with the ordnance on the site, they still must satisfy the third element of the third party defense.

[27] This Court recognizes that with regard to the contractual relationship element, the analysis for IPR may be different from that of IP.  However, some knowledge of IP may be imputable to IPR.  At this point, there is a question of fact as to what, if any, knowledge may be imputable to IPR.  Even if IP and IPR are treated as completely separate and distinct entities, there is a question of what IPR knew or should have known at the time it acquired the property. *See* discussion with regard to the Goodsons below.

contractual relationship whatsoever with the US.  Furthermore, given that the last release[28] in the instant

case happened more than fifty (50) years before Goodsons' purchase of the property from IPR and that

any contractual relationship was not "in connection with" any hazardous substance, there was obviously

nothing the Goodsons could have done to prevent the actions leading to a release.

With regard to any contractual relationship that the Goodsons had with IPR, the question is what

the Goodsons knew, or had reason to know, at the time they purchased the property.  *See* §

9601(35)(A)(i).  The Goodsons claim they had no reason to know of any ordnance on the property.  The

US contends that the Goodsons inadequately investigated the contamination problem before buying the

property despite being aware that a bomb had been found near the property line and that there were

concrete pillars–the remains of former bombing range observation towers–still standing on the property,

and took no affirmative steps after purchasing the property to contain, control, or clean up the ordnance.

The US argues that:

> To qualify as an "innocent owner," Goodson must prove by a preponderance of the
> evidence, among other things, that at the time it acquired the property, it "had no reason
> to know" of the munitions, meaning that it inquired into the previous uses of the facility
> in accordance with customary standards and practices.  42 U.S.C. § 101(35)(B)(i)(I).
> Those standards and practices require, for property purchases on or after May 31,
> 1997–at the very minimum–that an *environmental site assessment* be conducted in
> accordance with the procedures set forth by the American Society for Testing and
> Materials.  40 C.F.R. § 312.2.

(emphasis in original).[29]  The US submits that the plaintiffs are a sophisticated construction company

"with intimate knowledge of the Horry County area" and were represented by counsel.  At best, it

argues, plaintiffs were negligent in failing to make an inquiry to IPR as to any environmental hazards

---

[28] "Release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  42 U.S.C. § 9601(22).

[29] This argument is made under the new, amended definition of contractual relationship, which was not in effect when the Goodson's purchased the property in 1999 and 2000.

or to conduct any environmental studies prior to purchasing the Site.  The US argues that, at worst, the plaintiffs knew of the risk and willfully ignored it.

IPR alleges that "though a title search was apparently conducted, the search did not discover that the United States leased the property for a bombing range."  Plaintiffs explain that no lease was found during the title search because the lease between IP and the US is not recorded in the Horry County Clerk of Court's Office.  Additionally, neither the 1949 public advertisement nor the Right of Entry granted by IPR to the Corps on March 17, 1999, are recorded.  No party has presented this Court with evidence that any of these documents were filed and, therefore, susceptible to being discovered through a title search.

At the time plaintiffs purchased the property, it was aware that Horry County had approved residential development of Carolina Forest, including the land purchased by the plaintiffs, under a Development Ordinance.  The Agreement of Sale between IPR and the plaintiffs do not reference IP's lease to the US, the 1949 public advertisement, or the 1999 Right of Entry, despite the referencing of other exceptions in the Agreement of Sale.

The land purchased by the plaintiffs was timberland that they describe as "remote."  Before 1990, the land in question was three or four miles from a paved road and could only be reached by dirt roads.  It is not disputed that the property had no commercial or residential development.  Since the 1970s, the timber on the land was cut only once, with the exception of the "wet areas" where the timber was not cut.

The plaintiffs began working on the construction of several roads in the Carolina Forest Development beginning in 1996 or 1997.  IPR also consulted with the plaintiffs about building a golf course in Carolina Forest on a tract immediately adjacent to the tract later purchased by the plaintiffs.

Plaintiffs state that they spent years working on and observing the development of Carolina Forest without any bomb incidents except for the discovery of a bomb during the construction of Carolina Forest Drive.[30]   There are allegations that concrete pillars, once part of the bombing range, were observed still standing on the property.  In James Goodson's deposition he did testify that he observed pillars on the right of way of the road they were building, somewhere between Socastee Swamp and the first curve.  However, contrary to the assertions by the US and/or the IP defendants, plaintiffs assert they did not know what the pillars had been used for or that greater inquiry was warranted.  Plaintiffs argue that its activities and sources of information did nothing to put them on notice of specific target zones.

For the reasons discussed above, it is clear to this Court that the Goodsons purchased the property after the placement of ordnance on it.  However, there remains a question of fact as to what the Goodsons knew or should have known regarding ordnance on the property.  The Court cannot, at this time, conclude that the Goodsons are an innocent purchaser entitled to the third party defense.

Due Care

The third element of the third party defense is whether the party asserting the defense "exercised due care with respect to the hazardous substance concerned . . . in the light of all relevant facts and

---

[30]      In 1997, in the course of constructing Carolina Forest Boulevard, plaintiffs came across unexploded ordnance in the right-of-way adjacent to Tract 19A.  Plaintiffs reported this finding to the Horry County Sheriff's Department as well as to IPR.  Ronald A. Goodson, a principal of the R.E. Goodson Construction Company, was on-site at the time the bomb was found and when law enforcement arrived to detonate the bomb.

Alan Moore, Project Manager at Carolina Forest and a representative of IPR, submits that he told Ronald Goodson, at the time the ordnance was discovered, that this area had been an "old bombing range."  Ronald Goodson testified at his deposition that after the bomb was found he inquired to Moore and was told that work by his employees in the construction of Carolina Forest Boulevard could safely continue.

IP/IPR also submit that James Goodson testified that he uncovered a 2.5 inch rocket warhead when he was working on the nearby Myrtle Beach Golf Course in the 1970s.  However, plaintiffs contend that, in his deposition, James Goodson testified that he observed a 2.5 inch rocket with a dummy warhead when someone brought it into a shop in Aynor where he worked in the 1970s.  Additionally, plaintiffs point out that the Myrtle Beach Golf Course is approximately four (4) miles from the tract at issue in the instant case and was developed almost thirty (30) years before the Goodsons purchased the property.

circumstances" within the meaning of § 9607(b)(3). This requirement is not defined in the statute. CERCLA's legislative history, however, provides some guidance: "[T]he defendant must demonstrate that he took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." H.R. Rep. No. 1016, 96th Con., 2d Sess., pt. 1, at 34 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6137. Depending on the nature of the hazardous waste and other circumstances, the due care requirement of third party/ innocent purchaser affirmative defense to CERCLA liability would include those steps necessary to protect public health or environmental threat. *Idylwoods Assoc. v. Mader Capital, Inc.*, 956 F. Supp. 410 (W.D. N.Y. 1997). Additionally, "due care 'would include those steps necessary to protect the public from a health or environmental threat.'" *U.S. v. A&N Cleaners & Launderers, Inc.*, 854 F. Supp. 229, 238 (S.D. N.Y. 1994) (*quoting* H.R. Rep. No. 253, 99th Cong., 2d Sess. 187 (1986) U.S. Code Cong. & Admin. News 1986, 2835); *see also Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 & n. 3 (7th Cir. 1994) (due care not established when **no** affirmative measures taken to control site); *Lincoln Properties*, 823 F. Supp. at 1543-44 (due care exercised where defendant removed contaminated wells).

Under the due care requirement, a party must show that it took the necessary steps to prevent foreseeable adverse consequences arising from the pollution on the site. *Kerr-McGee, supra*. In other words, a party must show that it exercised due care with regard to the ordnance "in light of all relevant facts and circumstances" and that it took "precautions" against the "foreseeable acts or omissions" of third parties and the consequences that could foreseeably result. 42 U.S.C. § 9607(b)(3). Other courts considering the issue have found that "no care" can never be considered "due care." *See U.S. v. DiaBiase Salem Realty Trust*, 1993 WL 729662 (D. Mass. 1993) (unpublished).

The US argues that IP/IPR did not exercise due care or take any precautions relative to the contamination on the Site.  The US argues that IP/IPR has been aware that ordnance from the former bombing range has been on the Site since the termination of its lease with the US in 1948.  The argument is based on the following deposition testimony:

- Greg Hardee, an IP forest technician since 1973, found two (2) rockets on the Site in 1974 at the intersection of Cyprus Bay Road and Target Road.

- At the same location, Hardee also saw four-foot bombs, some rockets, and barrels that were "shot up."  He did not report this information to anyone.

- In the 1980s, Hardee found "a good many" bombs, more than ten (10), while digging a ditch between Target Road and Doug Trail.  He also found large circular holes in the ground, at least twelve (12) or fifteen (15) feet deep, in the Carolina Forest area at Cyprus Bay Road and Target Road.

- Larry Canada, an IP technician and supervisor since 1966, testified that there were "shells and stuff all over" the Site, and the company assigned somebody to take a metal detector and do a strafing on the timber to make sure there was not metal in it.

- During a "site prep burning" on Cyprus Bay Road, Canada heard an explosion and "a big noise that sounded like heavy thunder and it kind of jarred the ground a little bit." Canada did not report the incident or take any other action.

- Canada has seen, in the course of his work, 50-caliber bullets and shells in the north end of the Site as well as large holes (as large as twenty-five (25) to thirty (30) feet across) in the ground at the Site, including at the intersection of Target Road and Cyprus Bay Road.

- According to Allen Moore, IP's Project Manager for Carolina Forest from 1994 to 2001, the company was aware that a bomb had been found on Tract 22 on the Carolina Forest property in 1996, 1997, or 1998.

- In 1997, Moore became aware that the Corps had retained a contractor to conduct an environmental study at the Site, with a focus on identifying unexploded ordnance.

The US argues that IP/IPR took no action whatsoever to address the problem or investigate the extent of ordnance on the property.  Instead, it chose to rely on the Corps to enter the Site and address the

32

environmental damage.  The US submits that IP/IPR has done nothing to investigate or clean up the ordnance on the property and never disclosed to the Goodsons the true extent of its knowledge of the potential damage presented by the ordnance before agreeing to sell the property to the Goodsons.

Plaintiffs argue that IP/IPR failed to exercise due care because it cleared the underbrush to access and use its timber.  Plaintiffs argue that these actions could have disturbed unexploded ordnance ("OE"), causing a release of hazardous substances.  Plaintiffs additionally allege that IP failed to exercise due care by continuing its everyday operations from 1948 to present "of clearing underbrush and using the timber on its property without regard to any potential OE."  Plaintiffs state that IPR sold the Site to them without any warning as to potential OE, taking no precautions against the foreseeable acts and consequences of the Goodsons using the property.  The Goodsons argue that, at the very least, there are genuine issues of material fact with respect to IP/IPR's involvement in causing a release at the Site making summary judgment inappropriate.

When IP received the property back from the US in 1948, the US cleaned the Site and certified to IP, as well as the current and former owners of other tracts and potential purchasers of the property then under US ownership, that the US

> has made a careful visual inspection of the property and that it has been cleared of all dangerous and explosive materials reasonably possible to detect.  The Department of the Army is of the opinion that the area will no require additional dedudding to render it safe for public use.

There have been no allegations that additional ordnance was released on the Site after it was turned over to IP in 1948.

This Court cannot fault IP for wishing to rely on this certification of clearance and safety from the US.  While IP may be able to rely on the representations by the US to some extent, the Court

33

believes that a question of fact exists as to whether IP used due care.

The US and the IP defendants argue the Goodsons did not act with due care with regard to the OE on the Site.  The pertinent language of § 9607(b)(3) focuses the "due care" inquiry upon "all relevant facts and circumstances" of the case at hand.  The Goodsons assert that they did not know that there was OE on the Site at the time it purchased the property at issue.

The US argues that, after discovery of a bomb on the Site after purchasing the property, the plaintiffs ignored the Corps' warnings to cease work on the property because of safety concerns.  The US states that instead of ceasing work, the Goodsons began collecting dirt from another portion of the Site, only ceasing work after magnetometer readings in the area led it to believe that there might be threats to workers' safety.  The US argues that this evidences lack of due care on the part of the plaintiffs after they purchased the property.

"[T]he due care requirement arises only upon discovery of the hazardous substances or knowledge of such possible pollution, as CERCLA 'clearly does not contemplate a party taking due care and precautions *prior to*' these occurrences."  *1325 "G" Street Associates*, 2004 WL 2191709 (emphasis in original).  The Goodson plaintiffs assert that they were appropriately diligent and cooperated *after* they discovered bombs on the property.  Plaintiffs immediately contacted the County and the Corps.  They assert that they have gated and posted the property and inspect it regularly.  Plaintiffs also state that they have, with partial success, attempted to obtain the assistance and expertise of the U.S. to clear the ordnance from property.  The Court finds that there is a question of fact as to what steps plaintiffs have taken and whether those steps constitute due care as contemplated by CERCLA.

In this case, the Goodsons have asserted § 107 cleanup or response costs claims against the IP

defendants and the US and the IP defendants have asserted a § 107 cleanup or response costs claim against the US. This Court finds that there is a genuine question of material fact as to whether either the Goodsons or the IP defendants qualify for the third party defense and, therefore, whether they are PRPs. Accordingly, neither the Goodson plaintiffs not the IP defendants are entitled to summary judgment on the third party defense issue. Likewise, the US's motion for summary judgment as to the CERCLA § 107 claims against it is denied as their remain genuine questions of material fact as to whether the Goodsons or the IP defendants are entitled to the third party defense.

**Act of War**

IP also contends that it is not liable under § 107(a) of CERCLA because the "release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by . . . an act of war." 42 U.S.C. § 9607(b)(2). CERCLA does not define "act of war" and there are few cases discussing the defense.

In *United States v. Shell Oil Company*, 294 F.3d 1045 (9th Cir. 2002), the Ninth Circuit carefully traced the act of war defense provided by CERCLA and determined that it was to be narrowly construed consistent with the expansive liability and remedial purpose of the statute. That court expressly rejected the suggestion that the act of war defense encompassed any governmental act taken by authority of the War Powers Clause of the Constitution. The court instead adopted the prevailing view of international law act of war as meaning the "'use of force or other action by one state against another' which '[t]he state acted against recognizes . . . as an act of war, either by use of retaliatory force or a declaration of war.'" *Id*. at 1061 (*citing* James R. Fox, *Dictionary of International and Comparative Law* 6 (1992)). That court stated:

The two treatises that discuss the issue suggest that "act of war" has a narrow meaning.

35

> One suggests the "act of war" defense requires "massive violence." The other suggests that it requires "natural or man-made catastrophes beyond the control of any responsible party." Case law in other contexts also suggests a narrow definition of "act of war."
>
> *****
>
> The argument that any governmental act taken by authority of the War Powers Clause is an "act of war" sweeps too broadly.

*Id*. at 1061 (internal citations omitted).

At issue in the *Shell Oil* case was the cleanup of a World War II aviation fuel refinery. During the war, the US "exercised significant control over the means of [aviation gas] production" including "the authority to issue production orders to refineries," "to require production of goods at refineries owned by the Oil Companies," "and even resize refineries if necessary." Despite this element of control, the Ninth Circuit concluded that the oil company had other options for disposing of their waste and that they dumped waste from other operations at the same site. This situation is similar to the IP lease arrangement. They both involve the same war and they both involve a situation that is similar to the IP lease arrangement. Additionally, they both involve stateside activities in support of the war effort. Most importantly, neither set of facts involves "massive violence," "use of force," or "military action" on the Site property. IP argues that the *Shell Oil* court's definition of "act of war" is overly restrictive. However, this Court believes that this defense is to be interpreted narrowly, especially in light of the very few cases addressing the defense and no case finding the defense to apply. Accordingly, the Court concludes that the present contamination at the Site was not a result of an act of war and this defense does not apply under the facts of this case.

### § 113 Contribution Claim

Congress enacted § 113(f) in 1986 as part of the SARA amendments to address specifically

when a PRP may seek contribution from other PRPs. *See* 42 U.S.C. § 9613(f).[31]  Section 113(f)(1)

provides in pertinent part that "[a]ny person may seek contribution from any other person who is liable

or potentially liable under [§ 107(a)], during or following any civil action under [§ 106] or under [§

107(a)]." *Id.*[32]

Under Fourth Circuit precedent, responsible parties under § 107(a) may not assert claims against

other responsible parties solely under § 107(a).  Instead, they must sue to recover response costs under

§ 113(f)(1), which provides for contribution. *See Axel Johnson*, 191 F.3d at 415 ("Every circuit that

has addressed the question, including this one, has held that parties such as Axel who are potentially

responsible for cleanup costs under § 107 cannot bring § 107 cost recovery actions; rather, such parties

must seek contribution under § 113.") (internal quotation omitted); *Minyard Enter.*, 184 F.3d at 385

("However, a responsible party cannot recover Response Costs under § 107(a) of CERCLA from

another responsible party"); *Pneumo Abex Corp.*, 142 F.3d at 776 ("The courts have held consistently

that section [113] must be used by parties who are themselves potentially responsible parties.").[33]

The Supreme Court of the United States recently held that contribution is available under §

113(f)(1) only during or following a civil action against the claimant under §§ 106 or 107(a).  On

---

[31] Section 107 allows "any person" to recover <u>all</u> of their response costs from any responsible parties, whose liability is generally joint and several.  *Pneumo Abex Corp.*, 142 F.3d at 776; *see also Axel Johnson*, 191 F.3d at 415.

[32] In addition, CERCLA § 113(f)(3)(B) provides an express right of contribution for:
> [a] person who has resolved its liability to the United States . . . for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in [§ 113(f)(2)].

42 U.S.C. § 9613(f)(3)(B).  The Supreme Court in *Aviall* explained the difference between §§ 113(f)(1) and (f)(3)(B), stating that under § 113(f)(1) "contribution may only be sought subject to the specified conditions, namely, 'during or following' a specified civil action."  125 S. Ct. 583.  Section 113(f)(3)(B), however, "permits contribution actions after settlement. . . ." *Id.*

[33] Under § 113 liability is allocated among other PRPS and the potentially responsible plaintiff "using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).

December 13, 2004, the Supreme Court rendered its decision in *Cooper Industries, Inc. v. Aviall Services, Inc.*, 125 S. Ct. 577 (2004), a case that specifically discusses the relationship between a party's responsibility for contamination under CERCLA and its ability to recover response costs incurred in cleaning up the contamination. The Supreme Court, with Justice Thomas delivering the opinion for the Court, held that a private party who had not been sued in a CERCLA administrative or cost recovery action could not obtain contribution from other liable parties. As briefly explained earlier in footnote three (3) of this order, in *Aviall*, Cooper owned and operated four maintenance sites in Texas and sold them to Aviall, which continued to operate them. 125 S. Ct. at 582. After Aviall identified contamination at the site, it notified the relevant state agency, which threatened Aviall with an enforcement action if it did not undertake remediation. *Id*. Without having been sued or having a settlement with the government, Aviall cleaned up the properties and then asserted claims against Cooper under CERCLA §§ 107(a) and 113(f), as well as state-law claims. Aviall later amended its complaint to consolidate its CERCLA claims under a single contribution claim under § 113(f). *Id*.

The district court granted summary judgment in favor of Cooper, holding that § 113(f) relief was unavailable to Aviall because it had not been sued under §§ 106 or 107(a) cost recovery action against it." *Id*. at 582-83 (*quoting Aviall Serv., Inc. v. Cooper Indus.*, 263 F.3d 134, 145 (5th Cir. 2001)). On rehearing en banc, the Fifth Circuit reversed, holding that a PRP may proceed with a § 113(f) claim regardless of whether it has been sued under §§ 106 or 107(a). *Id*. at 583 (*citing Aviall Serv., Inc. v. Cooper Indus.*, 312 F.3d 677 (5th Cir. 2002)).

The Supreme Court reversed. The Court examined § 113(f)(1)'s requirement that contribution claims be brought "during or following" civil actions under §§ 106 and 107(a) and concluded that a self-standing cause of action under § 113(f) could not be maintained. *Id.* The Court also reasoned that

38

the "during or following" condition would be rendered superfluous if § 113(f)(1) were read to authorize persons to bring contribution claims at any time. *Id.* The Court held that "Section 113(f)(1) . . . authorizes contribution claims only 'during or following' a civil action under § 106 or 107(a)." *Id.* at 584. Accordingly, the Court concluded that, since Aviall had never been subject to such an action, it could not bring a contribution claim under § 113(f)(1) against Cooper. *Id.*

The facts in this case lead to the same result as *Aviall* for the plaintiffs. *Aviall* holds that a § 113(f)(1) claim may be brought only "during or following" a civil action against the claimant under §§ 106 or 107(a). *Id.* at 584. As there has been no civil action against under §§ 106 or 107(a) against the Goodson plaintiffs the condition precedent to the filing of the § 113(f) contribution claim has not been satisfied. Accordingly, *Aviall* requires dismissal of the plaintiffs' § 113(f) claims in this case.

As to IP/IPR, they have been subject to a cost recovery action brought in this case under § 107(a). Ultimately, the United States Supreme Court ruled in *Aviall* that a private party who has not been sued under § 106 or § 107(a) may not obtain contribution under § 113(f)(1) from other liable parties. The position of IP and IPR in this case, however, is clearly distinguishable from that of the party in *Aviall* in that IP and IPR are defendants in an action brought for cost recovery under § 107(a). They are all entitled to bring an action for contribution against the US, which is particularly fitting here, where the US is the PRP that was the sole source of the discharge of hazardous materials on the Site.

## RCRA

In 1976, Congress enacted RCRA (42 U.S.C. §§ 6901-6992) in response to growing concerns about the health and environmental problems associated with the waste materials generated by an increasingly urban population. RCRA provides a comprehensive regulatory structure for managing both hazardous and non-hazardous solid waste. Among its provisions, RCRA provides authority to the

Environmental Protection Agency under § 7003 of the Act and also to citizens under § 7002 of the Act

to seek abatement of "an imminent and substantial endangerment to health or the environment."

The plaintiffs have moved for summary judgment under RCRA seeking immediate injunctive

relief[34] and an order awarding attorney's fees under the statute.  Additionally, the US and the IP

defendants have moved for summary judgment as to Goodsons' RCRA claim.

The Goodsons assert a claim under the citizen suit provision of RCRA, 42 U.S.C. § 6972,

requesting the Court order the Corps to remove ordnance at the Site more quickly than the Corps

presently plans to do.  The Goodsons also ask that IP/IPR be held responsible and be involved, as

directed by the Corps, in the removal process.  The Goodsons have not provided any proposed dates

for the tasks that are necessary to the cleanup; they simply have asked the Court to "set deadlines for

the initiation and completion of such clean-up" and that such deadlines be established upon receipt of

a written report by the US laying out its plans for mobilization and removal.

The US argues that this Court lacks subject matter jurisdiction over Goodsons' RCRA challenge

to the Corps' removal action based on CERCLA §§ 104 and 113.  Plaintiffs argue that the US is not

"actively engaging in a removal action," § 104(b)(2)(B)(ii), or "diligently proceeding" with a remedial

action under CERCLA § 104(b)(2)(B)(iii).

Section 104 of CERCLA authorizes the federal government to act in the event of a release or

threatened release of a hazardous substance, pollutant, or contaminant.  The statute provides, in

pertinent part, that

> Whenever (A) any hazardous substance is released or there is a substantial threat of such
> a release into the environment, or (B) there is a release or substantial threat of release

---

[34] The plaintiffs seek only to speed up the process that the Corps is undertaking.  They present no specific requests for action, such as the placement of fencing around the site, to be taken or a time line for that action to take place.

into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment. When the President determines that such action will be done properly and promptly by the owner or operator of the facility or vessel or by any other responsible party, the President may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with section 9622 of this title.  No remedial investigation or feasibility study (RI/FS) shall be authorized except on a determination by the President that the party is qualified to conduct the RI/FS and only if the President contracts with or arranges for a qualified person to assist the President in overseeing and reviewing the conduct of such RI/FS and if the responsible party agrees to reimburse the Fund for any cost incurred by the President under, or in connection with, the oversight contract or arrangement.  In no event shall a potentially responsible party be subject to a lesser standard of liability, receive preferential treatment, or in any other way, whether direct or indirect, benefit from any such arrangements as a response action contractor, or as a person hired or retained by such a response action contractor, with respect to the release or facility in question. The President shall give primary attention to those releases which the President deems may present a public health threat.

42 U.S.C. § 9604(a)(1).  On January 23, 1987, President Reagan issued Executive Order 12580, in which the President delegated his authority under CERCLA § 104 to the heads of executive departments and agencies, including the Department of Defense ("DOD"), with respect to non-emergency removal actions "where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody or control of those departments and agencies."  Exec. Order 12, 580 at ¶¶ 2(d), 2(e), 52 Fed. Reg. 2923, 2924 (Jan. 23, 1987).[35]  The Corps acts for DOD at DERP-FUDS.

---

[35]    Although Congress placed authority for administering CERCLA with the President, most of this authority has been delegated to the EPA Administrator.  42 U.S.C. § 9615; Exec. Order 12, 580 Fed. Reg. at 2924.  In the case of "remedial actions for releases or threatened releases which are not on the National Priorities List . . . and removal actions other than emergencies, where either the release is on or the sole sources of the release is from any facility or vessel under the jurisdiction, custody or control of " the head of Executive departments and agencies (to include the DOD), the functions the President under CERCLA § 104(a), (b), and (c)(4) have been delegated to those heads of Executive departments and agencies. Exec. Order 12,580 at § 2(d) - (e), 52 Fed. Reg. at 2924.  The authorities delegated to the Secretary of Defense
(continued...)

Section 113(h) of CERCLA provides:

No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under Section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title. . . .

42 U.S.C. § 9613(h).[36]  Courts have held that this section precludes challenges that are related to the goals of the cleanup." *Hanford Downwinders Coalition, Inc. v. Dowdle*, 71 F.3d 1469, 1482 (1995); *Razore v. Tulalip Tribes of Washington*, 66 F.3d 236, 239 (9th Cir. 1995).  More specifically, § 113(h) precludes challenges that "seek to improve" on a CERCLA cleanup, *Hanford Downwinders*, 71 F.3d at 1482, or that would "interfere" with the cleanup by attempting to alter the method and order of the cleanup, *Razore*, 66 F.3d at 239-40.  *See also Broward Gardens Tenants Ass'n v. United States Envtl. Protection Agency*, 311 F.3d 1066, 1072 (11th Cir. 2002) ("To determine whether a suit interferes with, and thus challenges, a cleanup, courts look to seek if the relief requested will impact the remedial action selected.")  Once an activity has been classified as a § 104 removal or remedial action, § 113(h) "amounts to a blunt withdrawal of federal jurisdiction." *Hanford Downwinders*, 71 F.3d at 1474.

In this case, the US argues that the DOD, through the Corps, has undertaken a removal action

---

[35](...continued)
under Executive Order 12,580 apply to DERP-FUDS.

The plaintiffs argue that only if the EPA administrator, and not the DOD, is taking § 104 action is their lawsuit barred by § 113.  In making this argument, plaintiffs rely on § 120(g) which states that "no authority vested in the Administrator under this section may be transferred, by executive order of the President or otherwise, to any other officer or employee of the United States or to any other person."  However, § 120(g) applies only to federal properties (it is in a different **section** than § 104).  There is no indication elsewhere in the statute that the Administrator's authority cannot be transferred with regard to non-federal properties.  Additionally, plaintiffs rely on *Fort Ord Toxic Project, Inc. v. California Environmental Protection Agency*, 189 F.3d 828 (9th Cir. 1999).  However, that case specifically acknowledges that § 113 bars a citizen suit when the government is acting pursuant to § 104, but not when it is acting pursuant to § 120, recognizing a distinction between the two sections.

[36] There are five (5) exceptions to the jurisdictional bar of § 113(g), 42 U.S.C. § 9613(h)(1) - (5), but no party has argued that one of them applies here.

with respect to the ordnance at the Site, pursuant to § 104(a) of CERCLA. The Goodsons are challenging this alleged removal action by demanding that it be completed more quickly or in a manner different than the Corps is presently able to complete it. They are also asking the Court to order the Corps to immediately dedicate more resources to their properties, at the expense of other areas of the Site and other sites that exist around the country.[37] The plaintiffs argue that, with the exception of the Time Critical Action and the EE/CA study, there has been no "removal" action.

The US relies upon the statutory provision found within RCRA itself which preempts a private party's substantial endangerment action if the Administrator is "actually engaging in a removal action" under § 104 of CERCLA. 42 U.S.C. § 7002(b)(2)(B)(ii). Likewise, a private party's substantial endangerment action is also preempted if the Administrator has actually incurred investigation/feasibility study costs and is "diligently proceeding" with a remedial action under CERCLA. *Id.* at § 7002(b)(2)(B)(iii). This is echoed in CERCLA § 113(h) which likewise prohibits judicial review of a governmental removal or remedial action by the EPA Administrator under § 104 of CERCLA. *See* 42 U.S.C. § 9613(h). "Removal" and "remedial action" are terms of art also defined by the Act, 42 U.S.C. § 9601(23) and (24):

> (23) The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security

---

[37] To the extent that the IP defendants' request of injunctive and declaratory relief pursuant to RCRA also applies to the approximate 1,090 acres of the Site it still owns (*i.e.*, if IP seeks injunctive relief requiring the US' immediate cleanup of those 1,090 acres), then that too is related to the goals of, and interferes with, the Corps' removal action, and thereby constitutes a challenge prohibited by CERCLA section 113(h).

fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

(24) The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

The plaintiffs argue that these definitions do not include the type of preliminary study done by the Corps of Engineers. However, several courts have found remedial investigation/feasibility studies ("RI/FS") to constitute a removal or remedial action. *See Razore*, 66 F.3d 226; *State of California, on Behalf of the California Dept. of Toxic Substances Control v. Celtor Chemical Corp.*, 901 F. Supp. 1481 (N.D. Ca. 1995); *Kelley, ex rel. State of Michigan v. El du Pont de Nemous and Co.*, 786 F. Supp. 1268 (E.D. Mich. 1992); *Williams v. Allied Automotive, Autolite Div.*, 704 F. Supp. 782 (N.D. Ohio 1988) (The definition of "remove" or "removal" clearly contemplates such actions as are necessary to making a reasoned determination whether physical removal of hazardous contaminants is necessary in a given situation.). Consequently, this Court finds that the RI/FS, EE/CA, and the Time Critical Action

44

performed at the Site are removal actions authorized under § 104(a) of CERCLA. Additionally, any future cleanup actions recommended by the EE/CA are also removal actions are defined by CERCLA because the objective of those activities is to remove ordnance from the Site. *See* 42 U.S.C. § 101(23) (defining "removal" as including "the cleanup or removal of released hazardous substances from the environment").

In addition to § 113(h) of CERCLA, provisions in RCRA itself are consistent with the policy that removal actions performed under § 104 of CERCLA are not to be challenged in federal court. Section 7002(b)(2)(B)(ii) provides that no action may be commenced under the citizen-suit provision of RCRA if the Administrator of the US Environmental Protection Agency "is actually engaging in a removal action under section 104" of CERCLA.

This removal action is being performed responsibly in accordance with the Corps' expertise, the National Contingency Plan of CERCLA, the EE/CA, funding limitations,[38] and the Corps' nationally prioritized and coordinated approach toward resolving the problem of munitions removal. Under all of the circumstances, there is no valid reason to interfere with the Corps' plans. Furthermore, granting the relief sought by the Goodsons would be unfair to other areas of the Site and other munitions removal sites across the country. The Goodsons are not asking that the entire Site be cleaned up as soon as possible--they only want **their** portion of the Site cleaned up immediately. Such a reallocation of resources and a reordering of priorities would divert the Corps' resources not only from cleaning up other areas of the Site (much of which is owned by the South Carolina Wildlife and Marine Resources Department), but also would divert the corps' resources from cleaning up other sites that the Corps has determined present even greater risks to human health and the environment. If the Court

---

[38] The Court notes that the Corps has already spent more than $6.7 million and anticipate spending a total of $25.5 million.

were to grant the relief here, property owners elsewhere would be encouraged to file similar actions in

district courts across the country seeking to interfere with the Corps' decisions concerning relative risks

and funding priorities.  Court involvement in this regard would be inconsistent with Congress' mandate

that the Corps develop and implement a prioritization protocol to allocate available funds.  10 U.S.C.

§ 2710(b).  The Court believes that granting the relief sought by the Goodsons would merely complicate

the Corps' mission to deal with munitions on a national basis.[39]

Since this Court believes that § 113(h) bars any RCRA suit, including the one against the IP

defendants, there is no need for the Court to address IP's argument that it is a "mere landowner" and

not liable under RCRA.

In addition to the bar of § 113(h), plaintiffs' citizen suit is barred because the US is still

addressing the contamination.  Section 7002 of RCRA allows private citizens to institute civil litigation

only in certain limited circumstances.  To ensure that citizen suits are not duplicative or disruptive of

federal or state remediation efforts, § 7002(b)(2)(B) bars citizen suits in certain instances where the US

or a State has acted to address the alleged endangerment.  42 U.S.C. § 6972(b)(2)(B).  *See generally*

*Acme Printing Ink Co. v. Menard, Inc.*, 812 F. Supp. 1498, 1506-09 (E.D. Wis. 1992); *McGregor v.*

*Indus. Excess Landfill, Inc.*, 709 F. Supp. 1401, 1407-08 (N.D. Ohio 1987) ("Only when the federal or

state governments fail to act to remedy the situation or file suit in either state or federal courts due to

inadequate public resources did Congress envision the need for private citizens to commence actions

to correct environmental hazards.").  The statute specifically states that

---

[39] While plaintiffs focus on the "increasingly dangerous and festering condition" of the Site, any such allegations cannot give this Court the jurisdiction which it has been divested pursuant to § 113.  Additionally, the Court notes that the hazardous waste on this Site is confined to the area where it is currently located.  It is not like a chemical spill that can leach or runoff into other geographic areas.

> [n]o action may be commenced under subsection (a)(1)(B) of this section if the
> Administrator, in order to restrain or abate acts or conditions which may have
> contributed or are contributing to the activities which may present the alleged
> endangerment . . . (ii) is actually engaging in a removal action under section 104 of the
> Comprehensive Environmental Response, Compensation and Liability Act of 1980 . .
> . (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under
> section 104 of the Comprehensive Environmental Response, Compensation and
> Liability Act of 1980 . . . and is diligently proceeding with a remedial action under that
> Act.

42 U.S.C. § 6972(b)(2)(B).

In this case, plaintiffs are seeking to bring an action where the US, through the Corps, is engaging in a removal action under CERCLA § 104.  The purpose of RCRA § 7002 is to complement and not conflict or compete with the US and states' roles in investigating hazardous waste sites. *McGregor*, 709 F. Supp. at 1408.  That purpose applies here, where the cleanup is being performed by the Corps.  Allowing plaintiffs' suit would contradict the Congressional intent of avoiding duplication of effort.  To the extent that the IP defendants assert a claim for injunctive relief pursuant to RCRA, their claim cannot be allowed for the reasons stated above.

### State Law Causes of Action

The IP defendants have moved for summary judgment as to the plaintiffs' third (equitable indemnity), fourth (negligence and negligence per se), fifth (strict liability), and sixth (negligent nondisclosure) causes of action.  In reply to the motion, the plaintiffs have agreed that the fourth cause of action (negligence and negligence per se) and fifth cause of action (strict liability) can be dismissed. This order will address plaintiffs' third (equitable indemnity) and sixth (negligent nondisclosure) causes of action.

The IP defendants seek summary judgment on the basis that there was no duty of disclosure to the plaintiffs, since under the Agreement of Sale the plaintiffs bought the property from defendant IPR

47

"as is."  The IP defendants state further that the plaintiffs knew all material facts about the property known to the defendants.  Finally, the IP defendants contend that in no event do the plaintiffs enjoy a cause of action for equitable indemnity and negligent nondisclosure against the defendant IP, which had not owned the property in question in more than a decade prior to the plaintiffs' purchase from IPR and had no dealing with the plaintiffs.

IP conveyed the property at issue to IPR in 1989.  IPR is a subsidiary of IP and plaintiffs dealt with agents of IPR, not agents of IP, at all times relevant to this case.  The Court finds that there is no basis in the record or impute the common law obligation of indemnity or duty of disclosure to IP. Consequently, IP is granted summary judgment as to plaintiff's third and sixth causes of action.[40]

**Equitable Indemnity**

> Indemnity is a
>
> form of compensation in which a first party is liable to pay a second party for a loss or damage the second party incurs to a third party.  A right to indemnity may arise by contract (express or implied) or by operation of law as a matter of equity between the first and second party.

*Winnsboro v. Wiedeman-Singleton (Winnsboro I)*, 398 S.E.2d 500, 502 (S.C. Ct. App. 1990) (internal citations omitted).  The South Carolina courts have long recognized the principle of equitable indemnification.  *See e.g., Stuck v. Pioneer Loggins Machinery, Inc.*, 301 S.E.2d 552 (S.C. 1983); *Addy v. Bolton*, 193 S.E.2d 708 (S.C. 1971); *South Carolina Electric & Gas Co. v. Utilities Construction Co.*, 135 S.E.2d 613 (S.C. 1964).  With equitable indemnification, it does not matter that there is no contractual provision for indemnity; "[t]he very nature of equitable indemnification is that a contract for indemnity is unnecessary." *Winnsboro v. Wiedeman-Singleton (Winnsboro II)*, 414 S.E.2d 118, 121

---

[40] While plaintiffs argue in their memoranda that both IP and IPR are liable, they state in their proposed order that IP should be granted summary judgment on the indemnity and negligent nondisclosure claims.

(S.C. 1992).

Traditionally, courts have allowed equitable indemnification in cases of imputed fault or where some special relationship exists between the parties. *See Winnsboro I*; *First General Servs. v. Miller*, 445 S.E.2d 446 (S.C. 1994). Ordinarily, if one person is compelled to pay damages because of negligence imputed to him as the result of a tort committed by another, he may maintain an action for indemnity against the person whose wrong has been imputed to him. *Atlantic Coast R.R. v. Whetstone*, 132 S.E.2d 172 (S.C. 1963). However, no personal negligence of the party seeking indemnification may have joined in causing the injury. *Id*. The same principle may be applied where a contractual relationship or tortious conduct creates a legal relationship between the parties. *See Addy v. Bolton, supra*.[41] The South Carolina Supreme Court has noted

> that the modern trend concerning the right to indemnity is to look to principles of equity. According to equitable principles, a right of indemnity exists whenever the relation between the parties is such that either in law or in equity there is an obligation on one party to indemnify the other, as where one party is exposed to liability by the wrongful act of another in which he does not join.

*Griffin v. Van Norman*, 397 S.E. 2d 378 (S.C. Ct. App. 1990) (*citing Stuck*, 301 S.E.2d at 553).

In order to recover for equitable indemnification, three elements must be proven: (1) the indemnitor was liable for causing the plaintiff's damages; (2) the indemnitee was exonerated from any liability for those damages; and (3) the indemnitee suffered damages as a result of the plaintiff's claims against it which were eventually proven to be the fault of the indemnitor. *Vermeer Carolina's Inc. v. Wood/Chuck Chipper Corp.*, 518 S.E.2d 301, 307 (S.C. Ct. App. 1999).

---

[41] In that case, the South Carolina Supreme Court stated:
> [W]here the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as to make it necessary to incur legal expense to protect his interest, such costs and expenses, including attorneys' fees should be treated as the legal consequences of the original wrongful act and may be recovered as damages."

*Add*, 183 S.E.2d 709-710 (*quoting* Am. Jur. 2d, Damages, Section 166).

By definition equitable indemnity requires the first party (IPR) to expose a second party (Goodsons) to liability of a third party. There is no third party who has made a claim against the Goodsons. The Goodsons seek to recover their own loss; they have not been sued and have suffered no damage as the result of a third party's claims. Equitable indemnity does not apply to the facts of this case and, therefore, summary judgment is granted as to this cause of action.

## Negligent Nondisclosure

Under South Carolina law, a seller has a duty to disclose "an artificially created, and concealed, unstable condition." *Lawson v. Citizens & Southern Nat'l Bank*, 180 S.E.2d 206, 208 (S.C. 1971) (fraud); *see also Pruitt v. Morrow*, 342 S.E.2d 400, 401 (S.C. 1986) (misrepresentation). However, this duty is limited in that a seller must know that the material facts are beyond "the reach of the diligent attention, observation, and judgment of the purchaser." *Lawson v. Citizens & Nat'l Bank*, 193 S.E.2d at 128. In South Carolina, negligent misrepresentation is an action in tort:

> A duty to exercise reasonable care in giving information exists when the defendant has a pecuniary interest in the transaction. The recovery of damages may be predicated upon a negligently made false statement where a party suffers either injury or loss as a consequence of relying upon the misrepresentation. These general rules have been applied, in every case this Court has located, to support the recognition of a negligent misrepresentation claim where the misrepresented fact(s) induced the plaintiff to enter a contract or business transaction.

*Gilliland v. Elmwood Properties*, 391 S.E. 2d 577, 580 (S.C. 1990) (internal quotations and citations omitted).

The elements of negligent misrepresentation are:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of

his reliance upon the representation.

*AMA Management Corp. v. Strasburger*, 420 S.E. 2d 868, 874 (S.C. Ct. App. 1992). In determining whether reliance on a representation was justified, "[t]here is no liability for casual statements, representation as to matters of law, or matters which the plaintiff could ascertain on his own in the exercise of due diligence." *Id*.

> With regard to the recording statute, the South Carolina Court of Appeals recently stated:
>
> The recipient of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have discovered its falsity through investigation. The person committing the fraud cannot defeat a claim for misrepresentation simply because the person defrauded is charged with notice under a recording statute, particularly where the misrepresented facts are peculiarly within the representors knowledge. The purpose of the recording act is to protect one who buys a recorded title against one who acquires a paper title but fails to record it. The recording act is not intended to protect a seller who makes a false or misleading statement.

*Slack v. James*, 589 S.E.2d 772, 774 (S.C. Ct. App. 2003) (internal quotations and citations omitted). Whether a buyer can reasonably rely on a seller's representation in view of the information in the public record is for a jury, not the court, to determine. *Id*.

The question then, is whether a reasonable investigation by the plaintiffs would have uncovered the environmental problems at the Site. Questions of concealment of environmental problems and reasonableness of plaintiffs' investigation is a question that is appropriately left for the trier of fact to decide. *See Greenwood Mills, Inc. v. Russell Corp.*, 981 F.2d 148 (S.C. Ct. App. 1993). There is a genuine issue of material fact as to whether or not IPR had a duty to disclose anything to the Goodsons. Consequently, IPR's motion for summary judgment as to negligent nondisclosure is denied.

## Conclusion

For the foregoing reasons, the undersigned **DENIES** Goodsons' and the IP defendants' motion

51

to amend; **GRANTS** in part and **DENIES** in part the US's motion for summary judgment as to CERCLA; **DENIES** Goodsons' and the IP defendants' motions for summary judgment under CERCLA; **GRANTS** the IP defendants' and the US's motion for summary judgment as to the Goodsons' claim under RCRA; **DENIES** Goodsons' motion for summary judgment as to RCRA; and **GRANTS** in part and **DENIES** in part the IP defendants' motion for summary judgment as to the state law claims.

Accordingly, plaintiffs' claims under CERCLA § 113 and RCRA are **DISMISSED**. Plaintiffs' claims for negligence and negligence per se and strict liability have been **DISMISSED** by the plaintiffs and their equitable indemnification claim is **DISMISSED**. Additionally, plaintiffs' negligent nondisclosure claim against IP is **DISMISSED**, but not as to IPR. Plaintiffs are allowed to proceed under CERCLA § 107 against all defendants and the state law claim of negligent nondisclosure against IPR. The IP defendants are allowed to proceed under CERCLA §§ 107 and 113.

In their RCRA claim for immediate injunctive relief, the Goodsons have expressed a concern that someone will ignore their signs, trespass onto the property, and be harmed by ordnance that explodes. The Court assumes that, if this is a genuine concern, the US and the IP defendants would share the same concerns. However, each party asserts that the others are responsible for making sure such a tragedy does not occur. The facts appear to be that no one party can fence the property without the cooperation of the others. For example, the Goodsons claim they were told by the Corps not to dig fence posts because they might hit unexploded ordnance. The Goodsons also claim, even though they are a construction company, that they may not have the expertise to construct a fence for fear of detonating and explosive, and that they may have difficulty locating a contractor to do the work. The US cannot put up a fence without the approval of the Goodsons and IP/IPR for them to enter the land

and erect the fence.  Additionally, the land at issue in this case is owned by both IP/IPR and the Goodsons, requiring both of them to work together if the entire area is to be fenced.  It is unclear what the costs of simply fencing the property would be as this Court has no estimate provided.  This Court would ask the parties to attempt to work together to fashion a preventative measure, such as fencing the property.

While the issue has not been raised, argued or briefed, the fencing costs might be considered as part of cleanup or recovery response costs incurred.  Such costs, if incurred, would appear under the particular facts and circumstances of this case, to be remedial in nature and an effort at containment of the hazardous material from the public.  However, at this time, that issue is not before the Court and will be determined only if and when it occurs.

Finally, the parties are ordered to file with the Court, within fifteen (15) days of the date of this order, their position with regard to how the trial of this case should take place, including the necessity of bifurcation.

**IT IS SO ORDERED**.

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Court Judge

October 13, 2005
Florence, South Carolina

53