IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| R.E. Goodson Construction Company, Inc. and R.E. Goodson, L.L.C., | ) ) ) | Civil Action No. 4:02-4184-RBH |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW** |
| International Paper Company, International Paper Realty Corp., and the United States of America | ) ) ) | **AND ORDER** |
| Defendants. | ) ) ) | |

## *BACKGROUND*

On December 16, 2002, R.E. Goodson Construction Company, Inc. ("Goodson Construction") and R.E. Goodson, L.L.C. ("Goodson, L.L.C.") (jointly, "Goodsons") commenced this civil action, asserting claims under §§ 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980[1] ("CERCLA") against International Paper Company ("IP") and International Paper Realty ("IPR") (collectively, "IP/IPR") and the United States ("U.S."), as well as state law claims of equitable indemnity, negligence, negligent non-disclosure, and strict liability against IP/IPR, related to a parcel of real property located in Horry County, South Carolina.

On May 6, 2003, the Goodsons filed an Amended Complaint. IP/IPR answered the complaint and filed a counterclaim against the Goodsons and a cross-claim against the U.S., seeking contribution and indemnity for any alleged liability IP/IPR might have for cleanup costs. Additionally, IP/IPR filed cross-claims against the U.S. for cost recovery and for

---

[1] 42 U.S.C. § 9601, *et seq.*

injunctive and declaratory relief related to the location of unexploded ordnance on property IPR owned, near the Goodsons' property.

On October 13, 2005, this court issued an Order on the parties' respective motions for summary judgment. On June 14, 2006, this court issued a subsequent Order resolving motions to alter or amend its October 13, 2005 Order and denying a request for an immediate appeal. The court then set a bench trial of the CERCLA claims. Specifically, this phase of the trial focused on CERCLA liability issues with particular emphasis on the post-Aviall standing of the parties, i.e. the standing of the parties to sue under Section 107(a) as innocent purchasers, the necessity of the parties' cleanup costs, and compliance with the national contingency plan ("NCP").[2]    The court held a three-day bench trial on August 16-18, 2006 with regard to those limited issues. After reviewing all the documentary evidence and personally observing the witnesses called by the parties, this court has had an opportunity to consider the relevancy and weight of the evidence and to assess the demeanor of the witnesses. Based on all of the evidence, the testimony of the witnesses, and this court's review of the many documents introduced into evidence, this court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

---

[2] *Cooper Industries, Inc. v. Aviall Services, Inc.* significantly changed the legal landscape for claims such as these under consideration. 543 U.S. 157 (2004). While the difficulty of a Potentially Responsible Party to recover response costs under Sections 107 and 113 post-*Aviall* may be at odds with the purpose of CERCLA (to encourage voluntary clean-up), it is not this court's function to anticipate what action the Fourth Circuit may take. *See R.E. Goodson Constr. Co. v. International Paper Co.*, No. 02-4184, 2005 WL 2614927 (D. S.C. Oct. 13, 2005); *see also Pneumo Abex Corp. v. High Point, T. & D. R. Co.*, 142 F.3d 769 (4th Cir. 1998).

2

### *FINDINGS OF FACT*

1.     As an initial matter, the court recognizes that this is an extremely novel case and apparently unlike any other CERCLA case, reported or unreported.  The U.S. admits that it and no other party contaminated the subject property with ordnance.  The U.S. also represents that it fully intends to remove the ordnance from the subject property; however, because of federal budgetary constraints, the U.S. government will not be able to remove the ordnance until 2012 or later.  Meanwhile, the owners of the subject property, the Goodsons and IPR, were left with the decision, whether to wait on the U.S. to remove the ordnance from the site, or initiate removal actions of their own and seek reimbursement from the government.

## I.     The Former Range and IP's Lease with the U.S.

2.     On May 27, 1941, President Roosevelt declared an "Unlimited National Emergency" in response to the Nazis' campaign for worldwide domination. (IP-1[3]).  Within months of this proclamation, the U.S. began acquiring, either by lease or fee simple purchase, thousands of acres in Horry County for use as an air-to-ground bombing and gunnery range.  This area was known as the Conway Bombing and Gunnery Range ("CBGR").

3.     The former CBGR constituted approximately 55,854 acres between Conway and Myrtle Beach in Horry County, South Carolina.  The range was situated on what was known as the "Buist Tract."  The Buist Tract consisted of about 20,000 acres south of U.S. Highway 501 and 50,000 acres north of Highway 501.  (P-75,[4] EE/CA Rep. at Page 1-1; Lovelace Dep. at 10-11).

---

[3]  Citations to "IP-__" refer to IP and IPR's trial exhibits as identified at trial.

[4]  Citations to "P-__" refer to Plaintiffs' trial exhibits as identified at trial.

4.    During World War II, the U.S. conducted bombing and aerial gunnery activities at that location.  The former range contained five separate ranges – known as Ranges II, III, IV, VII, and XX – as well as a moving target range, two turret ranges, a machine gun range, and a rifle range.  These ranges were used for a variety of bombing and air-to-ground gunnery purposes throughout World War II. (P-75, EE/CA Rep. at 2-1 to 2-3).

5.    The former range included 35,674 acres owned by IP, which it leased to the U.S. on December 31, 1941, for approximately $2.00 per acre for an annual rate of $17,837. The original term of the lease was from January 1, 1942, to June 30, 1942, and was renewed by the U.S. from year to year in accordance with its terms until October 31, 1948. (US-106[5]). This lease was not recorded in the Horry County Register of Deeds.

6.    The property which is the subject of this litigation is at or near Range III, which includes areas known as Areas B and B-1.  The property at issue consists of 1092 acres, which was owned by IPR, and 392 acres, which is presently owned by the Goodsons. Initially, the subject property was part of a large tract of land acquired by IP from George Buist in 1937, generally referred to as the Buist Tract.  In 1989, IP conveyed their property within the Buist Tract to IPR.  The Goodsons acquired their tracts (Tracts 19A, 19B and 19C) (collectively "Tract 19") from IPR by deeds in December 1999 and March 2000.  Range III is located within what has now become the Carolina Forest residential development.

7.    Range III was comprised of the Target Zone and Safety Zone.  (P-75, EE/CA Rep. at 2-4).  The Target Zone, a circular area, was where bombers attempted to drop bombs and fire munitions.  The Target Zone was encircled by another, larger area known as the

---

[5]  Citations to "US-__" refer to the U.S.' trial exhibits as identified at trial.

4

Safety Zone.  Troops were required to stay outside the Safety Zone during bombing and gunnery operations.  The parcel known as Tract 19 is situated in the center of the Target and Safety Zones.

8.     In October 1948, the U.S. terminated its lease with IP and returned the 35,674-acre property to IP.  IP primarily used the property for limited hunting and the cultivation of timber until it conveyed the property to IPR.

9.     In 1949, the U.S. began advertising properties, which were adjacent to IP's property, for sale. (IP-21 at H-2).   The advertisement stated:

> This property was formerly used as a bombing and gunnery range by the Army and there is a possible potential hazard on that account; however, **the Department of the Army has certified that it has made a careful visual inspection of the property and that it has been cleared of all dangerous and explosive materials reasonably possible to detect.  The Department of the Army is of the opinion that the area will not require additional dedudding to render it safe for public use.**

(IP-21 at H-2).

10.     In connection with its sale of the properties adjacent to IP's property, the U.S. issued quitclaim deeds that included a "Certificate of Dedudding." (IP-11).   This certificate stated:

> **All lands within the Conway Bombing and Gunnery Range have been given a careful visual inspection and have been cleared of all dangerous and/or explosive materials reasonably possible to detect.  To the best of my knowledge and belief, this range will not require additional dedudding to render safe for public use.**

(IP-11 at USGOV00282).  This "Certificate of Dedudding" referred to **all** lands within the

CBGR, not just to the particular tract being transferred by quitclaim deed.

11.    There was no evidence that IP received a "Certificate of Dedudding" relating to the 35,674 acres that it had leased to the U.S.  These certificates appear to have been given only to purchasers of property.  However, it is clear to the court that these admissions by the U.S. related to the entire former CBGR.

12.    In 1953, IP filed a claim against the U.S. in the Court of Claims for alleged damages to timber and "improvements" on the land as a result of the U.S.' use of its property. (US-106).  An agreement was reached in which the U.S. paid IP $22,879.50 in full settlement of the claim.  (US-106).

13.    Larry Canada, an IP forest technician/employee since 1966, testified that there were "shells and stuff all over" the Buist tract. (US-3, Canada Dep. 6/24/04[6] at 20).  Mr. Canada also testified that he had heard an explosion during a controlled burn on the property "that sounded like heavy thunder." (US-3, Canada Dep. at 21-22; IP-13 at USGOV00228). "[I]t kind of jarred the ground a little bit, and I don't know what it was." (US-3, Canada Dep. at 22).  This occurred long before IPR's acquisition of the property.  Canada apparently did not tell anyone or do anything about the explosion he heard during the controlled burn.

## II.    IPR's Acquisition of Property within the Former CBGR and Development in the Area of the Former CBGR

14.    Between 1966 and 1980, James Goodson, who is currently employed by the Plaintiff Goodson Construction, worked at and was a co-owner of Goodson Construction

---

[6] Mr. Canada's deposition testimony of June 24, 2004 was incorporated into his deposition of July 18, 2006.  At the more recent deposition, Mr. Canada was designated by IP to testify as to certain topics under Federal Rule of Civil Procedure 30(b)(6).  (US-7, Canada Dep. 7/18/06 at 3).

Company in Aynor, South Carolina.[7]  Aynor Goodson Construction did work during this time period for IP in Horry, Georgetown, and perhaps Dillon counties.  (J. Goodson, Tr.[8] 8/17/06 at 26).

15.    Since 1966, James Goodson testified that he knew, and it was general knowledge in the area, that there had been a bombing range somewhere in Horry County.  (J. Goodson, Tr. 8/17/06 at 29, 69; US-9, J. Goodson 7/19/06 Dep. at 25).  Allen Moore, the current President of IPR, testified that practically every citizen in Horry County should know the area was used as a gunnery range.  (Moore, Tr. 8/18/06 at 32).

16.    In 1970, the Aynor Goodson Construction Company built the Myrtle Beach National Golf Course, which is about four to five miles from the property at issue in this case. (J. Goodson, Tr. 8/17/06 at 27-28).  During the construction of the golf course, two pieces of ordnance – an intact rocket and the tail portion of another rocket – were brought back to the company's shop in Aynor.  (J. Goodson, Tr. 8/17/06 at 28-29).  As of 2004, the rocket remained in the company's shop.  (J. Goodson, Tr. 8/17/06 at 63).

17.    In 1989, IP conveyed part of its property on the Buist Tract to IPR, IP's wholly owned subsidiary.  Among the parcels transferred to IPR were Tracts 9D, 18B, 19A, 19B, 19C, 22B, the "Proposed Middle School Site," and the "Proposed 20-Acre School Site," (collectively, the "IPR Parcels").  There is no evidence in the record as to the purchase price of the land at issue; however, Tom Connor, IPR's Comptroller, testified that IPR generally

---

[7]  Goodson Construction in Aynor, South Carolina is a totally separate company than the Plaintiff, which is located in Darlington, South Carolina.  (J. Goodson, Tr. 8/17/06 at 25).

[8]  Citations to "Tr." refer to the transcript of the trial held from August 16-18, 2006.

purchases its properties from IP based on appraisals and that IPR maintains "a very arms length relationship" with IP. (Connor, Tr. 8/17/06 at 102).

18.    In 1989, according to Congressman Weldon's statements in the U.S. House of Representatives, environmental investigations into the contamination of real estate lacked any consistency as a result of the confusion in the real estate and environmental consulting industry as to what was meant by "all appropriate inquiry" in CERCLA, 42 U.S.C. § 9601(35)(B)(i)(I), as it relates to the "innocent landowner defense." 135 Cong. Rec. E2367-01  (July 28, 1989) (statement of Rep. Weldon).

19.    In 1989, the only commonly known or reasonably ascertainable information regarding the presence of live ordnance on the IPR parcels was that the entire former CBGR had been dedudded and had been rendered safe for public use.

20.    Before 1989, the IPR parcels had been harvested at least twice since its use during World War II as a bombing and gunnery range. (Moore, Tr. 8/18/06 at 6).  The process of harvesting timber is very brutal and disruptive to the land and includes utilizing heavy equipment such as a bulldozer, a feller-buncher, skidder and crane, a kg blade, a disk harrow, and hauling trucks. (J. Goodson, Tr. 8/17/06 at 57-59).  Feller-bunchers are mounted on skidders, which are large four wheel drive machines weighing approximately five to ten tons. (J. Goodson, Tr. 8/17/06 at 57-58).  The wheels on a skidder are four to six feet high and eighteen inches wide. (J. Goodson, Tr. 8/17/06 at 58).  In order to harvest the timber, a feller-buncher mounted on a skidder would cut the timber a few inches or a foot above the ground. (J. Goodson, Tr. 8/17/06 at 58).  Then another skidder equipped with hooks comes along and grabs the timber and drags it to what is called the deck.  (J. Goodson, Tr. 8/17/06

8

at 58). Once the timber was dragged to the deck, men with chainsaws would cut the tops off of the timber. (J. Goodson, Tr. 8/17/06 at 58). After the timber is cut, before replanting can occur, a piece of equipment called a kg blade, which is mounted on a bulldozer, is used to remove the stumps from the ground. (J. Goodson, Tr. 8/17/06 at 59). Following the removal of the stumps from the ground, a disk harrow is used to cut the land and form a bed in which to plant the trees. (J. Goodson, Tr. 8/17/06 at 60). The disk harrow cuts into the ground up to two feet deep. (J. Goodson, Tr. 8/17/06 at 60). During these disruptive timber harvesting procedures, no live ordnance was found. (IP-21 at Appendix I-1).

21.     With respect to the IPR Parcels, IP and IPR are in the chain of title. (P-50 through P-56; Lovelace Dep. at 10-11) ("In terms of the Buist Tract, any tract through the ownership of [IP and IPR] had a common chain of title.")

22.     Allen Moore, who testified at trial, is the current president of IPR. (Moore, Tr. 8/18/06 at 4). From 1994 until 2000, Moore was IPR's project director for the Carolina Forest residential development. (US-5, Moore Dep. at 5). From approximately 1988 until 1994, Moore was IPR's sales manager for the eastern region. (US-5, Moore Dep. at 6-7).

23.     In 1990, Moore, who was also an amateur historian, prepared a history of the Buist tract using government reports, which showed that in the early 1940s, the Carolina Forest property was used as a bombing and gunnery range for the newly built Myrtle Beach Air Force Base, that the Target and Cypress Road sections were used for aerial bombing practice, while the lands adjacent to Telephone Road were used for aerial strafing practice, that Target Road was on the western boundary of Tract 19, and that thousands of bombs and 50-caliber shells were exploded on this tract. (Moore, Tr. 8/18/06 at 26-28; US-20 at 2).

9

24.     In or about 1994, IPR created a development plan for the area containing the former bombing range.  This 12,000-acre area was called Carolina Forest, and it was planned to become a residential community with about 26,000 housing units and 55,000 residents. IPR's plan also contemplated a four-lane highway called Carolina Forest Boulevard that would cross the property.  (Finnegan, Tr. 8/17/06 at 174-76; Moore, Tr. 8/18/06 at 8).  In the years that followed, the area became one of the fastest growing areas in South Carolina, and perhaps the country.  (Moore, Tr. 8/18/06 at 22).

25.     From 1994 through 1998 or 1999, IPR spent about $25 million on the construction of the infrastructure for the large-scale Carolina Forest development.  This work involved contacts with, and/or inspections by, Horry County engineering, stormwater, planning, education, emergency management, and fire department officials, as well as the Grand Strand Sewer Authority.  IPR also was involved with DHEC concerning stormwater and land disturbance rules and with DHEC's Office of Coastal Resource Management.  IPR had contacts with the South Carolina Department of Transportation and the South Carolina Department of Natural Resources.  IPR also dealt with the U.S. Fish and Wildlife Service concerning the delineation of numerous wetlands and with EPA concerning the construction of spoil basins. During this time period, there were hundreds of miles of roads built and over one-thousand workers engaged in construction activity in the area.  (Finnegan, Tr. 8/17/06 at 167-73, 177-78; Moore, Tr. 8/18/06 at 6-7, 12-14).

26.     As part of the delineation of wetlands, IPR measured the water table for about two years with a crew of 14 or 15 people that took water level readings from about 300 wells on a daily basis.  The result of this process, which began in 1991 and lasted five years, was

10

that 3,000 acres of wetlands were delineated by the Army Corps of Engineers (the "Corps") and IPR and its contractors.  (Moore, Tr. 8/18/06 at 9-10).

27.    During this period, IPR's project manager for the Carolina Forest subdivision, Sabina Finnegan, had a general "peripheral" knowledge that the Carolina Forest area had been used as a bombing range in the past.  (Finnegan, Tr. 8/17/06 at 178).

28.    In this same time period, Horry County held public hearings concerning the Development Agreement with IPR regarding the development of Carolina Forest.  There was media coverage of the public hearings as well as of the work being done at Carolina Forest. (Finnegan, Tr. 8/17/06 at 173; Moore, Tr. 8/18/06 at 14-15).

29.    In December 1997, Horry County issued an ordinance known as the Carolina Forest Development Agreement, which enabled the government to negotiate with developers for a long-term development plan for the Carolina Forest area.  (Carter, Tr. 8/17/06 at 3-5).

### III.    The Corps' Actions Concerning the Former Conway Bombing and Gunnery Range

30.    The Secretary of Defense is responsible for the environmental restoration of facilities that were formerly owned by, leased to or otherwise possessed by the U.S. and under the jurisdiction of the Secretary of Defense.  10 U.S.C. § 2701(c)(1)(B).  The program is known as the Defense Environmental Restoration Program ("DERP").  10 U.S.C. § 2701(a)(1). Former facilities owned, leased or otherwise possessed by the U.S. and under the jurisdiction of the Secretary of Defense are known as Formerly Used Defense Sites ("FUDS").  The Army is the executive agent for the DERP program and the Corps is the organization within the Army that manages and executes the program for FUDS.

31.    In 1991, as part of the DERP program, the Corps began a review of all of the

11

former bombing ranges to determine whether they contained ordnance.  The Corps prepared a

Preliminary Assessment of the former CBGR.  (P-79; P-75, EE/CA Rep. at 2-11).

32.     In its role as executing agent for the DERP at FUDS, the Corps is not a

regulatory agency.  The Corps must consult with the Administrator of the U.S. Environmental

Protection Agency ("EPA") and appropriate state agencies in the state in which the FUDS is

located regarding any response action it may undertake.  10 U.S.C. § 2705(b).  The Corps is

responsible only for the response actions it undertakes at a FUDS,  Exec. Order No. 12580, 52

Fed. Reg. 2923 (Jan. 29, 1987), but the Corps does not dictate what private property owners

may or may not do within the boundaries of a FUDS.  The Corps has not been delegated any

authority to bring enforcement actions, either administratively or judicially, concerning response

actions at FUDS.  (See Exec. Order 12580; Nesbit, Tr. 8/18/06 at 153) ("[W]e're [Corps] not

a regulatory agency as far as FUDS is concerned. We clean up sites, primarily.  That's our

function.").  The DERP statute authorizes the Department of Defense (or its designee) to carry

out a program of environmental restoration at FUDS.  10 U.S.C. § 2701(a)(1), (c)(1).

33.     In or around May 1991 the first Archives Search Report concerning the former

CBGR was prepared for the Corps by TCT-St. Louis. (IP-15).  The purpose of the report was

"to obtain, review, and evaluate historical records related to the potential presence of any

ordnance and explosive waste (OEW) that may exist on the former CBGR property." (IP-15 at

1-1).  The results of the evaluations of safety hazards at the former CBGR were presented in a

separate volume entitled Archives Search Report - Conclusions and Recommendations. (IP-15

at 1-1).  The court has searched the voluminous record for the conclusions and

recommendations of this May 1991 Archives Search Report and they do not appear to have

12

been placed in evidence.  This Archives Search Report was conducted by performing a review of pertinent records, telephone and in-person interviews, and a site visit. (IP-15 at 1-1). Interestingly, the report stated "[t]here were conflicting reports of specific targets, ranges and uses at the former Conway Bombing and Gunnery Range." (IP-15 at 5-1).

34.    In September 1995, the Corps released a Final Archives Search Report.  This report concluded that there was the potential for the presence of ordnance in Area B and B-1, in which Range III is situated. (IP-22 at 6).  Only Areas F and G were considered to have no ordnance. (IP-22 at 7).  As a result of the finding of a potential for ordnance in Areas B and B-1, an Expanded Site Inspection ("ESI") was recommended for those areas. (IP-22 at 7).  In the event that the presence of ordnance was confirmed in Areas B and B-1 by the ESI, an Engineering Evaluation/Cost Analysis ("EE/CA") was recommended for those areas. (IP-22 at 8).  The EE/CA is an analysis of removal alternatives for a site. 40 C.F.R. § 300.415(b)(4)(I) (removal actions).

35.    Mr. Canada, a forest technician with IP, was interviewed as part of the preparation for the September 1995 Archives Search Report.  (IP-21 at Appendix I).  With regard to Range III, the Corps' record of the conversation with Mr. Canada indicates that the "area has been cut and regrown twice.  IP has control burned the area several times, dug 2 ditches, and built a road in the area.  No OEW was found.  Large craters thought to be sinkholes by Canada, could possibly be bomb craters.  Deer and bear hunting occurs in the area." (IP-21 at Appendix I-1).  The conversation record further indicates "Mr. Canada was very knowledgeable and very able guide.  He knew the exact location of each target area as it appears on historic land maps.  However, he had never heard of a rifle range, machine gun

13

range or moving turret range being on site, as concluded by the 1991 TCT report." (IP-21 at Appendix I-1). The conversation record also showed that "IP is preparing a lot of its land for development. Some prepping was evident in the Target III area as well as areas near HWY 501." (IP-21 at Appendix I-1).

36.    The September 1995 Archives Search Report also included a risk assessment for Areas B and B-1. (IP-22 at Attachment C). The risk assessment classifies the risks associated with FUDS in two categories, hazard severity and hazard probability. There are five classifications of hazard severity: 1) catastrophic; 2) critical; 3) marginal; 4) negligible; and 5) none. (IP-22 at Attachment C, pg. 3). Likewise, there are five classifications of hazard probability: 1) frequent; 2) probable; 3) occasional; 4) remote; and 5) improbable. (IP-22 at Attachment C, pg. 7). The hazard severity assessed for Areas B and B-1 was critical; the hazard probability assessed for Areas B and B-1 was remote. (IP-22 at Attachment C, pg. 8). Based on these assessments, the area was assigned a low risk assessment code. However, the report concluded that "[a]n ESI is recommended despite the low RAC (risk assessment code) because of the potential for extremely hazardous OE (bombs, rockets) and because the area may become a residential area in the future." (IP-22 at Attachment C, pg. 8).

37.    In November of 1996, the Corps developed an Initial Project Management Plan ("IPMP") for the former CBGR. (IP-23). The objective of the project was to reduce the risk to property owners and users to acceptable levels. The plan stated that "[t]his will be accomplished by safely locating, identifying, and disposing of OE." (IP-23 at USGOV01052). The first step of the plan was to conduct an EE/CA for the site. (IP-23 at USGOV01052). The plan set a budget of approximately $570,000 for the EE/CA. (IP-23 at USGOV01062).

14

38.    On February 26 and 27, 1997, the Corps' contractor, Parsons Corporation ("Parsons"), conducted a visit to the former range, including the Range III area.  During the visit, no ordnance or explosives were reported at the former CBGR except at Range III.  Ordnance reported at Range III included several 50-caliber shell casings, bullets, and fragments of 4-pound incendiary bombs.  This ordnance was found at the ground surface.  A practice 2.5-inch rocket was also discovered at the edge of the access dirt road at the site.  (P-75, EE/CA Rep. at 2-13 to 2-14; P-77, US-100, US-101, US-102, US-127).  Based on the recommendations contained in the September 1995 Archives Search Report, the confirmation of ordnance at Range III prompted the commencement of an EE/CA on the site.

39.    In June of 1997, IPR provided the Corps with a right-of-entry to its property to conduct an Environmental Assessment and Response concerning the former CBGR.  (Finnegan, Tr. 8/17/06 at 207; US-13).  IPR believed that the government was conducting a routine review of all gunnery ranges. (Moore, Tr. 8/18/06 at 58).  IPR believed that the U.S. was still standing by the fact that the property had been deduded. (Moore, Tr. 8/18/06 at 58).

40.    In January 1999, the Corps and Parsons released a public report identifying the geophysical technique to be used for the EE/CA investigation at the site.

41.    In July 1999, the Corps released its work plan for the EE/CA.  The purpose of the EE/CA was "to characterize OE contamination, analyze risk management alternatives, and recommend feasible OE risk reduction alternatives" for the former CBGR. (IP-42 at 1-1).  The project schedule set forth in the Final Work Plan for the EE/CA stated that the project was initiated with a Notice to Proceed dated December 1998 and ends with the completion of the Final EE/CA Report including Responsiveness Summary and Final Action Memorandum.  The

EE/CA was scheduled to be complete in August 2000. (IP-42 at 3-8). Addressing CERCLA and the National Contingency Plan ("NCP"), the final work plan for the EE/CA noted that "[t]he EE/CA will implement ordnance and explosive (OE) risk management actions consistent with the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and the National Contingency Plan (NCP)." (IP-42 at 1-1).

42.     In December 1999, the Corps held public meetings in the Conway/Myrtle Beach area concerning the EE/CA process. (P-81). The purpose of the public meetings was to inform the public about what the Corps was doing, what the EE/CA would involve, and also to explain what the right-of-entry was about. (Nesbit, Tr. 8/18/06 at 162). At the time, the Corps did not anticipate that there would be a Time Critical Removal Action at the former CBGR. (Nesbit, Tr. 8/18/06 at 163).

43.     As of 1999, IPR knew that the Corps had identified subterranean anomalies on IPR's property at Carolina Forest. (Moore, Tr. 8/18/06 at 23). There is insufficient evidence that in 1999 IPR knew of the specific findings and recommendations in the Corps' previous reports.

**IV.    Goodson Construction Finds a Bomb or Bomb Part While Constructing Carolina Forest Boulevard**

44.     In the 1990s, Goodson Construction was involved in various construction projects in the Carolina Forest area, including the Man-o-War and Wizard golf courses, Glenn Hall lakes and roads, Schoolhouse Road, River Oaks Drive, and Towne Centre Boulevard. These projects involved moving large quantities of dirt from their natural place within Carolina Forest. (R. Goodson, Tr. 8/16/06 at 26-29; J. Goodson, Tr. 8/17/06 at 32-34). IPR contracted

with Goodson Construction with respect to certain road-building projects in the Carolina Forest area in the mid-1990s. (US-112 at 2-3).

45.    At the time, the Carolina Forest area was pine plantation timberland that was mostly thick with undergrowth.  (R. Goodson, Tr. 8/16/06 at 29-30).  Tract 19[9] was overgrown with a lot of brush; it was almost impenetrable in places.  (R. Goodson, Tr. 8/16/06 at 45).

46.    In connection with these road building projects, Goodson Construction had significant contacts with representatives of various companies (including IPR) and government agencies, but no such representative cautioned Ronald Goodson – a Goodson Construction manager – about bombs on Tract 19.  (R. Goodson, Tr. 8/16/06 at 31, 53-54, 88; J. Goodson, Tr. 8/17/06 at 34-40).

47.    In 1996, IPR contracted with Goodson Construction to construct Carolina Forest Boulevard.  (Moore, Tr. 8/18/06 at 33).  This road cut through the former bombing range and the planned Carolina Forest subdivision, as well as the Target and Safety zones of former Range III.  (US-64, US-65).

48.    In 1998 or 1999, prior to Goodson Construction's purchase of Tract 19, while constructing Carolina Forest Boulevard for IPR, Goodson Construction found at least one bomb, a bomb part, or other bomb-like object in the right-of-way next to Tract 19, which was owned by IPR at the time.  The bomb or bomb part appeared to be "a projectile like a bullet, something like the end of a bullet but larger, a piece of iron."  Ronald Goodson first saw the

---

[9] In these findings of fact, "Tract 19" refers to the property in Carolina Forest owned by Plaintiffs R.E. Goodson Construction Company, Inc. and R.E. Goodson, L.L.C. (jointly, "Goodsons").  This includes the 367.156-acre parcel described as Tracts 19A and 19C, as well as a 25-acre parcel, which is a portion of Tract 19B.  (P-1).

bomb or bomb part in the bucket of the excavator that had removed it from the earth.  (R. Goodson Tr. 8/16/06 at 32; US-115 at 2).

49.    The bomb was found in the right-of-way of Tract 19, between the property line and the roadway.  (Moore, Tr. 8/18/06 at 34; US-64).  Its length was between 18 and 24 inches according to Allen Moore.  (Moore, Tr. 8/18/06 at 66).  It was about 12 inches long according to Ronald Goodson. (Goodson, Tr. 8/16/06 at 89).

50.    Following this discovery, Ronald Goodson became concerned about the safety of his construction workers, so he notified Allen Moore, who was at the time IPR's sales manager at Carolina Forest (and now IPR's President), at his office in Georgetown.  (R. Goodson, Tr. 8/16/06 at 32, 90; Moore, Tr. 8/18/06 at 33).  Mr. Goodson told Mr. Moore "we found something out here that looks like a bomb, or shrapnel, or a bullet or something." (R. Goodson Tr. 8/16/06 at 91).  Moore reported the discovery to the Horry County Sheriff's Department.  (Moore, Tr. 8/18/06 at 34).

51.    Mr. Moore then drove to the location near Tract 19.  When Moore arrived at the location, an Horry County Sheriff's Deputy arrived on the scene and informed Moore that the Sheriff had notified military personnel at Fort Jackson.  (Moore, Tr. 8/18/06 at 34).  Mr. Goodson expressed concern for the safety of his workers. (R. Goodson, Tr. 8/16/06 at 92).  Over the course of six or seven hours, while waiting on Fort Jackson military personnel to arrive and standing in the place where the bomb or bomb part had been discovered, Mr. Moore told Mr. Goodson: "This used to be an old bombing range.  We have found some stuff over the years."  (R. Goodson, Tr. 8/16/06 at 94-96; US-5, Moore Dep. 6/24/04 at 73-78; US-2, R. Goodson Dep. 6/23/04 at 35-36).  Mr. Moore told Mr. Goodson about the former range

18

and what had been found on IPR's property. (Moore, Tr. 8/18/06 at 35; US-5, Moore Dep. 6/24/04 at 75-76). Mr. Moore also told Mr. Goodson "it was our supposition that [there] had to be some unexploded ordnance left over from the bombing range during World War II." (Moore, Tr. 8/18/06 at 36).

52.    Mr. Goodson understood Mr. Moore to be referring not just to the exact spot where the bomb or bomb part was removed, but to a broader area. Goodson testified that Moore told him it was not a big deal and to not worry about it, that it had been proven to be safe. (R. Goodson, Tr. 8/16/06 at 96). Mr. Goodson also understood Mr. Moore to be referring by the word "stuff" to "things that would have been placed on a bombing range" or "stuff that you would find on a bombing range." (R. Goodson, Tr. 8/16/06 at 97). Eventually, after six or seven hours, the military personnel from Fort Jackson arrived on the scene and "these people were terribly excited." (Moore, Tr. 8/18/06 at 35).

**V.    Goodsons' Purchase of Tract 19 from IPR**

53.    In 1999, the Goodsons wanted to make a bid for a large state highway project known as Phase I of the Carolina Bays Parkway. (R. Goodson, Tr. 8/16/06 at 37-38).

54.    In connection with this bid, Goodson Construction wanted a source of fill material that was relatively close to the proposed project. Goodson Construction first contacted IPR about the purchase of dirt only, but IPR wanted to sell the entire parcel. (US-1, J. Goodson Dep. 6/23/04 at 33-34; US-2, R. Goodson Dep. 6/23/04 at 12-13). Goodson Construction eventually negotiated with IPR for the purchase of Tract 19 of Carolina Forest from IPR. Goodson believed that this transaction would satisfy the present need for fill material for the Carolina Bays Parkway and also could turn future profits from the expected

19

"upscale" residential subdivision there.  (US-97).

55.    At the time of these negotiations, in the summer and fall of 1999, Goodson Construction was aware that an old bomb or bomb part had been found in the right-of-way next to Tract 19.  Goodson Construction was also aware that there was an old bombing range in an area broader than where the bomb or bomb part was found, and that some "stuff" had been found on the property over the years. (R. Goodson, Tr. 8/16/06 at 94-96; US-5, Moore Dep. 6/24/04 at 73-78; US-2, R. Goodson Dep. 6/23/04 at 35-36; US-5, Moore Dep. 6/24/04 at 75-76).

56.    There were other indications that Tract 19 was at or near the former Target Zone of the former bombing range.  Visible from Carolina Forest Boulevard – the road that Goodson Construction had built in 1998 or 1999 – were three, three feet by three feet, concrete pillars situated in the vicinity of Tract 19.  (J. Goodson, Tr. 8/17/06 at 81; Moore, Tr. 8/18/06 at 39-40; US-64; US-1, J. Goodson Dep. 6/23/04 at 50-51).

57.    These pillars, which looked like concrete trapezoids, were the foundation of a siting or observation tower on the former bombing range.  (J. Goodson, Tr. 8/17/06 at 67-68; US-1, J. Goodson Dep. 6/23/04 at 50).  Mr. Moore had told Ronald Goodson that he believed that these concrete pillars were the bases of tower-type observation platforms where people would observe the dropping of practice bombs.  Goodson Construction was instructed to remove these pillars as part of their construction activities on Carolina Forest Boulevard. (Moore, Tr. 8/18/06 at 37-39).

58.    As part of the purchase of Tract 19, the Goodsons received various maps showing the physical features of the property.  At least one of these maps showed a road

named Target Road, which crossed the length of Tract 19. (P-15; US-72).   Goodson was familiar with Target Road because the road was clearly marked on the plat attached to the deed for Tract 19.  (P-1 at IPC04928).

59.     A wetlands map given to the Goodsons in connection with their purchase of Tract 19 showed that the parcel contained an unusual cluster of small wetlands in the southern portion of the property.  (J. Goodson, Tr. 8/17/06 at 70; R. Goodson, Tr. 8/16/06 at 99; P-15; US-72).

60.     Although it has been suggested that the cluster of small wetlands on the wetlands map indicates bombing craters, it does not appear from these maps that it was clear these were in fact bomb craters and not wetlands or natural sinkholes.

61.     At no time prior to the Goodsons' purchase of Tract 19, did IPR advise the Goodsons of the Corps' activities on the site or the Corps' July 1997 right-of-entry for environmental assessment and response.

62.     Prior to purchasing Tract 19, the Goodsons did not conduct a physical search for bombs, bomb parts, or projectiles. (R. Goodson, Tr. 8/16/06 at 99).  The Goodsons' physical inspection of the property was limited to digging some pits to determine the type and quality of soil for use in the Carolina Bays Construction project.  (R. Goodson, Tr. 8/16/06 at 47).

63.     The Goodsons paid the full purchase price for Tract 19, over $2,000,000.00, and did not receive a discount for the possible contamination. (R. Goodson, Tr. 8/16/06 at 55; Moore, Tr. 8/18/06 at 61).

64.     While Janet Carter, the Horry County Planning Director, who resided in Horry County for decades, was unaware of the former bombing range, the Goodsons, however, did

21

have knowledge of its existence prior to their purchase of Tract 19.

65.    In 1989, the State of South Carolina purchased about 7,000 acres of property on the Buist Tract from International Paper known as the Louis Ocean Bay Complex.  It was the State's policy at that time, and it remains the State's policy today, to require Phase I Environmental Site Assessments in connection with real estate transactions.[10] (Jeffcoat, Tr. 8/17/06 at 124-25).

66.    In April 1998, Earth Management Systems, Inc. prepared a Phase I Environmental Site Assessment for Landmark Homes, Inc. in connection with Landmark's purchase of Carolina Forest Tract 4D, also known as Walkers Woods. (P-73).

67.    In the summer of 1999, the Catholic Diocese of Charleston purchased about 70 acres in Carolina Forest, within a mile and a half from Tract 19.  A Phase I Environmental Site Assessment was done in connection with that transaction.  (Jeffcoat, Tr. 8/17/06 at 126-27).

68.    Jeffcoat, Pike, and Nappier is a law firm that represented developers in connection with property acquisition all around Tract 19 in Carolina Forest.  In connection with such acquisition, Environmental Site Assessments were either done by the firm's clients or they relied on assessments done by the seller who had bought the property from IPR. (Jeffcoat, Tr. 8/17/06 at 126).

69.    In 1999 in Horry County, the "customary commercial practice" among purchasers of commercial real estate property was to have made inquiry into the prior uses and ownership

---

[10] While it may have been the State of South Carolina's policy in 1989 to conduct Phase I Environmental Site Assessments, it does not appear that in 1989 this was the general customary practice. *See* 135 Cong. Rec. E2367-01  (July 28, 1989) (statement of Rep. Weldon).

of the property, to determine whether there was any sign of environmental problems or hazardous waste contamination.  It should be noted that this was a purchase of several hundred acres for over $2,000,000.00 for a commercial purpose by a commercial business.  The level of inquiry applicable to a commercial entity is greater than the level of inquiry required by the average home buyer.  In Jeffcoat's opinion, purchasers should conduct what everyone calls a Phase I or Environmental Site Assessment.  (Jeffcoat, Tr. 8/17/06 at 128).  However, a Phase I study, because of its limited scope, would not have discovered subterranean ordnance.  David G. Nichols testified that a Phase I Environment Site Assessment would normally not include searching for ordnance contamination. (Nichols, Tr. 8/16/06 at 197).

70.    Jeffcoat testified that most people involved in commercial real estate in Horry County in 1999 were well aware of the location of the former bombing range in Horry County. (Jeffcoat, Tr. 8/17/06 at 133, 159).  However, Richard M. Lovelace, an experienced commercial and residential real estate attorney, who closed the sale of Tract 19 for the Goodsons, testified that he believed only the northernmost portion of the Buist Tract had been used as a bombing range. (Lovelace Dep. at 17).

71.    Prior to closing on the purchase of Tract 19, the Goodsons undertook no environmental assessments of Tract 19 and did not conduct a Phase I Environmental Site Assessment.  (R. Goodson, Tr. 8/16/06 at 101-02).

72.    A Phase I Environmental Site Assessment costs about $1,500 to $2,000. (Higgins, Tr. 8/18/06 at 220).

73.    Other than Ronald Goodson's discussion with Allen Moore when the bomb or bomb part was found in the right-of-way of Tract 19 (See ¶ 47 above), the Goodsons did not

23

ask IPR further questions about the presence of bombs on Tract 19. (R. Goodson, Tr. 8/16/06 at 98). The Goodsons did not inquire of IPR as to the former uses of the property other than history of its use as timberland.[11] (R. Goodson, Tr. 8/16/06 at 103; J. Goodson, Tr. 8/17/06 at 71-72) ("We did not specifically ask International Paper the prior use of the property."); see also (Moore, Tr. 8/18/06 at 41). The only issues raised by the Goodsons with IPR concerned the history of timber harvesting on the property, whether the timber would be there at the date of purchase, and the soil quality. (R. Goodson, Tr. 8/16/06 at 45-46; Moore, Tr. 8/18/06 at 57).

74.    In addition to not inquiring of IPR about the previous uses of Tract 19 before purchasing Tract 19, the Goodsons did not make any inquiry of any representatives of any government agency about the property's previous uses. (J. Goodson, Tr. 8/17/06 at 72; US-9, J. Goodson Dep. 7/19/06 at 25-26).

75.    Prior to purchasing Tract 19, the Goodsons did not make any inquiry of any other property owners in Carolina Forest concerning the previous uses of Tract 19. (J. Goodson, Tr. 8/17/06 at 73; US-9, J. Goodson Dep. 7/19/06 at 26).

76.    Prior to purchasing Tract 19, the Goodsons did not make any inquiry of Kimley-Horne engineers, which the Goodsons had employed to prepare their development plan for an upscale residential community on Tract 19, concerning the previous uses of Tract 19. (J. Goodson, Tr. 8/17/06 at 73; US-9, J. Goodson Dep. 7/19/06 at 29-30).

77.    Prior to purchasing Tract 19, the Goodsons did not make any inquiry of Survey

---

[11] James Goodson testified as to his understanding of the word "inquiry" at his deposition: "You ask questions." (US-9, J. Goodson Dep. at 24).

Technology, Inc., which prepared survey maps of Tract 19, concerning the previous uses of Tract 19.  (J. Goodson, Tr. 8/17/06 at 73; US-9, J. Goodson Dep. 7/19/06 at 31).

78.    The Goodsons procured a professional title examination of Tract 19 before closing on the purchase.  (R. Goodson, Tr. 8/16/06 at 50).  However, the Goodsons did not tell the attorneys performing the title search or the attorneys closing the sale that a bomb or bomb part had been found in the right-of-way, (R. Goodson Tr. 8/16/06 at 98), or of any other indication that the property was part of a former bombing range, (J. Goodson, Tr. 8/17/06 at 74; US-9, J. Goodson Dep. 7/19/06 at 32).  Mr. Lovelace, the Goodsons' closing attorney, testified that if he had received actual knowledge of any condition with regard to the ground, which would impact the economic interest of his client, he would have advised his client accordingly. (Lovelace Dep. at 47-48).

79.    A routine title search is not intended to uncover previous *uses* of the property, only its previous *ownership*.

80.    The Goodsons did not ask IPR for a discount on Tract 19 based on the fact that a bomb or bomb part had been found in the right-of-way of Tract 19, and IPR had told Ronald Goodson that the area was an old bombing range and "stuff" had been found there over the years.  Ronald Goodson was satisfied with his discussion with Moore regarding the conditions of the property after the bomb or bomb part was found on the right-of-way.  Mr. Goodson was not concerned about the issue.  (R. Goodson, Tr. 8/16/06 at 108-09; US-64).

81.    At the time of the transaction, the Goodsons had been involved in several multimillion-dollar commercial real estate transactions.  In 1991, the Goodsons contributed between $2 million to $2.2 million in services to acquire golf course property.  As of 2004,

25

the golf course took in about $1.2 million in revenue over the previous couple of years. (J. Goodson, Tr. 8/17/06 at 61-62).

82. On December 22, 1999, the transaction for the purchase of 367.56 acres of Range III, Tracts 19A and 19C, closed with the Goodsons. (P-1).

83. Although they had done so a year earlier when Allen Moore and Ronald Goodson met after the bomb was found on the right-of-way of Tract 19 (US-64), IPR did not disclose the information they had about the former range in connection with sale of the property at the time of closing. Additionally, IPR did not indicate that they previously granted the Corps a right-of-entry.

84. On March 14, 2000, the Goodsons acquired from IPR approximately 25 acres of an adjacent parcel known as Tract 19B. (P-1).

85. Once again, the Goodsons made no further inquiry, other than as noted in ¶ 47 above, with respect to the former use of the property and the presence of ordnance likely to be in, on, or at Tract 19.

VI.    **Removal Action on the Goodsons' Property**

86. In March 2000, Goodson Construction was awarded a subcontract with Palmetto Transportation Constructors ("Palmetto") for the Carolina Bays Parkway project. (US-71; R. Goodson, Tr. 8/16/06 at 65).

87. Shortly thereafter, Goodson Construction mobilized on the site, including moving equipment there, surveying the property, removing timber, and preparing to excavate a lakebed that would form the centerpiece of the planned residential community. (R. Goodson, Tr. 8/16/06 at 57; P-2).

26

88.    In connection with the excavation of dirt for the Carolina Bays Parkway project and the concomitant creation of the lakebed on Tract 19, the following permits were obtained by or for Goodson Construction:  (1) a March 9, 2000 NPDES General Permit from DHEC's Bureau of Water; (2) a March 17, 2000 Construction Permit issued to the South Carolina Department of Transportation and Palmetto by DHEC's Bureau of Water; and (3) a March 20, 2000 Encroachment Permit from the Horry County Engineering Department.  (P-17; P-17A; P-18; R. Goodson, Tr. 8/16/06 at 109-10; J. Goodson, Tr. 8/17/06 at 50-54).

89.    After a few days of excavating dirt on the site, Goodson Construction uncovered a bomb from underneath a tree stump, about 12 to 18 inches below the surface of the earth.  (R. Goodson, Tr. 8/16/06 at 60).

90.    This discovery created tremendous business problems for Goodson Construction because, under its subcontract with Palmetto, Goodson Construction potentially would be liable for liquidated damages of up to $10,000 a day for failing to perform and maintain the construction schedule.  (R. Goodson, Tr. 8/16/06 at 67; US-77).  The company needed to start hauling dirt as soon as possible to meet its contractual obligations.  (R. Goodson, Tr. 8/16/06 at 67).

91.    In a letter dated April 17, 2000, the Corps advised the Goodsons that:

> The Corps, under the Defense Environmental Restoration Program, has been tasked by the Department of Defense (DOD) to identify, investigate, and remediate environmental hazards that are a direct result of DOD activities at former installations. As you are aware, the property in question is being evaluated for possible inclusion in the subject project.  Inclusion in the project will be dependent upon both funding and the results of the evaluation, and even if approved, will involve some delay.

27

(US-73).

92.    After being told initially that the Corps could not move immediately to remove the ordnance, Goodson Construction's attorney contacted a Member of Congress, who requested that the Corps take action at the former range so that Goodson Construction could avoid a breach of its subcontract.  (R. Goodson, Tr. 8/16/06 at 63-64; US-9, J. Goodson Dep. 7/19/06 at 38-40; US-74; US-75).

93.    In late April 2000, in response to the Congressman's inquiry, the Corps deliberated as to how it might respond to Goodson Construction's request for assistance.  Two internal e-mails mentioned the concept of "reimbursement" or "restitution" from the FUDS program.  (US-74; US-75).  On May 10, 2000, the Corps advised Goodson Construction that the agency was prohibited from reimbursing the company under the DERP-FUDS program for expenditures incurred in connection with ordnance removal at Tract 19.  (Nesbit, Tr. 8/18/06 at 165; US-84).

94.    In May 2000, the Corps' headquarters directed the Charleston District to perform a Time-Critical Removal Action ("TCRA") on 65 acres of Tract 19 – the property owned by the Goodsons.  (Nesbit, Tr. 8/18/06 at 169).

95.    On May 3, 2000, the Corps drafted an Action Memorandum concerning Tract 19 and consisting of approximately 65 acres of the former CBGR. (IP-50).  The Memorandum stated that the 65 acres, which was owned by the Goodsons, would "undergo a removal action to remove potential ordnance and explosives (OE) hazards to accommodate a local road building project." (IP-50).

96.    The Corps' Action Memorandum noted threats to public safety stating that

28

"[c]onstruction activities will take place on the land exposing workers to potentially hazardous situations." (IP-50 at 3).  The Memorandum also noted threats to the environment stating "[a]ccidental detonation of ordnance has little impact on the environment unless fires are started.  The pine timber could prove to be highly vulnerable to fires." (IP-50 at 3).

97.     The Memorandum listed four alternatives for proposed actions for the Goodson property: 1) restrict use of the site; 2) perform interim removal action; 3) delay action; or 4) perform work with appropriate support. (IP-50 at 3).

98.     In concluding that the performance of an interim removal action was the appropriate action for the site, the Memorandum stated the following:

> Restricting the use of the site will result in a loss to the property owner since there is a contractual agreement to provide borrow fill material for nearby highway construction. Performing the Interim Removal Action would consist of a subsurface clearance, which includes the detection and removal of all OE found at or below the ground surface.  **It was concluded that the only alternative that provides sufficient protection to public safety and the environment, which complies with applicable or relevant and appropriate requirements (ARARs) and provides short term effectiveness until appropriate actions can be taken as a result of the EE/CA recommendations, is the "Perform Interim Removal Action" alternative.**

(IP-50 at 3-4).

99.     On or about May 10, 2000, the Corps advised Goodson Construction that the soonest that it could begin the TCRA on the 65 acres was July 6, 2000.  (US-77).  July 6, 2000, however, was not soon enough for Goodson Construction.  The company told the Corps that it needed the fill sooner to avoid potential contractual liability.  (R. Goodson, Tr. 8/16/06 at 68; US-77) ("This will cause problems with our contract.  Our contract to build part of the

29

Carolinas Bay Parkway has a liquidated damages clause of $10,000.00 a day for overtime. The entire project will be affected if we fail to perform our work on time.").

100.    Goodson Construction's contractual obligations required that preparation of the borrow pit on the site occur by May 15, 2000, and removal of dirt from the borrow pit occur by June 15, 2000. (US-77).

101.    The Corps was not able to begin removal work on the Goodson property until July 6, 2000, more than thirty days after the preparation of the borrow pit needed to begin. (US-76).  The Corps' inability to begin removal work before July 6, 2000, would inevitably result in a loss to Goodson Construction, the avoidance of which was one of the Corps' justifications for performing the TCRA.

102.    On or about May 11, 2000, Goodson Construction hired USA Environmental, Inc. ("USA Environmental") to remove ordnance from 20 acres on Tract 19 so that Goodson Construction could meet the deadline of its highway construction contract. (US-79).  USA Environmental was the same company hired by the Corps to perform removal work in connection with the TCRA and investigation work in connection with the EE/CA. (US-6 at 84-85).

103.    Goodson Construction calculated that the removal of 20 acres of dirt, to a depth of four feet, would give it enough fill dirt to make up lost time on the Carolina Bays Parkway project.  (R. Goodson, Tr. 8/16/06 at 74).

104.    Goodson Construction was in constant communication with the Corps during the Goodsons' removal work. (R. Goodson, Tr. 8/16/06 at 74).  Goodson Construction also directed USA Environmental to share with the Corps all available data gathered by USA

Environmental during the removal action regarding the areas that were cleared and the OE that was removed. (US-87).

105.    USA Environmental completed the removal work for Goodson Construction on June 10, 2000. (US-87).  Goodson Construction paid USA Environmental $84,941.00 for their services. (US-86; R. Goodson, Tr. 8/16/06 at 71).

106.    Goodson Construction and USA Environmental completed the work on the 20 acres before the Corps mobilized on Tract 19 for removal on the remaining 40-45 acres that had been contemplated in the TCRA.

107.    Before, during, and after the Goodsons' removal work on the 20 acres, Ronald Goodson and Ronald Nesbit, the Corps' project manager, had numerous conversations. Mr. Goodson asked questions, and Mr. Nesbit tried to be as helpful as possible, but Mr. Nesbit was careful not to give directions to Goodson Construction or suggest what the company must do or must not do.  Mr. Goodson shared information about the project with Mr. Nesbit.  (R. Goodson, Tr. 8/16/06 at 73-74; Nesbit, Tr. 8/18/06 at 156-57, 172).

108.    In issuing the final TCRA report in October 2002, the Corps summarized its removal action on the 40 or 45 acres on Tract 19. (P-76 at 1-1).  A grid map shows that the Corps deleted the removal work performed by USA Environmental for Goodson Construction from the Corps' TCRA project, noting that the Goodson Construction had subcontracted directly with USA Environmental. (P-76 at Figure 2.1).  The work performed by USA Environmental for Goodson Construction apparently satisfied the Corps' own TCRA.

109.    Sandra Frye, the U.S.' NCP (national contingency plan) compliance expert, testified that the Corps' TCRA work complied with the NCP. (Frye, TR. 8/18/06 at 142-43).

31

110.    The Corps spent approximately $4.817 million dollars removing ordnance from the 40 or 45 acres on Tract 19. (IP-57 at Table 5.1). The Corps' removal action began in June 2000 and was completed in October 2001. (IP-57 at 6-1).

## VII.    Removal Action on the IPR Parcels

111.    Shortly after Goodson began clearing dirt on the 20 acres of Tract 19, IPR began considering how to deal with the presence of ordnance on its property, which was also located within Range III.  IPR, unlike Goodson Construction, faced no contractual urgency. However, since 1994 IPR had been developing the area within the former CBGR, known as Carolina Forest, believing that if ordnance did exist on the property that it posed no threat to the public safety.  As stated above, between 1994 and 1998 or 1999, IPR spent approximately $25 million on the construction of infrastructure for the Carolina Forest development.

112.    As early as September 1995, the Corps classified the severity of any hazard posed by ordnance on Range III as critical.  However, based on the remoteness of the property, the probability of any human encountering the hazard was classified as remote. (IP-22 at Attachment C).  Documents in the record seem to indicate that as late as 2002 generally the Corps was not aware of the extent or scope of development that had been taking place in the Carolina Forest area or the amount of infrastructure that had already been constructed. (US-23; US-28).

113.    The final work plan for the EE/CA was issued in July 1999. (IP-42).  However, the Corps and Parsons did not begin preparing a draft of the EE/CA report until 2000 and 2001.  In approximately 2001, IPR knew that the U.S. took responsibility for placing the bombs and the Corps was tasked with cleaning up the property.  The only question was when

32

the Corps would complete the cleanup. (Finnegan, Tr. 8/17/06 at 184-85). IPR had "a high degree of confidence" that the Corps was eventually going to clean it up. (Moore, Tr. 8/18/06 at 23). "There was a high degree of confidence they (the Corps) were going to ultimately do it. But they put the bombs out there 60 years prior to this. Nothing had been done in 60 years." (Moore, Tr. 8/18/06 at 23).

114.    In 2000, when the Goodsons' construction activities revealed the presence of subterranean bombs, IPR immediately pulled their real estate from the market. They stopped all marketing and development activity in the surrounding area, despite having a planned urban development agreement with Horry County. (Moore, Tr. 8/18/06 at 21-22).

115.    Shortly thereafter, IPR began considering alternatives for dealing with the presence of hazardous ordnance on their property, which was located in the middle of the fastest growing county in South Carolina. (Moore, Tr. 8/18/06 at 22). IPR considered fencing off the area or creating a park. (Moore, Tr. 8/18/06 at 22). However, because of the rapid growth of the area surrounding the contaminated property, IPR concluded that it would not be possible to isolate the site from the public. (Moore, Tr. 8/18/06 at 22). "So the decision to clean it up and get rid of the materials that were a potential hazard was fairly easy." (Moore, Tr. 8/18/06 at 22).

116.    On January 31, 2000 and February 2000, two unexploded ordnance items, identified as 20lb fragment bombs were uncovered in Area B (Range III - Impact Zone). (IP-55 at 3-21). As of July 2000, a letter written on IPR's behalf, and copied to IPR's litigation counsel, reflected IPR's belief that there was a significant amount of live bombs on IPR's property. (US-21).

117.    As of April 2001, IPR knew that the draft EE/CA was scheduled for public release in June 2001.  At the same time, IPR was informed about certain NCP requirements for a Non-Time Critical Removal Action, including the requirement to prepare an EE/CA. (Finnegan, Tr. 8/17/06 at 210-12; US-22).

118.    In May 2002, the Corps issued its Final Draft EE/CA Report. (IP-55).  The risk assessment summary for the IPR parcels stated that ongoing construction, current and future residential and recreational activities, and the large population creates the presence of an explosive safety risk. (IP-55 at 4-11).  According to this report, the recommended response action for the IPR parcels (Range III) was clearance of ordnance and explosives to depth with institutional controls. (IP-55 at 8-1).

119.    In July 2002, IPR submitted comments to the Final Draft EE/CA Report correcting the mistaken assertion that the current use of Range III was forestry and community development. (IP-58, at 16, Responsiveness Summary, Comments to EE/CA).  In fact, according to IPR, since 1989, Range III had been used primarily for development purposes. IPR also requested that the Corps provide notice to IPR as to when and where the public hearings would take place. (IP-58, at 18, Responsiveness Summary, Comments to EE/CA).

120.    In or about April 2003, IPR hired ERM Southeast, Inc. ("ERM Southeast") to clear ordnance from the IPR Parcels, to the extent they were in the Target and/or Safety Zones of former Range III.  (Finnegan, Tr. 8/17/06 at 186; US-38; US-39; US-65).  The work was done pursuant to a Master Services Agreement with IP.  (Finnegan, Tr. 8/17/06 at 187; IP-85). ERM Southeast is the world's largest environmental consulting and remediation company. (US-11, McKibben Dep. at 14).  ERM Southeast has performed environmental consulting and

34

cleanup services for the armed forces, the federal government, and private parties. (McKibben, Tr. 8/18/06 at 73).

121.    In May 2003, IPR's President, L.H. Ronnie, Jr., sought from IPR the first of a series of authorizations to spend money for a magnetic anomaly detection survey on the IPR Parcels.  In his memorandum requesting the money, Ronnie stated that about 1,000 acres of Carolina Forest were "unsaleable because of the issues regarding WWII ordnance.  The sales value of this property is a minimum of $12.2 million which could be realized easily if we had a clear determination of the extent of the ordnance."  (US-40).  IPR estimated that the maximum cost of the ordnance removal would be $3.5 million, which would yield a "net value" of $9 million and also stated that the investigation "would readily clear at least 500 acres for immediate sale."  The memorandum concluded: "With potential 2003 revenue of $7 million for expenditures of $427,000, I think we need to proceed aggressively in this investigation."  The memorandum made no mention of public health or environmental concerns.  (US-40).

122.    In July 2003, IPR met with Corps attorneys about a settlement concerning the cleanup of the IPR Parcels.  At the meeting, the Corps offered to help IPR and to answer IPR's questions.  (Finnegan, Tr. 8/17/06 at 192).  The key issue discussed at that meeting was compliance with the EE/CA and the NCP. (Finnegan, Tr. 8/17/06 at 192).  At that meeting, the Corps represented that they would answer any questions IPR had with regard to the cleanup and suggested that IPR hire ERM Southeast. (Finnegan, Tr. 8/17/06 at 192).  The Corps told IPR that if IPR wanted any sort of reimbursement, IPR had to comply with the alternatives and public participation requirements of the NCP.  (Finnegan, Tr. 8/17/06 at 215-

16; US-63 at Page 12-13). During the meeting, the Corps provided IPR with the appropriate citation to the Code of Federal Regulations so that IPR could comply with the NCP. (Finnegan, Tr. 8/17/06 at 216; US-63 at Page 12-13).

123. Following the meeting with the Corps in July 2003, IPR informed ERM Southeast that their work plan must comply with the NCP in order for IPR to get reimbursed for the removal action. (Finnegan, Tr. 8/17/06 at 213).

124. In July of 2003, ERM Southeast and Advent Environmental, Inc. ("Advent") prepared a work plan in connection with the ordnance removal work for IPR. (IP-63[12]). It is not clear whether this work plan was submitted to the Corps. Ms. Finnegan testified that she believed that ERM Southeast submitted the work plan to the Corps and that the Corps provided comments to the work plan. (Finnegan, Tr. 8/17/06 at 192). Ronald Nesbit testified that it was his belief that the Corps did not receive or review a work plan for the IPR parcels. (Nesbit, Tr. 8/18/06 at 157, 159). However, ERM Southeast or Advent did send the Corps a draft work plan for a separate client named American Mining LLC, who also owned property in Range III. The draft work plan for American Mining LLC concerned a project named "Plantation Lakes Development" on Tract 8A of the former CBGR, which is not one of the IPR Parcels. (P-65; US-125). The Corps reviewed the American Mining LLC work plan and prepared comments. (US-126). On May 9, 2003, the Corps sent comments on the American Mining LLC work plan to ERM Southeast. (IP-124). McKibben testified that it was the normal protocol for ERM Southeast to submit its work plans to the Corps for review.

---

[12] ERM Southeast's work plan for the IPR Parcels was part of Exhibit IP-63 and was handed to the Court during the testimony of Michael McKibben. (McKibben, Tr. 8/18/06 at 79, 81).

(McKibben, Tr. 8/18/06 at 80).

125.    In September 2003, the Corps issued the final EE/CA report.  (Finnegan, Tr. 8/17/06 at 185).  The risk assessment summary for the IPR parcels stated that ongoing construction, current and future residential and recreational activities, and the large population creates the presence of an explosive safety risk. (IP-58 at 4-11).  According to this report, the recommended response action for the IPR parcels (Range III) was clearance of ordnance and explosives to depth with institutional controls. (IP-58 at 8-1).

126.    The Corps' EE/CA began with the Notice to Proceed in December 1998 and the Final EE/CA Report was issued in September 2003.  As noted previously in this Order, the EE/CA was scheduled to be completed in August 2000.

127.    The purpose of the EE/CA was to characterize the presence of ordnance and explosives, analyze risk management alternatives, and recommend feasible risk reduction alternatives for the entire former CBGR. (IP-58 at 1-1).  The EE/CA included a community relations plan and a regulatory compliance plan that included identifying and complying with all applicable or relevant and appropriate requirements (ARARs). (IP-42 at 9-1).  The EE/CA was conducted to comply with the requirements of the National Contingency Plan (NCP) for non-time critical removal actions. (IP-58 at 1-1).

128.    The specific tasks that comprised the Corps' EE/CA for the former CBGR included: 1) records review and drafting the project work plan - this task required Parsons ES, the Corps' contractor, to review the 1995 Archives Search Report and other data and prepare and submit a work plan; 2) site preparation - this task required Parsons ES to clear the sampling areas of brush and underbrush for future surveys, geophysical and ordnance and

explosives intrusive work; 3) location surveys and mapping; 4) site characterization - this task involved the actual investigation of the sites for subterranean ordnance; 5) public risk evaluation - this task required Parsons to evaluate the public risk using the data collected during the site investigations to mathematically determine the expected number of exposures and the associated risk to the population from exposure to unexploded ordnance at the site; 6) preparation of the EE/CA report - the report documented the investigation effort and subsequent evaluations and recommendations for the various ranges within the former CBGR; 7) preparation of Action Memorandum describing the selected risk reduction alternatives for the site; 8) preparation of all Department of Defense reports; 9) community relations support - this task required Parsons to support, attend, and participate in public meetings and to distribute to interested local residents fact sheets detailing the current investigation and site history; 10) project meetings - this task allowed the public to participate and provide comments regarding the EE/CA process in order to comply with NCP requirements for public involvement; 11) project management; 12) defense reutilization and marketing organization turn in - this task provided that all scrap metal would be turned in to a locally approved scrap dealer. (IP-42 at 5-1 - 5-7).

129.    During the public response period for the EE/CA, individual property owners and the community expressed an interest in having the contaminated areas cleared of ordnance. (IP-58 at 7-10).

130.    ERM Southeast and IPR did not conduct separate public hearings from the Corps' public hearings in connection with the EE/CA; however, IPR participated in the public hearings conducted by the Corps. (McKibben, Tr. 8/18/06 at 84).  The public hearings held by

the Corps in connection with the EE/CA allowed the community to comment on and ask questions about the former CBGR, the proposed actions for restoration, and if and when any cleanup activities by the Corps would take place.

131.    At the public hearing on September 12, 2002, Ronald Nesbit of the Corps, suggested to the public that it would be more economical for a private landowner to clean up the property themselves than if the Corps performed the clean up. (IP-56 at 44).

132.    IPR and ERM Southeast did not prepare an EE/CA for their removal work on the IPR Parcels separate from the Corps' EE/CA because they believed that they were not required to do so.  (US-11, McKibben Dep. at 38).  The Corps' initial budget for the EE/CA was approximately $570,000.00. (IP-23 at USGOV01062).  For IPR to incur these costs to simply duplicate the efforts of the Corps with regard to the same property would have been unnecessarily duplicative and wasteful.

133.    In September 2003, IPR began the first phase of its removal efforts on the IPR parcels. (IP-63).

134.    In October 2003, IPR sought approval from IP for the expenditure of an additional $1,905,000 for a geophysical investigation.[13]  As part of this request, IPR did not mention any public safety or environmental concerns.  Rather, IPR noted that it was "in the process of finalizing a contract for the majority of this property for $17,000 per upland acre and $1,000 per wetland acre, for a total of $12,000,000.  We have high expectations of being able to close this sale in 2003 and expect an additional sale of $3-4,000,000 in 2004.  In order

---

[13] As IP's wholly-owned subsidiary, IPR was required to seek approval from IP for any expenditures over $300,000.00. (Connor, Tr. 8/17/06 at 87-89).

to make this sale, we must do the cleanup . . . .  The expenditure is fully supportable on an economic basis." (US-46).

135.   In August 2004, when the physical cleanup of the ordnance on the IPR Parcels had just begun, Ms. Finnegan prepared a document for IP's Chief Financial Officer to request the expenditure of $4,950,000 in additional funds for the ordnance removal work.  (Finnegan, Tr. 8/17/06 at 220-21; US-53).

136.   At the time of this request, there was no doubt that the Corps had taken full responsibility for the placement and removal of ordnance at the former CBGR.  (Finnegan, Tr. 8/17/06 at 221; US-53 at Page 6).  However, there was a question as to when the Corps would begin removal work on the site.

137.   In making the request for $4.95 million, Ms. Finnegan presented four alternatives:

* Do nothing.  Property is worth $18.5mm.  If cleanup is not done, IP will not realize these revenues.

* Wait for the Corps to do the clean up.  Corps has taken responsibility for the site.  Projected clean up is within 20 years.

* Expend the capital now and realize $16.5mm in revenues in 2004.

* Expend capital now, realize the revenues in 2004 and negotiate with the Corps for reimbursement . . . .

(US-53 at 17; see also Finnegan, Tr. 8/17/06 at 222).

138.   Even though none of the alternatives stated in the presentation specifically mentioned public safety, it is clear from the testimony of Allen Moore and Sabina Finnegan

40

that everyone at IPR was substantially concerned with public safety with regard to the former CBGR. (Finnegan, Tr. 8/17/06 at 222-23; Moore, Tr. 8/18/06 at 22; US-53 at 17). IPR's concern for public safety is further evidenced by their immediate withdrawal of their properties from the market upon their discovery of hazardous ordnance and explosives.

139. IPR could not get a commitment from the Corps as to when any removal work would begin even though the Corps had been investigating the presence of ordnance and explosives on the former CBGR since the early 1990s.

140. In the presentation authored by Ms. Finnegan, she noted that the property was worth $18.5 million "in today's dollars."

141. In mid-2003, IPR began incurring costs concerning the removal of ordnance at the IPR Parcels. The work was performed by ERM Southeast and Advent over the next three years, in three phases, on Parcels 9D, 16, 18, 19B, 22B, and the two school sites. (US-10, Connor Dep. Exhibit 3).

142. The first phase involved surface clearance of the site that included 100 percent coverage of the site using a magnetic anomaly detector to determine whether ordnance was present on the site and could pose a danger to the brush clearing crews. The second phase of ERM Southeast's work was known as a geophysical survey. The purpose of this survey was to determine the location, depth, and size/type of the anomalies present within the survey area to a depth of six feet below ground. The third phase involved the actual removal of ordnance at the site. Using the data from the previous phase, workers went to the site and excavated the earth at the locations where anomalies were identified. The anomalies were then removed from the earth and either detonated in place or moved to a central holding area and later sent

41

to a recycling facility.  (US-12, Fowler Dep. at 22-29).

143.    In January 2005, IPR and ERM Southeast met with the Corps about a change in IPR's work plan relating to a repetitive signature during the reacquisition of anomalies on Tract 18.  The Corps had no problem with the alteration to IPR's work plan.  Based on this meeting, IPR and ERM Southeast were left with the impression that they were doing fine. (Finnegan, Tr. 8/17/06 at 193-95; IP-118).

144.    At some point, IPR sent the reports generated by ERM Southeast to Janet Carter, the Horry County Planning Director, with the intention that Ms. Carter would forward the reports to the Corps.  (Finnegan, Tr. 8/17/06 at 195-96).  Ms. Carter, however, does not recall forwarding the reports to the Corps.  (Carter, Tr. 8/17/06 at 12-13).

145.    In March 2005, as part of his duties to review and approve invoices submitted by ERM Southeast, IPR's comptroller recommended approval of an invoice of $278,000 and noted:  "We have sales contracts on Tracts 18, 19, and 22, all within the ordnance area, totaling $16.4 million dollars.  These sales will close immediately after the tracts are cleared. A portion of Tract 18 has already been cleared, and 673 acres on this tract are scheduled for sale in March for $5.158 million."  (US-57).

146.    In April 2005, IPR requested that IP increase the ordnance removal budget to $11,000,000.  In the memorandum requesting the additional $3,750,000, Mr. Ronnie stated: "Since we have sunk substantial funds in our program to date, the tradeoff of $13,000,000 in sales versus $3,750,000 in additional costs dictates that we need to complete the work.  I also think that from a corporate liability issue, this work must be completed.  *We know what is in the soil and I feel uncomfortable leaving it in place.  While historical data indicated there*

42

were no live ordnance on site, **we have found at least 10 live large (250-500 pound) bombs**. *I do not feel that we can leave the site in its current condition*.  I recommend that you sign below authorizing an increase in the budget to $11,000,000.  With gross sales on this parcel of $18,200,000 and ordnance and other costs of $12,000,000, we are still $6,000,000 in cash flow better than having left it alone.  We may still be reimbursed for our cleanup by the government."  (US-58).

147.    In September 2005, IPR requested that IP approve the expenditure of an additional $3,000,000 for the ordnance removal work, to bring the total budget to $14,000,000.  Ms. Finnegan briefly summarized the cleanup work IPR had performed to date.  "Of the anomalies we have dug up, 14 have been live bombs, requiring roadway shut down and evacuation.  Another 2700 bombs/rockets have been removed and sent to the detonation magazine for a common blow.  When a live ordnance is found the procedure is to hand dig the location to uncover the ordnance and then virtually use 'garden tools' to unearth and maneuver it." (US-62).  She stated that IPR had removed 28,785 lbs of ordnance related scrap.  In her memorandum, Ms. Finnegan justified the request by describing "the economics of the ordnance removal on a per site basis."  Her conclusion was: "Upon completion of the project we should net $4.6 million.  The buyers for tracts 19[B], 22, and 9D are eager to close and are scheduled for the end of September 2005. . . I would also like to mention that we continue to explore the possibility of government reimbursement." (US-62).

148.    The work performed by ERM Southeast on the IPR Parcels was completed in January 2006 and included the cleanup of approximately 1200 acres. (Finnegan, Tr. 8/17/06 at 189, 197).  IPR alleges that it paid $13,674,159 to ERM Southeast for its services.  (Connor,

Tr. 8/17/06 at 101).  The U.S. stipulated that IPR incurred approximately $13,274,159 in cleanup costs,[14] $400,000 of IPR's cleanup costs remain in dispute, which is explained further below. (Tr. 8/17/06 at 83).

149.    Several of the invoices upon which IPR bases its claim are incorrect, in that they have overlapping billing dates.  (Connor, Tr. 8/17/06 at 103).  The incorrect invoices include Invoice Nos. SE00350 and SE00502, both in the amount of $66,000, dated December 7, 2004 and January 6, 2005, respectively.  (US-55).  These invoices reflect a problem with the amount of days charged with regard to the period-ending dates, ERM Southeast did not issue substitute invoices, and there are no documents that purport to correct the problem.  (US-10, Connor Dep. at 75-76).

150.    Other invoices upon which IPR bases its claim contain no information about the work that was performed, other than the general project.  These invoices are SE00209 and SE00210, both dated May 28, 2004, in the amounts of $5,000 and $75,000, respectively.  (US-49).  IPR's comptroller could not identify the work that was the subject of these charges and is not aware of any documentation that supports the work reflected on the invoices.  (US-10, Connor Dep. at 63).  The U.S. also disputes $191,000 in overtime costs which IPR incurred in order to meet certain deadlines concerning real estate transactions.  (US-56; US-12, Fowler Dep. at 31).

151.    The court finds that $337,000 of IPR's total removal costs are unnecessary.

---

[14] It should be noted that the Corps spent approximately $4.817 million removing ordnance from 40-45 acres on the Goodsons' property.  IPR spent approximately $13.27 million removing ordnance from approximately 1200 acres.  By way of illustration and assuming the Corps' cleanup cost per acre on IPR's property would have been the same as the Corps' cleanup cost per acre on the Goodson property, the Corps would have spent approximately $128,453,333 cleaning up IPR's property.

Specifically, IPR is not entitled to recover: 1) $66,000, Invoice No. SE00502, because evidence shows that the dates for Invoice No. SE00502 overlap with dates for Invoice No. SE00350; 2) $80,000, Invoice Nos. SE00209 and SE00210, because IPR could not identify the work that was the subject of those charges; and 3) $191,000 for overtime charges incurred in order to meet real estate deadlines.

152.    The court finds that Goodson Construction incurred $84,941 in response costs. (US-86; R. Goodson, Tr. 8/16/06 at 71).  The court further finds that IPR incurred $13,337,159 in response costs.  Goodson LLC and IP did not incur any costs of response. (R. Goodson, Tr. 8/16/06 at 115; US-6, Spencer Dep. at 77; Connor, Tr. 8/17/06 at 101; US-10, Connor Dep. at 18-19).

153.    As explained further below, the court finds by a preponderance of the evidence that the costs of response incurred by IPR and Goodson Construction were both "necessary" and consistent with the NCP and both IPR and Goodson Construction have met their burden of proof in that regard.  Further explained below, Goodson Construction has not met its burden to prove by a preponderance of the evidence that it qualifies as an "innocent purchaser." However, IPR has met its burden of proof and does qualify as an "innocent purchaser."  IPR has satisfied the Section 107(b)(3) third party defense and Goodson Construction has not.

## *CONCLUSIONS OF LAW*

**I.    The CERCLA Claims at Issue**

   **A.    Summary of the Goodsons' Remaining Claims**

154.    The Goodsons seek to recover from IP, IPR, and the U.S. the $84,941 in "costs of response" that they allegedly incurred in connection with the removal of ordnance by USA

45

Environmental on 20 acres of Tract 19 in May 2000. 42 U.S.C. § 9607(a)(4)(B). The Goodsons also seek a declaration that IP, IPR, and the U.S. are jointly and severally liable for future costs of response on the property.[15]

### B.     Summary of IP's and IPR's Remaining Claims

155.    IP and IPR seek to recover from the U.S. $13,674,159 in response costs that IPR allegedly incurred in connection with the removal of ordnance by ERM Southeast on the IPR Parcels from 2003 to 2006. 42 U.S.C. § 9607(a)(4)(B). IPR also seeks contribution from the U.S. in the event that it is liable to the Goodsons for costs of response at Tract 19. 42 U.S.C. § 9613(f)(1). IPR expects to incur no future "costs of response" with respect to the IPR Parcels.[16]

## II.     Prima Facie Case for Cost Recovery under Section 107 of CERCLA

156.    A private party seeking to recover response costs under CERCLA must prove the  following three elements by a preponderance of the evidence: "(1) that the defendant 'owned or operated' a 'facility' from which there was a 'release' or 'threatened release' of a hazardous substance, (2) that the defendant is a 'potentially responsible person,' and (3) that

---

[15]  By Order dated October 13, 2005, the court dismissed the Goodsons' contribution claims under Section 113 because "there has been no civil action against [them] under §§ 106 or 107(a)" of CERCLA. (Order 10/13/05 at 39) (citing Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. 157 (2004)). In the same Order, the Court dismissed the Goodsons' claims under the citizen-suit provision of the Resource Conservation and Recovery Act because such claim was barred by Section 113(h) of CERCLA, as well as 42 U.S.C. § 6972(b)(2)(B). (Order 10/13/05 at 45-46).

[16]  In its Order of October 13, 2005, the court declined to dismiss the claims of IP and IPR under Aviall Services because IP and IPR have been subject to a cost recovery action in this case under Section 107(a). (Order 10/13/06 at 39). Those Section 107(a) claims, however, relate only to the Goodsons' costs concerning Tract 19. IP and IPR have never been sued under Section 106 or 107 concerning the costs incurred at the IPR Parcels. Accordingly, IP and IPR's claims under Section 113 concerning their costs at the IPR Parcels must be dismissed in accordance with Aviall Services.

the plaintiff incurred necessary cleanup costs 'consistent with the national contingency plan.'" Westfarm Assocs. Ltd. P'ship v. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 677 (4th Cir. 1995); see also Rhodes v. County of Darlington, 833 F. Supp. 1163, 1177 (D.S.C. 1992).

157.    With respect to the first element, there is no dispute that the U.S. operated a facility from which there was a release or threatened release of a hazardous substance.  That is, the U.S. operated the CBGR from approximately 1941 through 1948, during which time it caused exploded and unexploded ordnance to remain on the property.

158.    As for the second element, there is no dispute that the U.S. is a potentially responsible person ("PRP") with respect to the ordnance contamination at the former bombing range, which includes Tract 19 and the IPR Parcels.

159.    Regarding the third element, the claimants, Goodson Construction and IPR, have shown by a preponderance of the evidence that they have (A) incurred (B) necessary cleanup costs that are (C) consistent with the NCP.

**A.    Goodson L.L.C. and IP Did Not "Incur" Any Costs of Response**

160.    R.E. Goodson L.L.C. did not incur any costs of response that are claimed in this litigation.  (R. Goodson, Tr. 8/16/06 at 115; US-6, Spencer Dep. at 77).  Accordingly, R.E. Goodson L.L.C. has not proved a claim for relief under Section 107 of CERCLA.

161.    IP did not incur any costs of response that are claimed in this litigation. (Connor, Tr. 8/17/06 at 101; US-10, Connor Dep. at 18-19).  Accordingly, IP has not proved a claim for relief under Section 107 of CERCLA.

**B.    The Costs Incurred by R.E. Goodson Construction Company, Inc. and IPR Were "Necessary"**

162.    In order to recover costs of response under Section 107(a)(4)(B) of CERCLA, such costs must be "necessary."  Courts deny recovery where the costs incurred are "duplicative of other costs, wasteful, or otherwise unnecessary to address the hazardous substances at issue."  Waste Management of Alameda County, Inc. v. East Bay Reg'l Park Dist., 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001); see also Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp., 847 F. Supp. 389, 401 (E.D. Va. 1994).  "Necessary" costs means they were incurred in response to a threat to human health or the environment. See 42 U.S.C. § 9607 (a)(4)(B); see also Regional Airport Authority of Louisville v. LFG, LLC, 460 F.3d 697, 700 (6th Cir. 2006); Carson Harbor Vill., Ltd v. Unocal Corp., 270 F.3d 863, 871 (9th Cir. 2001) (noting that "necessary" requires that an actual and real threat to human health or the environment exist *before* initiating a response action); G.J. Leasing Co. v. Union Elec. Co., 854 F. Supp. 539, 562 (S.D. Ill. 1994) (stating that an actual or real threat to public health must exist *before* any response action is initiated).  Costs incurred at a time when the party seeking to recover was unaware of any threat to human health or the environment are not "necessary." Regional Airport Authority, 460 F.3d at 704.

**1.    The Removal Costs Incurred by R.E. Goodson Construction, Inc. Were "Necessary"**

163.    The necessity of the actual costs incurred by Goodson Construction have not been disputed to the extent that the costs were necessary to remove the ordnance.  Instead, the U.S. argues that the costs were unnecessary because the Corps intended to clean up the property under a Corps authorized TCRA beginning July 6, 2000, and it was unnecessary for

Goodson Construction to initiate its own cleanup in light of the Corps' TCRA.  The actual costs incurred by Goodson Construction related to locating, removing and disposing of the ordnance.

164.    On May 3, 2000, the Corps drafted an Action Memorandum concerning approximately 65 acres of the former CBGR. (IP-50).  The Memorandum stated that the 65 acres, which was owned by the Goodsons, would "undergo a removal action to remove potential ordnance and explosives (OE) hazards to accommodate a local road building project." (IP-50).  The Action Memorandum noted threats to public safety stating that "[c]onstruction activities will take place on the land exposing workers to potentially hazardous situations." (IP-50 at 3).  The Memorandum also noted threats to the environment stating "[a]ccidental detonation of ordnance has little impact on the environment unless fires are started.  The pine timber could prove to be highly vulnerable to fires." (IP-50 at 3).

165.    The Action Memorandum rejected the options of restricting the use of the site, delaying action, or performing the work with appropriate support. (IP-50 at 3).  The option of restricting use of the site was rejected because it would "result in a loss to the property owner since there is a contractual agreement to provide borrow fill material for nearby highway construction." (IP-50 at 3).  It is clear from the Corps' Action Memorandum that a removal action was deemed appropriate and necessary for the Goodson property.  It is also clear that the justifications for the Corps' removal action on the Goodson property were: 1) to protect the construction workers from the dangers of unexploded ordnance; 2) to protect the environment from any fires that could result from a detonation of unexploded ordnance; and 3) to avoid any economic loss suffered by the Goodsons by virtue of their contractual obligations.

49

166.    Goodson Construction's contractual obligations required that preparation of the borrow pit on the site occur by May 15, 2000, and removal of dirt from the borrow pit occur by June 15, 2000. (US-77).  Goodson Construction's highway construction contract included a liquidated damages clause that provided for a penalty of $10,000.00 each day the project ran overtime. (US-77).

167.    The Corps, however, was not able to begin removal work on the Goodson property until July 6, 2000, more than thirty days after the preparation of the borrow pit needed to begin. (US-76).  Importantly, the Corps' inability to begin removal work before July 6, 2000, would inevitably result in a loss to Goodson Construction frustrating one of the stated purposes of the Corps' TCRA.

168.    On or about May 11, 2000, Goodson Construction hired USA Environmental, Inc. ("USA Environmental") to remove ordnance from 20 acres on Tract 19 so that Goodson Construction could meet the deadline of its highway construction contract. (US-79).

169.    The section of the Code of Federal Regulations concerning removal actions under CERCLA states that "[i]f the lead agency determines that a removal action is appropriate, actions shall, as appropriate, begin as soon as possible to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat to public health or welfare of the U.S. or the environment." 40 C.F.R. § 300.415(b)(3).  A plain reading of section 300.415(b)(3) suggests that the section does not require the lead agency to perform the removal action, but that the removal action begin as soon as possible.

170.    The Corps is the lead agency for cleaning up FUDS.  In this case, the Corps had already made the determination that a removal action on the Goodson property was

50

necessary noting the potential threat to the environment (threat of fire) and public safety (exposure of construction workers to hazardous situations) and the potential loss to the property owner (Goodson Construction).

171.    In the court's view, Goodson Construction should not be faulted for hiring USA Environmental to perform removal work when their reasons for doing so were the same as the Corps' reasons for performing the TCRA.  The court is not persuaded by the U.S.' assertion that Goodson Construction was obliged to wait for the Corps to remove ordnance from the property after the Corps had determined that a removal action was appropriate.  With regard to Goodson Construction's removal action, the Corps had documented an actual threat to public health and the environment *before* Goodson Construction initiated their removal action. See Carson Harbor, 270 F.3d at 971; G.J. Leasing, 854 F. Supp. at 562.

172.    Goodson Construction's removal costs were not duplicative of the Corps' removal costs.  Initially, the Corps intended to remove ordnance from 65 acres of the Goodson Property.  (IP-50).  Goodson Construction hired USA Environmental to remove ordnance from 20 of the 65 acres leaving only 45 acres for the Corps clean up. (US-78; US-79; US-81).  A grid map included in the Corps' Final TCRA Report showed that the Corps deleted the removal work performed by USA Environmental for Goodson Construction from the Corps' TCRA project. (P-76 at Figure 2.1).  As a result of Goodson Construction's removal activities, the Corps' removal work on the Goodson property was reduced by almost one third.

173.    For the reasons stated above, the court finds by a preponderance of the evidence that the removal costs incurred by Goodson Construction were necessary.

## 2.    The Removal Costs Incurred by IPR Were Necessary

174.    Unlike Goodson Construction, IPR did not face any contractual urgency and did not have the benefit of a Corps authorized TCRA relating to their property.  IPR, however, was faced with owning hazardous ordnance contaminated property in the middle of one of the fastest growing developments in South Carolina.

175.    The U.S. argues that IPR's removal costs were unnecessary because their decision to incur these costs was driven by a desire to realize profits from land sales rather than concerns for public safety.

176.    In 1994, before IPR knew of the presence of hazardous unexploded ordnance, IPR created a development plan for 12,000 acres, part of which was located in and around Range III.  Ultimately, 55,000 or more people would reside in this development.  From 1994 to 1998 or 1999, IPR spent approximately $25 million on the infrastructure for this development, which would have so many people that it would have its own zip code.  During this time, IPR received no indication from any state, federal, local agency, or contractor that there was any problem with the planned development because of ordnance. (Moore, Tr. 8/18/06 at 16, 58).

177.    As early as September 1995, the Corps had concluded that the severity of any hazard posed by ordnance on Range III was critical. (IP-22 at Attachment C).  This information, apparently, was not disclosed to IPR despite IPR's widely publicized development activities in the area.

178.    IPR's development activities required that Horry County pass an ordinance adopting the development plan. (Moore, Tr. 8/18/06 at 12).  The process that led to Horry

52

County's adoption of the development plan began in 1994 and included extensive meetings with all departments in Horry County, public hearings, cooperative efforts with Horry County's consulting land planner, impact reviews, an editorial board review by the Sun News which assigned reporters to cover the project, as well as local television coverage. (Moore, Tr. 8/18/06 at 12-14). Despite the extensive coverage of the planned development for Carolina Forest, the Corps remained oblivious of the extent or scope of the development. (US-23; US-28).

179.    Upon the discovery of hazardous ordnance in the middle of this development, IPR considered isolating the area or creating a park. (Moore, Tr. 8/18/06 at 22). However, because of the amount of people moving into the area, IPR concluded that it would be impossible to isolate the site from the public. (Moore, Tr. 8/18/06 at 22).

180.    As noted above, the Corps had been investigating the presence of ordnance at the former CBGR since as early as 1991 and specifically at Range III since 1995. It cannot be disputed that the U.S. considered ordnance and explosive waste a "safety risk." (IP-16 at USGOV00051).

181.    By May of 2002, *before* IPR had begun to remove any ordnance on their property within Range III, the Corps had determined in its Final Draft EE/CA Report that the necessary response action for Range III was clearance of ordnance and explosives to depth with institutional controls. (IP-55 at 8-1).

182.    Despite its extensive investigation of ordnance on Range III and the conclusion that clearance of ordnance to depth was the necessary response action to protect the public, the Corps refused to commit to if and when any removal work on the IPR parcels would take

place.  Furthermore, the excruciatingly slow pace at which the Corps operated and their failure

to commit to a specific date for any removal action on the IPR parcels would indicate an

indifference to public safety on their part, but for their budgetary constraints.  "A CERCLA

regime which rewards indifference to environmental hazards . . . cannot be what Congress had

in mind." Nurad, Inc. v. William E. Hooper & Sons, Co., 966 F.2d 837, 845-46 (4th Cir.

1992).  The first Archive Search report was issued in 1991 and the final EE/CA report was

not completed until 2003.

183.    In September 2002, at one of the public hearings for the Corps' EE/CA, Ronald

Nesbit, the Corps' project manager for FUDS in South Carolina, practically invited large

landowners to initiate cleanup actions themselves suggesting to the attendees of the meeting

that it would be more economical for a private large landowner to clean up the property

themselves than wait for the Corps to clean up the property. (IP-56 at 44).

184.    When IPR began its removal action in approximately September 2003, the Corps

had already made the determination that removal of ordnance and explosives on Range III was

necessary for public safety. (IP-55).  It is disingenuous for the U.S. to now argue that IPR's

cleanup of the site was unnecessary.  It is true that IPR's internal memoranda state the

economic bases for cleaning up their property.  However, by 2003, the threat to public safety

posed by the contamination was well-documented by the Corps and the probability of human

contact with these threats increased daily as the area's population grew.  This growth in

population was primarily a result of the growth of Horry County coupled with IPR's

development activities in the Carolina Forest area.  IPR could not in good conscience leave the

ordnance in place.  Perhaps the best indication of IPR's state of mind with regard to the

ordnance on their property is found in an IPR memorandum written by Len Ronnie which states "[w]e know what is in the soil and I feel uncomfortable leaving it in place. While historical data indicated there were no live ordnance on site, we have found at least 10 live large (250-500 pound) bombs. I do not feel that we can leave the site in its current condition." (US-58).

185.    This is not a case where IPR's motive was to improve the marketability of its property. IPR's motive for its removal action was to reduce the risk the unexploded ordnance posed to the surrounding human population, which was growing at a more than swift pace.

186.    In support of its position that IPR's removal costs were unnecessary, the U.S. cites Regional Airport Authority. 460 F.3d 697. In Regional Airport Authority, the plaintiff ("Authority") incurred response costs in connection with its construction of an airport runway. 460 F.3d at 700-02. In concluding that the Authority's response costs were not "necessary," the court noted "[t]here is no evidence in the record demonstrating the need for a CERCLA-quality cleanup prior to constructing the runway." Id. at 704. The court added further that "allowing the Authority to recoup its 'response costs' would be tantamount to a reimbursement of its runway construction costs." Id. at 705.

187.    The key difference between Regional Airport Authority and the instant case is that before IPR, or Goodson Construction as addressed above, incurred any response costs, the Corps had concluded that the appropriate and necessary response action for their respective property was to clear the ordnance and explosives to depth. The only reason the Corps itself had not begun to clean up IPR's property was the lack of money allocated for that purpose in the Federal budget. Here it is clear that IPR and Goodson Construction as discussed above,

have established that an actual and real public health threat existed *prior to initiating their response actions*. See Regional Airport Authority, 460 F.3d at 705. Also unlike Regional Airport Authority, allowing IPR to recover for its response costs is not tantamount to reimbursement of its totally unrelated $25 million in infrastructure costs.

188.    For the reasons stated above, the court finds by a preponderance of the evidence that IPR's removal costs were "necessary."

### C.    The Costs Claimed by Goodson Construction and IPR Were Consistent with the National Contingency Plan

189.    Section 107(a)(4)(B) requires that the claimant's costs of response be "consistent with the national contingency plan." In order for a private party to recover any of its costs under CERCLA, it bears the burden to prove by a preponderance of the evidence that those costs were incurred "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B); 40 C.F.R. § 300.700(c)(3).

190.    The NCP, promulgated by the EPA pursuant to CERCLA Section 105, 42 U.S.C. § 9605, at 40 C.F.R. Part 300, guides response actions. See, e.g., Washington State Dep't of Transp. v. Washington Natural Gas Co., 59 F.3d 793, 799 (9th Cir. 1995). The NCP "provide[s] the organizational structure and procedures for preparing for and responding to . . . releases of hazardous substances . . . ." Id. (quotation omitted). It establishes both procedural and substantive requirements for, among other things, the investigation of contaminated sites and the development of action plans for those sites under CERCLA.

191.    The NCP has different requirements for remedial and removal actions tailored to the different characteristics of each type of cleanup. Because removal actions are generally

taken in response to urgent situations, the NCP has less detailed requirements for those actions. See 40 C.F.R. § 300.415.  In contrast, remedial actions are subject to more rigorous planning and evaluation.  See 40 C.F.R. §§ 300.420-435.

192.    Regardless of the differences, both removal and remedial actions require identification of all the applicable or relevant and appropriate requirements ("ARARs") to the release or response action contemplated under 40 C.F.R. § 300.400(g); preparation of a preliminary assessment and/or site inspection under 40 C.F.R. §§ 300.410(c), 300.420(b)-(c); and involvement of the public in the selection of the response action under 40 C.F.R. §§ 300.415(n), 300.430(c), (f)(2)-(3), (6); 300.435(c), 300.700(c)(6).  In addition, some removal actions require preparation of an EE/CA under 40 C.F.R. § 300.415(b)(4)(I).  Remedial actions also require preparation of a remedial investigation/feasibility study under 40 C.F.R. § 300.430(d)-(e); preparation of a proposed plan under 40 C.F.R. § 300.430(f)(2); and preparation of a record of decision under 40 C.F.R. § 300.430(f)(5).

193.    Unlike a federal or state CERCLA cleanup, in which consistency is statutorily presumed, see 42 U.S.C. § 9607(a)(4)(A), a plaintiff in a private CERCLA action has the burden to affirmatively prove that it has acted consistently with the NCP in order to recover any of its cleanup costs.  See, e.g., Waste Mgmt. of Alameda County, 135 F. Supp. 2d at 1099; Washington State Dep't. of Transp., 59 F.3d at 799-800; Union Pacific R.R. v. Reilly Indus. Inc., 215 F.3d 830, 839 (8th Cir. 2000) (citation omitted).  "A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA - quality cleanup." 40 C.F.R. 300.700 (c)(3)(I).

57

194.    In determining questions of consistency with the NCP, the question is one of substantial compliance – not complete or perfect compliance. See 40 C.F.R. 300.700(c)(3)(4). In its commentary that accompanied publication of the Final Rules for the 1990 revisions to the NCP, the EPA stated:

> Thus, in the final rule (§300.700(c)(3)) strict compliance with that list of NCP provisions is not required in order to be "consistent with the NCP"; the list is provided in §300.700(c)(5) – (7) as guidance to private parties on those requirements that may be pertinent to a particular site . . .

> EPA believes that "consistency with the NCP" should be evaluated by whether the private party cleanup has, when evaluated as a whole, achieved "substantial compliance" with potentially applicable requirements, and resulted in a CERCLA – quality cleanup. (CERCLA section 107(a)(4)(B) requires that the private party also show that the costs incurred were "necessary" cleanup costs.) …

> **EPA's decision to require only "substantial" compliance** with potentially applicable requirements **is based, in large part, on the recognition that providing a list of rigid requirements may serve to defeat cost recovery for meritorious cleanup actions based on a mere technical failure** by the private party that has taken the response action.

> EPA also recognizes that private parties generally will have limited experience in performing cleanups under the NCP, and thus may be unfamiliar with the detailed practices and procedures in this rather long and complex rule; an omission based on lack of experience with the Superfund program should not be grounds for defeating an otherwise valid cost recovery action, assuming the omission does not affect the quality of the cleanup.

> EPA attempted to identify those NCP provisions with which compliance would not be necessary to meet the "substantial compliance" test, but concluded that a hard line cannot be drawn on these questions, given the considerable variability in types of response actions, potential ARARs, communities, etc.  EPA found that what may be a significant deviation from procedures under one set of circumstances may be less serious in another (for example, some types

58

of contaminants may be susceptible to only a limited number of remedial technologies, resulting in a more limited analysis of alternatives, and some communities may express no interest in a site, resulting in fewer public meetings). ***Thus, this determination is best left to the courts for a case-by-case determination.***

(55 Fed. Reg. 8793 and 8794) (emphasis added).

### 1.     Goodson Construction's Removal Action Was Substantially Compliant With the National Contingency Plan

195.    The Court concludes that Goodson Construction substantially complied with the National Contingency Plan.  The Court specifically concludes that the expenditures of Goodson Construction were necessary and incurred in a manner substantially compliant with the National Contingency Plan.

196.    The U.S. argues that Goodson Construction did not comply with the National Contingency Plan, according to the U.S.' NCP compliance expert, Ms. Sandra Frye, because they failed to evaluate the appropriateness of taking a removal action, did not conduct community involvement activities, did not notify state and local officials, and did not identify applicable or relevant and appropriate requirements (ARARs).

197.    The justifications for Goodson Construction's removal action were the same justifications the Corps relied upon in its May 3, 2000 Action Memorandum, i.e. the safety of the construction workers, the threat of fire from an accidental detonation of ordnance, and the potential loss to Goodson Construction due to the time constraints in its highway construction contract. (IP-50).

198.    As to the community involvement activities, notification of state and local officials, and identification of ARARs, this court concludes that for Goodson Construction to

repeat the same activities the Corps performed in connection with the EE/CA and TCRA would have been unnecessarily duplicative. When the activities done by the Corps in connection with the EE/CA and TCRA are juxtaposed against the complaints of Ms. Frye regarding Goodson Construction's NCP non-compliance, it is clear to the court that her arguments of non-compliance must fail. In fact, if Goodson Construction had duplicated the Corps' efforts, the recovery of those duplicated costs would have been denied by this court to the extent that those costs would have been unnecessary. See Waste Mgmt. of Alameda County, 135 F. Supp. 2d at 1099 (stating that "courts will deny recovery where the costs incurred were duplicative of other costs"); Northwestern Mut. Life Ins., 847 F. Supp. at 401.

199.    Notably, the U.S.' NCP compliance expert, Sandra Frye, testified that the Corps' TCRA complied with the NCP. (Frye, TR. 8/18/06 at 142-43). Initially, the Corps' TCRA was meant to include the area that Goodson Construction cleaned up. In a public meeting associated with the EE/CA held on April 20, 2004, the Corps seemed to classify the removal work done by Goodson Construction as part of the TCRA. (IP-59 at 35) (describing the completed TCRA, "[w]e've already cleared a total of about 60 acres of that land. Twenty acres of this, of that was cleared, primarily, by the owner, Mr. Goodson, and Parsons was contracted to clear 40 acres of that, so 60 acres of that portion of that range has been cleared.").

200.    Goodson Construction's removal efforts were concurrent with and closely mirrored the Corps' TCRA. The Work Plan used during Goodson Construction's removal action cloned the same ARARs followed in the Corps' EE/CA and TCRA, which concerned the exact same property.

60

201.    Though local and state officials had not yet realized the seriousness of the situation, DHEC, the FAA, and Horry County road and law enforcement personnel were advised through the Corps' public information campaign.  Ms. Frye testified that the Goodsons should have undertaken a public relations program of their own in connection with the limited removal action by the Goodsons.  There is nothing in the National Contingency Plan requiring separate and repeated activities that would serve only to drive up costs.  Practicing environmental professionals David Nichols and Michael McKibben, President of ERM (the largest environmental cleanup company in the world), both opined that it is not necessary for every party in a response action to repeat steps already properly accomplished. (Nichols, Tr. 8/16/06 at 151-52, 169-70; McKibben, Tr. 8/18/06 84-86).

202.    Section 300.700(c)(6) suggests that private parties who undertake response actions provide an opportunity for public comment. 40 C.F.R. § 300.700(c)(6).  In this case there was an opportunity for public comment under the Corps' EE/CA, which concerned the entire former CBGR.  It would have been unnecessarily duplicative for Goodson Construction, or IPR as discussed below, to provide additional opportunities for the public to comment on proposed actions for the same property covered under the Corps' EE/CA.

203.    Also quoting the EPA commentary accompanying the 1990 NCP revisions, the Court in Bedford Affiliates v. Sills, stated as follows:

> **Even the plain language of the National Plan does not mandate public participation**; it simply states that private parties "should" seek public comment.  See 40 C.F.R. Section 300.700(c)(6).
>
> The 1990 revisions to the National Plan suggest that significant state involvement serves the identical purpose that the public notice provision seeks to effectuate.  The EPA added the public notice provision because

> "[t]he public – both [potentially responsible persons] and concerned citizens - have a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups - *which are performed without governmental supervision* – are carried out in an environmentally sound manner. Thus, EPA has decided that providing public participation opportunities should be a condition for cost recovery under CERCLA."

> National Plan, 55 Fed. Reg. at 8795 (emphasis added). This language suggests that ***when the EPA inserted the public comment provision it was troubled by private cleanups lacking significant governmental involvement. These concerns are mitigated– if not eliminated – where, as here, a [governmental] environmental agency is substantially involved in the formulation and execution of a preliminary remediation plan.***

156 F. 3d 416, 428 (2nd Cir. 1998) (emphasis added) ("governmental" substituted for "state").

204.    In this instance, the Corps had been investigating the former CBGR since 1991, had commenced an EE/CA, had employed Zapata Engineering to engage in a public information campaign for the EE/CA, which concerned the entire former CBGR and took place both before and after the TCRA, and had authorized a TCRA for the Goodsons' property. Thus, there was both extensive government involvement and a governmental public information campaign that surrounded Goodson Construction's removal action.

205.    Goodson Construction's removal action must be viewed in the context in which it was performed – where there was an on-going Corps' EE/CA and authorization for a Corps' TCRA. Goodson Construction's removal work did not occur in a vacuum and cannot be viewed in isolation as a stand-alone project.

206.    Based on the record and by a preponderance of the evidence, the court concludes that Goodson Construction's removal action, when evaluated as a whole under all the existing circumstances, achieved substantial compliance with the National Contingency Plan and resulted

in a CERCLA-quality cleanup. Notably, none of the parties disputed the quality or cost of the Goodson Construction's cleanup. To preclude Goodson Construction's recovery on the basis of noncompliance with the NCP would "defeat cost recovery for [a] meritorious cleanup [action] based on a mere technical failure" and ignore the equitable component that Congress and EPA built into cleanup cost decisions. See Sherwin – Williams Company, 125 F. Supp. 2d at 752; Bedford Affiliates, 156 F.3d at 429.

### 2.    IPR's Removal Action Was Substantially Compliant With the National Contingency Plan

207.    The court concludes that IPR's removal action was substantially compliant with the NCP for the same reasons Goodson Construction's removal action was substantially compliant with the NCP. In both cases, there was significant involvement in the cleanup by the Corps. The Corps had commenced an EE/CA, made the determination that removal of the ordnance and explosives was necessary, conducted multiple public hearings regarding the proposed cleanup, and had employed Zapata Engineering to engage in a public information campaign.

208.    The U.S. argues, through the testimony of Sandra Frye, that IPR did not comply with the NCP because it failed to evaluate the appropriateness of taking a removal action, did not conduct community involvement activities, did not notify state and local officials and did not identify applicable or relevant and appropriate requirements. The U.S. also argues that IPR should have performed a separate, independent EE/CA for the IPR parcels, even though the Corps' EE/CA covered the entire former CBGR, which included the IPR parcels.

209.    IPR's urgency in the cleanup was motivated by the massive amount of development activity surrounding this site and the virtual impossibility of keeping people out of the site who

might be harmed by the remaining unexploded ordnance.  The Corps recognized the threat to the public health and environment in its EE/CA and Action Memorandum drafted for the TCRA.

210.    As for community involvement activities, IPR participated in a significant way in the public hearings and public comment portions of the Corps' EE/CA process.  It cannot be disputed that the residents living in and around the former CBGR preferred that the ordnance and explosives be removed sooner rather than later.  Prior to the EE/CA, IPR had engaged the public in a significant way by informing the public of its development plans and activities through the Horry County development approval process.  Finally, during the removal, IPR, through ERM, coordinated their activities by notifying appropriate local officials when ordnance was being destroyed.

211.    For IPR to perform its own EE/CA would have been unnecessarily duplicative and would have further thwarted a prompt response.  The clear purpose of the regulations requiring NCP compliance is to ensure a CERCLA-quality cleanup, which has been satisfied here.  The U.S.' argument that IPR should in essence repeat what has already been done by the Corps involving the same property is an emphasis on form over substance.  While this is an unusual situation in which the landowner has benefitted from the Corps' efforts in satisfying the requirement of NCP compliance, the U.S. has cited no authority that precludes a landowner from relying on and using the Corps' efforts in achieving substantial compliance with the NCP.  Once again, the Corps' extensive activities in connection with the EE/CA substantially satisfies Ms. Frye's complaints regarding IPR's alleged non-compliance.

212.    Based on the evidence, the court concludes that IPR's removal action when evaluated as a whole under the existing circumstances achieves substantial compliance with the

64

NCP and resulted in a CERCLA-quality cleanup.  As with Goodson Construction's removal action, none of the parties disputed the quality of IPR's cleanup.

    **D.**    **Potentially Responsible Parties and the Third Party Defense Section 107(b)(3)**

    213.    Goodson Construction is a current owner and operator of Tract 19.  (US-107 ¶¶ 10-11).  IP is a former owner and operator of Tract 19 and the IPR Parcels at the time at which the ordnance was disposed.  (US-111 ¶ 47).  IPR was the current owner and operator of the IPR Parcels at the time this action was commenced.  (US-111 ¶ 46).  The U.S. was a former operator at the CBGR, which included Tract 19 and the IPR Parcels.

    214.    Therefore, the Goodsons, IP, IPR, and the U.S. are all "covered persons," within the meaning of Section 107(a) of CERCLA.

    215.    It is well-established in the Fourth Circuit that persons liable under Section 107 ("potentially responsible parties" or "PRPs") may not assert a claim under that section.  Axel Johnson, Inc. v. Carroll Carolina Oil Co., 191 F.3d 409, 415 (4th Cir. 1999); Minyard Enter., Inc. v. Southeastern Chem. & Solvent Co., 184 F.3d 373, 385 (4th Cir. 1999); Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R., 142 F.3d 769, 776 (4th Cir. 1998).

    216.    "Covered persons" can avoid liability for response costs under Section 107(a) only if they can establish that they qualify for one of the enumerated defenses in Section 107(b), 42 U.S.C. § 9607(b), or an exclusion from liability, see, e.g., 42 U.S.C. §§ 9607(n) (liabilities of fiduciaries and certain exclusions), 9607(q) (contiguous properties), 9607(r) (bona fide prospective purchasers).  The Goodsons, IP, and IPR have raised the "third party" defense under Section

107(b)(3).[17]

217.    The so-called "third party" defense to CERCLA liability is extremely narrow.  It

provides that an otherwise liable party can escape liability under Section 107(a) of CERCLA only

if it can establish by a preponderance of the evidence that it satisfies all of the requirements set

forth in Section 107(b)(3):

> There shall be no liability under subsection (a) of this section for a person
> otherwise liable who can establish by a preponderance of the evidence that the
> release or threat of release of a hazardous substance and the damages resulting
> therefrom were caused solely by —
>                              *    *    *
> (3) an act or omission of a third party other than an employee or agent
> of the defendant, or than one whose act or omission occurs in connection with
> a contractual relationship, existing directly or indirectly, with the defendant . .
> . if the defendant establishes by a preponderance of the evidence that (a) he
> exercised due care with respect to the hazardous substance concerned, taking into
> consideration the characteristics of such hazardous substance, in light of all
> relevant facts and circumstances, and (b) he took precautions against foreseeable
> acts or omissions of any such third party and the consequences that could
> foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b)(3).

218.    With respect to the elements of the Section 107(b)(3) defense, this Court has stated

that the elements are: (1) that another party was the "sole cause" of the release of hazardous

substances and any resulting damages; (2) that the other, responsible party did not cause the

release in connection with a contractual, employment, or agency relationship with the defendant;

and (3) that the defendant exercised due care and guarded against the foreseeable acts or

omissions of the responsible party.  (Order 6/14/06 at 11) (citing Westfarm Assocs. Ltd. P'ship,

---

[17]  On October 13, 2005, this Court granted summary judgment in favor of the U.S. as to IP and IPR's
assertion that they satisfied the "act of war" defense set forth in Section 107(b)(2).  (Order 10/13/05 at
35-36).

66 F.3d at 682).

219.    The U.S. has not contested the first of these three elements, i.e., that it was the sole cause of the release of hazardous substances and any resulting damages regarding the ordnance at the site.    The U.S. argues that Goodson Construction, IP, and IPR all had contractual relationships with the U.S. and therefore they are all precluded from recovering their costs of response.

1.    **Goodson Construction Cannot Satisfy the Exception to the "Contractual Relationship" Definition in Section 101(35)**

220.    The pre-Brownfields Amendments definition of "contractual relationship" states:

(A) The term "contractual relationship," for the purpose of section 9607(b)(3) of this title includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendants after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:
(i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.
(ii) The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.
(iii) The defendant acquired the facility by inheritance or bequest.
In addition to establishing the foregoing, the defendant must establish that he has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title.
(B) To establish that the defendant had no reason to know, as provided in clause (i) of subparagraph (A) of this paragraph, the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the

67

> court shall take into account any specialized knowledge or experience
> on the part of the defendant, the relationship of the purchase price to
> the value of the property if uncontaminated, commonly known or
> reasonably ascertainable information about the property, the
> obviousness of the presence or likely presence of contamination at the
> property, and the ability to detect such contamination by appropriate
> inspection.

42 U.S.C. § 9601(35).[18]

221.    The definition of "contractual relationship" under both the pre-Brownfields Amendments and the Brownfields Amendments includes deeds and the pre-Brownfields Amendments definition at least contemplates leases.[19]   A contractual relationship may exist either directly or indirectly.   For example, being in the chain of title or having a lessor/lessee relationship to the other party may satisfy the "contractual relationship."

222.    There is no "contractual relationship" for the purposes of CERCLA if a party can prove by a preponderance of the evidence that: (1) it acquired the property after the disposal of the hazardous substances at issue and (2) at the time it acquired the property, it "did not know and had no reason to know" that the hazardous substances were "disposed of on, in, or at" the property. 42 U.S.C. § 9601(35)(A)(i).   To establish that the landowner had no reason to know of the contamination, the landowner must demonstrate to the court that on or before the date the landowner acquired the property the landowner carried out all appropriate inquiries into the previous ownership and uses of the property consistent with good

---

[18] This court has previously concluded that the Brownfields Amendments do not apply retroactively.   (Order 10/13/05 at 22-23).   Thus, both Goodson Construction and IPR fall under the pre-Brownfields Amendments

[19] The definition of "contractual relationship" under   the Brownfields Amendments and pre-Brownfields Amendments is discussed further in this court's Order dated October 13, 2005.

commercial or customary practices. 42. U.S.C. § 9601(35)(B) (pre-Brownfields Amendments).

223.    The requirements in Section 101(35)(A) essentially create an exception to the "contractual relationship" requirement of the third party defense, thereby making the third party defense available to some owners who acquire property after the disposal or placement of hazardous substances there.  See Foster v. United States, 922 F. Supp. 642, 654 (D.D.C. 1996).  This exception is commonly referred to as the "innocent purchaser" or "innocent landowner" exception.

224.    The "in connection with" language of Section 107(b)(3) does not require that the "contractual relationship" be related to the handling of hazardous substances.  In this case, it is undisputed that Goodson Construction had contracts to purchase Tract 19 with IPR followed by deeds.  (Order 6/14/06 at 14).

225.    Goodson Construction, however, attempts to satisfy this element of the test for the Section 107(b)(3) defense by contending that they qualify for the "innocent purchaser" exception to the definition of "contractual relationship," set forth in Section 101(35)(A) of CERCLA.[20]

226.    For the following reasons, Goodson Construction has not satisfied its burden to prove by a preponderance of the evidence that it "had no reason to know" of any ordnance contamination at Tract 19 after undertaking "all appropriate inquiry" into the previous ownership and uses of the property consistent with "good commercial or customary practice in an effort to minimize liability."  42 U.S.C. § 9601(35)(B) (pre-Brownfields Amendments).  In

---

[20] It is unnecessary to determine whether Goodson L.L.C. satisfies the exception to the "contractual relationship" definition as they have incurred no costs of response and have not established a prima facie case for cost recovery under Section 107.

making this determination, the court has taken into account the following statutory factors: specialized knowledge or experience on the part of Goodson Construction; the relationship of the purchase price to the value of the property if it was uncontaminated; commonly known or reasonably ascertainable information about the property; the obviousness of the presence or likely presence of contamination on the property; and the ability to detect such contamination by appropriate inspection.  42 U.S.C. § 9601(35)(B) (pre-Brownfields Amendments).

227.    As of 1998 – just one year before Goodson Construction purchased Tract 19 – Allen Moore testified it was common knowledge in Horry County that there was a bombing range in the area.

228.    Sometime in 1998 or 1999, Goodson Construction found a bomb or bomb part, which was between 12 and 24 inches long, on the right of way next to Tract 19, between the property line and Carolina Forest Boulevard.  (US-64).  At the very least, this discovery placed Goodson Construction on notice of the likelihood that there might be bombs or bomb parts in the area.

229.    Not only did Goodson Construction find the bomb or bomb part in the vicinity of Tract 19, but Ronald Goodson sought more information about it from his principal IPR contact, Allen Moore.  Mr. Moore, a self-described history buff who had written a summary of the history of the Buist Tract (US-20), came to the scene and during this six to seven hour time period told Mr. Goodson that the area used to be an old bombing range and that IPR had found some "stuff" there over the years.  Mr. Goodson understood Mr. Moore to be referring to an area broader than the precise location in the right of way where the unexploded ordnance had been excavated.  Immediately following Goodson Construction's discovery of the bomb or

70

bomb part, officials from the Horry County Sheriff's Department arrived on the scene. After six or seven hours, military personnel from Fort Jackson arrived on the scene and "these people were terribly excited."

230.    At the time, there were other indications that Tract 19 was in the Target Zone. A road named "Target Road" formed the western boundary of Tract 19 and connected at or near Carolina Bays Parkway. Also, during the construction of the highway, Goodson Construction was required to move three concrete footings that, according to what Mr. Moore told Mr. Goodson, were believed to be part of the observation tower for the bombing range. Those concrete footings were situated very close to Tract 19. (US-64).

231.    This key information was in Goodson Construction's possession in mid-1999, when they began negotiating with IPR for the purchase of Tract 19.[21]  At that time, the customary commercial practice in Horry County and the coastal part of South Carolina was to make inquiry into the prior uses and ownership of the property to determine whether there was any sign of environmental problems or hazardous waste contamination. (Jeffcoat, Tr. 8/17/06 at 127-28).

232.    In that regard, the customary practice in that area also included the performance of a Phase I Environmental Site Assessment, which costs between $1,500 and $2,000. That was the "baseline" of what purchasers of commercial real estate needed to do. (Jeffcoat, Tr. 8/17/06 at 132-33); see also United States v. Dominic Lombardi Realty, Inc., 290 F. Supp. 2d

---

[21] Goodson Construction was a family owned business. Ronald Goodson, a vice-president of Goodson Construction who is involved in the day to day operations of the company, is the individual who discovered the bomb or bomb part approximately one year before and notified Allen Moore out of concern for the safety of his construction workers. (R. Goodson, Tr. 8/16/06 at 25).

198, 211 (D.R.I. 2003) (citing expert testimony that an environmental assessment of the property would have been required to satisfy "good commercial or customary practices" for purchasing property).  One purpose of this assessment is to obtain protection under the innocent purchaser defense of CERCLA.  (Jeffcoat, Tr. 8/17/06 at 132-33).  This assessment would have been consistent with the "good commercial or customary practices" in 1999 under the pre-Brownfields Amendments definition of "all appropriate inquiry" and essentially a safe harbor after the enactment of the Brownfields Amendments.  This is still the case even though the record in this case reflects that a Phase I Environmental Site Assessment would not have revealed subterranean ordnance.

233.    Goodson Construction, however, had much more knowledge about Tract 19 and the surrounding area than would the average purchaser of commercial property.  Goodson Construction therefore had a duty to conduct a more searching inquiry into the previous uses of the site and its environmental condition.  (Jeffcoat, Tr. 8/17/06 at 133-34).

234.    Goodson Construction fell short of the standard for the "all appropriate inquiry" in connection with their purchase of Tract 19.  Not only did Goodson Construction fail to perform a Phase I Environmental Site Assessment of Tract 19, they failed to perform any environmental review at all.  In this respect, the Goodsons acted differently than others who purchased property in Carolina Forest from IPR.  In 1998, Landmark Homes performed a Phase I assessment on Tract 4D.  (P-73).  In the Summer of 1999, The Catholic Diocese of Charleston performed a Phase I assessment on a separate parcel in Carolina Forest.  (Jeffcoat, Tr. 8/17/06 at 126).  Landbank L.L.C. performed Phase I assessments on Parcels 16, 18, and 22 of Carolina Forest.  (US-124; US-128, Nichols Dep. at 61-62).

235.     Other than the discussions with Moore immediately after finding a bomb or bomb part near Tract 19, Goodson Construction made no inquiry into the prior uses of the former CBGR and completely ignored the credible, firsthand information they had about Tract 19. Goodson Construction was simply satisfied with Moore's response that finding the bomb or bomb part was not a big deal and to not worry about it, that it had been proven to be safe. (R. Goodson, Tr. 8/16/06 at 96). This does not constitute a sufficient inquiry to satisfy the innocent purchaser exception to the definition of "contractual relationship."

236.     Goodson Construction did not ask IPR, or any other entity, further questions about the bombing range, the target zone, and the likelihood of additional ordnance on Tract 19 at the time of purchase of the property. If they had conducted such an inquiry, they may have learned about the rights of entry that IPR had given to the Corps in connection with the site-wide investigation of the former range. (US-13; US-15; US-16; US-18; US-19). Further inquiry might have uncovered the Corps' comprehensive reports containing numerous maps showing the precise location of the Target Zone in Range III. (P-78; P-80). Further inquiry might also have turned up the site visit reports from 1995 and 1997 showing the ordnance lying on the surface of the ground. (US-101; US-102; US-127). See Chesapeake & Potomac Tel. Co. of Va. v. Peck Iron & Metal Co., 814 F. Supp. 1269, 1281 (E.D. Va. 1992) (holding that the plaintiffs were not innocent landowners because "[t]he record reveals that a question to their husbands, an inquiry of the state, or a cursory investigation of the Site would have revealed the existence of or potential for contamination.").

237.     Goodson Construction did not consult with other persons who recently purchased property from IPR or anyone else involved in real estate transactions with IPR. They did not

inquire of the engineering firms, surveying firms, or government agencies that were involved with ongoing construction projects at Carolina Forest.  They did not do any library research, they did not look at newspaper articles, and they conducted no documentary review whatsoever.  All of these facts were undisputed at trial.

238.    Indeed, Goodson Construction was focused exclusively on those aspects of the purchase relating to business income and profits.  Rather than looking for bombs or ordnance on the property, they dug a relatively small number of test pits to determine whether the soil was appropriate for use in the highway project.  Instead of asking Mr. Moore to provide additional information about the bombing range and the potential for bombs, Goodson Construction asked him whether Tract 19 would be sold with the timber intact, so Goodson Construction could realize income from timber sales.  (R. Goodson, Tr. 8/16/06 at 45).

239.    Target Road was distinctively labeled on maps received by Plaintiffs during their negotiations with IPR for the purchase of Tract 19.  (See, e.g., P-1 at IP04928, Amended Agreement).

240.    Notwithstanding the general knowledge that the property was used as a former bombing range and the discovery of a bomb or bomb part in the right-of-way of Tract 19, which necessitated a response from the Horry County Sheriff's Department and military personnel from Fort Jackson, Goodson Construction undertook no further inquiry into the previous uses of the property.  Goodson Construction certainly made no attempts to contact the Corps or even other military personnel at Fort Jackson even though military personnel at Fort Jackson had responded previously.

241.    Rather, Goodson Construction rested on their view that they had done

74

construction work in the area and nobody had told them that the area was the target zone of the former bombing range. This might have been a plausible excuse if Ronald Goodson had not found a bomb or bomb part a few yards from the boundary of Tract 19. (US-64).

242.    For purposes of CERCLA liability and establishing that an appropriate inquiry was made, Goodson Construction fails in this regard. Goodson Construction was content to rely on what they thought they already knew. They understood that IP had harvested timber there for many years. Goodson Construction had moved a lot of dirt in the surrounding area. Their decision to rely on this generalized lack of awareness of environmental problems on the property – instead of conducting any inquiry – is insufficient to satisfy the innocent purchaser defense. See United States v. W.R. Grace & Co.-Conn., 280 F. Supp. 2d 1135, 1147-48 (D. Mont. 2002), aff'd, 429 F.3d 1224 (9th Cir. 2005), petition for cert. filed, 74 U.S.L.W. 3629 (Apr. 27, 2006) (No. 05-1363) ("KDC states only that at the time it purchased the KDC properties, there was no active mining or vermiculite processing and that it was not aware of the presence of asbestos on the property. KDC does not point to facts that show it made any inquiry into the previous ownership and uses of the property, let alone 'all appropriate inquiry.'"). In this case, such passive reliance is especially unreasonable, particularly in light of Goodson Construction's discovery within the vicinity of Tract 19 and the fact that their shareholders are experienced businessmen who were paying $2 million for the property.

243.    Goodson Construction relies on the title search that was performed in connection with their purchase of Tract 19. The title search concerned only the site's previous *ownership*, not its previous *uses*. Further, the title search for Tract 19 is of little value in terms of inquiry into prior uses because Goodson Construction never advised the closing attorneys or

attorneys handling the title search about the former bombing range or the discovery of a bomb or bomb part a few feet from the property.

244.     Goodson Construction appears to have paid "market price" for Tract 19.

245.     While Goodson Construction may argue that the statutory factors relating to the "obviousness of the presence" of the contamination, the "ability to detect" the contamination, and the "relationship of the purchase price" to the value of the property if uncontaminated militate in its favor, on the other hand, the factors relating to "specialized knowledge or experience" and "commonly known or reasonably ascertainable information" militate against Goodson Construction.  More importantly, while the statutory factors noted above are relevant in the determination of whether the party undertook "all appropriate inquiry" into the previous uses and ownership of the property, it is clear to the court that, other than the isolated discussion with Allen Moore, Goodson Construction took no further inquiry regarding the previous ownership and uses of the property consistent with good commercial or customary practices in an effort to minimize liability.  As such, Goodson Construction has failed to establish by a preponderance of the evidence that it had no reason to know of the presence of ordnance on Tract 19.  Accordingly, Goodson Construction has not established that it qualifies as an "innocent purchaser."

246.     For the preceding reasons, Goodson Construction has not satisfied their burden to prove by a preponderance of the evidence that they "did not know and had no reason to know" of any ordnance contamination at Tract 19 after undertaking "all appropriate inquiries" into the previous uses and ownership of the property consistent with "generally accepted good commercial and customary standards and practices."  See Dominic Lombardi Realty, 290 F.

76

Supp. 2d at 211 (holding that the purchaser could not satisfy the innocent purchaser defense under the pre-Brownfields Amendments version of Section 101(35) because it never performed an environmental assessment of the site and did not make "any other meaningful inquiry into the Site's environmental state").  Additionally, in the event that the Brownfields Amendments apply retroactively, analyzing Goodson Construction's "reason to know" under the Brownfields Amendments, Goodson Construction did not prove by a preponderance of the evidence that they "did not know and had no reason to know" of ordnance contamination on Tract 19.

247.    Goodson Construction therefore has not proven that the U.S. "did not cause the release in connection with a contractual, employment, or agency relationship with" Plaintiffs. Westfarm Associates, 66 F.3d at 682.  As such, Goodson Construction does not qualify for the Section 107(b)(3) defense.

248.    Because Goodson Construction is a potentially responsible party without a defense to liability, i.e. they have not established that they are entitled to the third party defense, they may not assert claims under Section 107 of CERCLA.  Axel Johnson, 191 F.3d at 415; Minyard Enterprise, 184 F.3d at 385; Pneumo Abex, 142 F.3d at 776.

### 2.    The Lease Between IP and the U.S.

249.    Section 101(35)(A) defines "contractual relationship" for purposes of the third party defense contained in Section 107(b)(3).  Section 101(35)(A) states in relevant part that "[t]he term 'contractual relationship' . . . includes, but is not limited to, land contracts, deeds, easements, leases or other instruments transferring title or possession . . ."  42 U.S.C. § 9601(35)(A).  The statutory definition of "contractual relationship" therefore expressly includes contracts for the sale of land or any other instruments transferring title or possession.

77

250.    Thus, a person who purchases contaminated property shares a direct or indirect contractual relationship with all of its predecessors in title.[22]  See, e.g., Dominic Lombardi, 204 F. Supp. 2d at 332 ("In order to give full effect to the contractual definition of 'contractual relationship,' this Court concludes that contracts for the sale of land preclude a defendant . . . from availing itself of the protection afforded by the third party defense."); Grand Street Artists v. General Elec. Co., 28 F. Supp. 2d 291, 296 (D.N.J. 1998) ("Thus, prior to the enactment of [Section 101(35)], the third-party defense was not available to a defendant if the defendant was in the chain of title with the third party."); Lefebvre v. Central Maine Power Co., 7 F. Supp. 2d 64, 70 (D. Me. 1998) (property chain of title creates a contractual relationship); M&M Realty Co. v. Eberton Terminal Corp., 977 F. Supp. 683, 686 (M.D. Pa. 1997) ("This 'third party' defense is, by itself, of limited value to a subsequent purchaser of contaminated land, as the purchaser will have a 'contractual relationship' with all its predecessors in title.").

251.    IP and the U.S. had a contractual relationship between December 31, 1941, and October 31, 1948.  During that period, the U.S. leased from IP a portion of the Site pursuant to a written lease.  (US-106, Stipulation of Settlement 12/23/54 at 1).  Under Section 101(35) of CERCLA, the term "contractual relationship" is defined as including "land contracts, deeds, easements, leases, or other instruments transferring title or possession."  42 U.S.C. § 9601(35)(A).

252.    IP contends that it did not have a "contractual relationship" with the U.S.

---

[22]  For example, if A sells property to B, and B later sells the property to C, C has an indirect contractual relationship with A as a result of this sequence of land transfers.

because it was coerced into entering into the lease with the U.S.  IP further argues that this lease was not the voluntary arms length transaction contemplated by the statute.

253.    The U.S. argues that the phrase "contractual relationship" as set forth in Sections 107(b)(3) and 101(35) is not limited to "consensual" land contracts or leases.  The U.S. also makes essentially an estoppel argument to the extent that IP never mentioned any coercion or a "government taking" 42 years ago, when it sued the U.S. for compensation for damage to timber at the former range allegedly caused by the U.S.

254.    By late December 1941, the U.S. was either leasing or acquiring by fee simple land around IP's property as part of a large military facility.  The lease entered into between IP and the U.S. was less than one month after the Japanese attack on Pearl Harbor.  This may not be the type of contractual relationship Congress contemplated in section 101(35).  However, as previously stated in this Order, IP did not incur any of the costs of response that are claimed in this litigation.  Therefore, it is unnecessary to find that IP did or did not have a contractual relationship with the U.S.[23]

### 3.    IPR Satisfies the Exception to the "Contractual Relationship" Definition in Section 101(35)

255.    As mentioned at the outset of the previous section, a person who purchases contaminated property shares a direct or indirect contractual relationship with all of its predecessors in title.

256.    The "in connection with" language of Section 107(b)(3) does not require that the "contractual relationship" be related to the handling of hazardous substances.  (Order 6/14/06

---

[23] It is not necessary for the court to make a formal finding or reach the issue as to whether IP's lease with the U.S. was a lease as contemplated in Section 101(35).

at 14). However, the court finds that IPR qualifies as an innocent landowner and thereby satisfies the exception to the contractual relationship definition found in Section 101(35).[24]

257.   IPR acquired the subject property from IP in 1989 after the disposal of ordnance on the property. The weight of the evidence supports the conclusion that in 1989 IPR did not know or have reason to know that live ordnance existed on the property.[25]

258.   To establish that IPR had no reason to know of live ordnance on their property, IPR must have undertaken, at the time of acquisition, "all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability." 42 U.S.C. § 9601(35) (pre-Brownfield Amendments definition of "contractual relationship"). In determining whether all appropriate inquiries were made, the court has taken into account: 1) any specialized knowledge or experience of the landowner; 2) the relationship of the purchase price to the value of the property if uncontaminated; 3) commonly known or reasonably ascertainable information about the property; 4) the obviousness or likely presence of contamination on the property; and 5) the ability to detect

---

[24] The court requested that the parties submit Proposed Findings of Fact and Conclusions of Law. Interestingly, the U.S.' Proposed Findings of Fact and Conclusions of Law did not address whether IPR qualified as an innocent purchaser under the definition of "contractual relationship" in section 101(35).

[25] There is evidence in the record which indicates that an IP forest technician, Larry Canada, heard an explosion during a controlled burn of IP property many years prior to IPR's acquisition; however, there is no evidence that Mr. Canada related this information to anyone at IP or that IPR had any knowledge of the explosion. (US-3 at 22). "The general rule is that the knowledge of the parent corporation is not imputed to the subsidiary corporation . . . unless a sufficient nexus between them is shown . . . to provide an equitable reason for disregarding the separate corporate existences." In re Mercedes-Benz Antitrust Litigation, No.99-4311, 2006 WL 2129100, at *17 (D.N.J. July 26, 2006) (Slip Copy) (citing Thompson v. Air Power, Inc., 448 S.E.2d 598, 603 (Va. 1994)); William Meade Fletcher, et al., Fletcher Cyclopedia of the Law of Private Corporations § 43.60 (perm. ed., rev. vol. 1999). Here, the court has not been provided any evidence of an equitable reason to disregard the separate corporate existence of IP and IPR.

such contamination by appropriate inspection. Id.

259.    The threshold question with regard to whether IPR undertook "all appropriate inquiries" is what level of inquiry was IPR, as a wholly owned subsidiary of the transferor, required to make into the previous uses and ownership of the property.  The requirement that a defendant undertake "all appropriate inquiries" into the prior uses and ownership of property is meant to be flexible. In re Hemingway Transp., Inc., 174 B.R. 148, 166 (Bankr. D. Mass. 1994).  The appropriate inquiry standard must necessarily change over time. Hemingway Transp., 174 B.R. at 168 (noting "an appropriate inquiry into possible contamination in 1983 is not the same as one in 1994").  The appropriate inquiry into the previous ownership and uses of the property with regard to IPR in 1989 is different, under the circumstances here, from the appropriate inquiry required of a buyer of real estate in 1999 or today.

260.    The court notes two things before analyzing whether IPR undertook "all appropriate inquiries" into the previous ownership and uses of the property.  First, in 1989, arguably, there was great confusion in the real estate and environmental consulting industries as to what was meant by "all appropriate inquiry."  135 Cong. Rec. E2367-01  (July 28, 1989) (statement of Rep. Weldon).  Second, and more importantly, at the time of IPR's acquisition of the property in 1989, no one knew that live ordnance still existed on the property.

261.    With regard to specialized knowledge or experience of the landowner, IPR was in the commercial real estate business and would have had some knowledge with regard to the prior uses of the land as a bombing range.  In fact, IPR's Moore indicated it was common knowledge that the property was used as a bombing range during World War II.  IPR also would have been aware that the land was used to harvest timber.

81

262.    There is no evidence in the record as to the purchase price of the land at issue; however, Tom Connor, IPR's Comptroller, testified at trial that IPR purchases its properties from IP based on appraisals and that IPR maintains "a very arms length relationship" with IP. (Connor, Tr. 8/17/06 at 102).

263.    With regard to commonly known or reasonably ascertainable information about the property, it was commonly known that the property was used for timberland.  Generally, it was common knowledge that there was a bombing and gunnery range somewhere in Horry County. (J. Goodson, Tr. 8/17/06 at 68-70; Finnegan, Tr. 8/17/06 at 178).  However, as reported in the May 1991 Archives Search Report, which was two years *after* IPR's acquisition of the property, "[t]here were conflicting reports of specific targets, ranges and uses at the former Conway Bombing and Gunnery Range." (IP-15 at 5-1).  Unlike Goodson Construction, which may have been able to ascertain the Corps' investigations and findings in the 1990's, the Corps had not yet performed these studies when IPR acquired the property in 1989.

264.    It is important to note that the "all appropriate inquiry" concerns an inquiry into the *prior uses and ownership* of property.  However, even assuming that IPR knew that the property was used as a bombing and gunnery range and that the U.S. had leased the property from IP during World War II, that information, in 1989, would not necessarily give IPR notice or a reason to know of the presence of live ordnance on the property.  In 1989, the presence of live ordnance on the property, as opposed to the prior use of the property as a bombing and gunnery range, was not obvious, commonly known or reasonably ascertainable.

265.    First, in 1949, the U.S. issued "Certificates of Dedudding" to landowners who purchased former bombing and gunnery range property from the U.S.  The certificates stated

that "[a]ll lands within the Conway Bombing and Gunnery Range have been given a careful and visual inspection  and have been cleared of all dangerous and/or explosive materials reasonably possible to detect." (IP-11 at USGOV00282).  The certificates are signed by Remington K. Webster of the Bomb and Shell Disposal Team and state that "[t]o the best of my knowledge and belief, this range will not require additional dedudding to render safe for public use." (IP-11 at USGOV00282).[26]  As late as 1997, IPR believed that the U.S. was still standing by the fact that the property had been dedudded. (Moore, Tr. 8/18/06 at 58).  If the U.S. could not discover the presence of live ordnance at the time the "Certificates of Dedudding" were issued, IPR cannot be expected to have detected the presence of live ordnance.

266.    Second, the process of harvesting timber, as noted in ¶ 20 above, is very brutal and disruptive to the land.  (J. Goodson, Tr. 8/17/06 at 57-59).  Before 1989, the timberland at issue had been harvested at least twice since its use as a bombing and gunnery range.  (Moore, Tr. 8/18/06 at 6).  During these timber harvesting procedures, no live ordnance was found.  If the presence of live ordnance on the property was obvious or easily detectable, certainly these brutal and disruptive timber harvesting procedures would have disclosed the presence of live ordnance.

267.    "The standard of 'all appropriate inquiry' was intended to evolve continuously and '[defendants] shall be held to higher standards as public awareness of the hazards

---

[26] The U.S. argues that neither IP nor IPR possessed or relied on the "Certificates of Dedudding." However, these certificates were recorded in the Horry County Register of Deeds and serve as evidence that from 1949 until the Corps' activities in the 1990's that no one knew that live ordnance existed at the former CBGR, and that the U.S. was representing that the property was safe.

associated with hazardous substance release has grown.'" <u>Hemingway Transp., Inc.</u>, 174 B.R. at 166.  The "all appropriate inquiry" was meant to be flexible and each case must be analyzed on its own facts. <u>Id</u>.  The circumstances under which IPR acquired the property from IP in 1989 are distinguishable from the circumstances under which the Plaintiffs acquired Tract 19 in 1999.  In 1989, at the time IPR acquired the property, no one, including the Corps of Engineers, knew of the existence of live ordnance on the former CBGR.  In fact, as earlier noted, since 1949 the U.S. had represented that "all" lands within the former CBGR had been dedudded.  However, by 1999, the Corps of Engineers had either commissioned or conducted numerous investigations to determine whether ordnance and explosives existed at the former CBGR and had, in fact, confirmed the presence of ordnance on the property. (IP-58, Final EE/CA Conway Bombing and Gunnery Range, at 2-11, 2-13).  Before purchasing Tract 19 from IPR in 1999, Goodson Construction found ordnance on the right-of-way of Tract 19.  With some reasonable inquiry, Goodson Construction could have discovered the Corps' extensive investigative activities at the former CBGR.  Goodson Construction, however, chose to rely solely on the representations of Allen Moore, a representative of the sellers.  Goodson Construction did not even inform the attorney handling the closing of the sale of their discovery.  Under these facts, IPR qualifies as an "innocent purchaser" while Goodson Construction cannot.

### 4.    IPR Satisfies the Due Care / Reasonable Precautions Element of Section 107(b)(3)

268.    A defendant can satisfy the due care/ reasonable precautions element of the Section 107(b)(3) defense if he can establish by a preponderance of the evidence that: "(a) he

84

exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions." 42 U.S.C. § 9607(b)(3).

269.    The U.S. argues that IPR cannot establish that it exercised due care and guarded against the foreseeable acts or omissions of the responsible party because the due care inquiry is focused on due care and precautions taken *at the time of the disposal*. See Westfarm Assocs., 66 F.3d at 682-83; United States v. Monsanto Co., 858 F.2d 160, 168-69 (4th Cir. 1988); see also United States v. 150 Acres of Land, 204 F.3d 698 (6th Cir. 2000). Thus, the U.S. argues, the due care/ reasonable precautions inquiry is not applicable to IPR. Therefore, the U.S. concludes, IPR cannot satisfy this element of the Section 107(b)(3) defense. The court is not persuaded by the U.S.' reading of the above-cited cases. The U.S.' position seems to preclude all landowners who acquired contaminated property after the disposal of the hazardous substances from asserting the third party defense. In light of the relevant facts and circumstances of this case, and the approach taken by district courts in the Fourth Circuit and other circuits, the more reasonable interpretation is to question whether IPR exercised due care at the time of their discovery of the hazardous substances.

270.    CERCLA "clearly does not contemplate a party taking due care and precautions *prior to* the discovery of any hazardous substances or knowledge of the possibility of pollution." HRW Systems, Inc. v. Washington Gas Light, Co., 823 F. Supp. 318, 349 (D. Md. 1993) (emphasis in original); *see also* 1325 "G" Street Assocs., LP v. Rockwood Pigments

NA, Inc., No. 2002-1622, 2004 WL 2191709, at *8 (D. Md. Sept. 7, 2004) (stating that

CERCLA requires that due care and precautions be exercised upon discovery of hazardous

substances); Idylwoods Assocs. v. Mader Capital, Inc., 915 F. Supp. 1290, 1301 (W.D.N.Y.

1996) (stating that the defendant must exercise due care once the presence of the hazardous

substance becomes known).

271.    It is clear from the evidence of this case that IPR acted with due care and took

all reasonable precautions against the foreseeable acts or omissions of any third party at the

time they discovered that live ordnance existed on their property.  Immediately upon

discovering the existence of live ordnance, IPR ceased all activity in the area and removed all

of its property for sale in the area from the market. (Moore, Tr. 8/18/06 at 21-2).  IPR secured

the site and hired ERM-Southeast, an action which was recommended by the Corps, to

perform the removal operation. (Moore, Tr. 8/18/06 at 64-5).  Further it has never been

suggested that reasonable precautions were not taken with regard to the methods of IPR and

ERM Southeast with regard to the actual removal of the ordnance and explosives.

### E.    IP and IPR's Contribution Claims Against the U.S. Under Section 113(f)(1) Must Be Dismissed

272.    As demonstrated above, IP is a potentially responsible party with respect to the

contamination at the former bombing range and, as such, is limited in its efforts to recover

costs to bringing a claim for contribution under Section 113(f).  Aviall Services holds that a

Section 113(f)(1) claim may be brought *only* "during or following" a civil action brought

under Section 106 or Section 107(a).  543 U.S. at 167-68.  As there has been no civil action

under Section 106, and no legally supportable Section 107(a) claims against IP, the condition

precedent to the filing of the Section 113(f)(1) contribution claim has not been satisfied. Accordingly, Aviall Services requires dismissal of IP's Section 113(f) claims concerning Tract 19 and the IPR Parcels.  Similarly, IPR's Section 113(f) claims concerning Tract 19 and the IPR Parcels are dismissed because there has been no civil action under Section 106, and no legally supportable Section 107(a) claims against IPR.

### *CONCLUSION*

273.    R.E. Goodson L.L.C.'s claim against the U.S. under CERCLA Section 107(a), 42 U.S.C. § 9607(a), concerning Tract 19 fails because R.E. Goodson L.L.C. has not incurred any "costs of response."

274.    IP's claim against the U.S. under CERCLA Section 107(a) concerning the IPR Parcels fails because IP has not incurred any "costs of response."

275.    Goodson Construction's claims against the U.S., IP, and IPR under Section 107(a) concerning Tract 19 fail because Goodson Construction is a potentially responsible party without a defense to liability.  Specifically, Goodson Construction has not satisfied the requirements of the innocent purchaser exception to the 107(b)(3) defense as set forth in Section 101(35).  Accordingly, Goodson Construction is precluded from asserting claims under Section 107 of CERCLA.[27]

276.    IPR has successfully proven its claim for cost recovery under Section 107(a) against the U.S. because the costs incurred by IPR were "necessary" and "consistent with the national contingency plan."  Additionally, IPR has successfully established that it qualifies as an innocent purchaser and is entitled to the third party defense to liability under Section

---

[27] That the Goodsons are not entitled to recover costs under CERCLA does not necessarily mean that they are not entitled to damages under state tort law from the seller.  The Goodsons may proceed with their only remaining state law claim, the negligent nondisclosure claim, against IPR.  (Order 10/13/05 at 50-51).

107(b)(3). IPR incurred $13,337,159.00 in recoverable response costs. IPR is directed to file, within ten (10) days of this Order, an amended itemization of its response costs together with interest calculations up to the first day of the trial, August 16, 2006. The amended itemization should not include the following: 1) $191,000 in overtime costs incurred to meet real estate deadlines; 2) $66,000, Invoice No. SE00502, because the dates for Invoice No. SE00502 overlap with the dates for Invoice No. SE00350; and 3) $80,000, Invoice Nos. SE00209 and SE00210, because IPR could not identify the work that was the subject of these charges. IPR's interest calculation shall be in accordance with 42 U.S.C. § 9607.

277. IP and IPR's contribution claim against the U.S. under Section 113(f)(1) concerning the IPR Parcels fails in light of the principles set forth in Aviall Services, as they have not been properly sued under Section 106 or 107 with respect to the IPR Parcels.

278. IP and IPR's contribution claims against the U.S. under Section 113(f)(1) concerning Tract 19 fail because such claims are derivative of their liability for response costs on Tract 19 and Plaintiffs have not succeeded in their Section 107 response cost claim for the reasons set forth above.

**ACCORDINGLY, JUDGMENT** is granted in favor of IPR against the U.S. on its claims under Section 107 of CERCLA for cost recovery in the amount of Thirteen million, three-hundred thirty-seven thousand, one-hundred fifty-nine ($13,337,159.00) dollars, plus interest. The amount of prejudgment interest to which IPR is entitled will be calculated and determined in a separate Order. Judgment is denied as to IP and IPR's counterclaim for contribution against the Goodsons.

Judgment is also entered in favor of the U.S., IP, and IPR as to the Goodsons' CERCLA claims. This judgment shall have no preclusive effect on the Goodsons' pending state law claim against IPR.

Judgment is further entered in favor of the U.S. regarding any remaining claims of IP and IPR.

**IT IS SO ORDERED.**

s/ R. Bryan Harwell

R. Bryan Harwell

United States District Judge

December 15, 2006

Florence, South Carolina